**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

NYEISHA S. GHEE,

        Plaintiff,

                                    Civil Action No.: 3:25-cv-17-RCY

v.

                                    **JURY TRIAL DEMANDED**

PINETREE APARTMENTS, LLC,

        Defendant.

**<u>AMENDED COMPLAINT</u>**

COMES NOW Plaintiff Nyeisha S. Ghee ("Ms. Ghee"), by counsel, and moves this Court for judgment against Defendant Pinetree Apartments, LLC ("Pinetree"), for the reasons stated below:

**I.**     **<u>INTRODUCTION</u>**

1.     Early in the morning on February 20, 2024, Ms. Ghee awoke to one of her sons yelling, "Fire!"  Her two older sons quickly escaped through their apartment's front door.  But when Ms. Ghee grabbed her youngest son, three-year-old Mark, as he stood in the living room where he had been sleeping, the flames quickly filled the front doorway.  With Mark in her arms, Ms. Ghee retreated into her bedroom (referred to below as the "Primary Bedroom").  Still holding Mark in her arms, she checked to make sure that the bar on the sliding door assembly was up and then pushed the thumb latch down to unlock the door and slide the door open.  But the door would not budge.  In order to use both hands to slide the door, she placed Mark on her bed, pushed the thumb latch down again, and tried to slide the door open.  But it still would not budge.

2.     While Ms. Ghee was wrestling with the door, Mark vanished.  She searched for him, going through the front door to see if he had made it to safety outside, but he was not there.

She then rushed back into the burning apartment and resumed her search, suffering severe burns and smoke inhalation in the process. Despite her valiant efforts, Mark perished in the fire. Firefighters later found his charred body on the floor near the front door.

3.      Before Ms. Ghee and her children moved into the apartment, a work order had been filled out to "fix both sliding doors." But this work was never correctly done, and unbeknownst to Ms. Ghee, water and termites had deteriorated the supporting wooden framing behind the sheetrock wall. This supporting wooden framing was intended to hold the sliding door's frame in place. But rather than removing the sheetrock and replacing the deteriorated wood, Pinetree's agents *painted over* the sliding door's finished wood trim to mask the holes termites had eaten in the trim, thereby preventing a person in the Primary Bedroom from seeing the holes.

4.      Initially, Ms. Ghee and her family did not use the sliding glass door. But roughly 13 months after taking possession of the apartment, while preparing for an inspection by Pinetree, she discovered that she could not move the door. She reported this to Pinetree's maintenance worker. Ms. Ghee did not know what Pinetree knew or should have known – that the problem was caused by deteriorated wood behind the sheetrock in the Primary Bedroom's back wall, an area behind the sheetrock that was exclusively controlled by Pinetree. Ms. Ghee was told that the door would be repaired and did not believe otherwise.

5.      Approximately two months after the fire, a photograph was taken of the deteriorated wood in the wall at the back of the Primary Bedroom. (*See* **Exhibit 1.**) Before this photograph was taken, a putty knife was inserted into the wood to demonstrate the extent of the damage. Before the fire, sheetrock covered this deteriorated wood.



This deterioration caused the wooden framing around the sliding glass door to deflect, putting the frame out of square. As a result, the sliding glass door could not move along its track.

6.      As a direct and proximate result of Pinetree's conduct described in this Amended Complaint, Ms. Ghee suffered burns over 53 percent of her body, from her scalp down to her feet. Her face was terribly disfigured.  All five fingers on her right hand and three on her left hand had to be amputated. To date, Ms. Ghee has been hospitalized twice, for a total of 110 days, and has undergone multiple surgeries.  Her medical bills currently exceed $2.7 million.

7.      The photo below shows Ms. Ghee and her son Mark in 2021 (before the fire). (**<u>Exhibit 2</u>).**



8.     The following photos (**<u>Exhibits 3 and 4</u>**) reveal some of Ms. Ghee's injuries.





## II.    <u>JURISDICTION</u>

9.      Pinetree, a limited liability company, has filed a statement with this Court asserting that at the time of Plaintiff's original filing of her Complaint in Virginia Circuit Court and then upon removal of the action to this Court, Pinetree's sole member was Clearfield/Pinetree Apartments LLC ("Clearfield"). ECF Nos. 12 and 13 (the latter filed Under Seal).  Pinetree has further represented that at the relevant times, Clearfield's members – dozens of individuals and entities – all resided outside of Virginia, the state of Plaintiff's citizenship.

10.      As a result of Pinetree's representation that all of its members reside outside of Virginia, and Plaintiff's assertion that the amount in controversy exceeds $75,000, pursuant to 28 U.S. Code § 1332, this Court has diversity jurisdiction over this matter.

## III.    <u>VENUE</u>

11.      Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in this district.

12.      Assignment to the Richmond Division of the Eastern District of Virginia is proper under Eastern District of Virginia Local Rules 3(B)(4) and 3(C) because a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in this division.

## IV.    <u>PARTIES</u>

13.      Plaintiff NYEISHA S. GHEE is, and was at all relevant times, a resident of Virginia. As noted above, Ms. Ghee's youngest son, Mark, died in the fire.  Ms. Ghee's remaining sons, Elijah and Joshua, are ages 11 and 7, respectively. Ms. Ghee's injuries have impeded her ability to carry out her functions of everyday living and greatly hindered her ability to assist both boys.

5

14.     At all relevant times, Defendant PINETREE APARTMENTS, LLC owned and operated Pinetree Apartments, a 147-unit complex located at 3100 Pinetree Drive in the City of Petersburg, Virginia.[1]

## V.     FACTS

### The Initial Lease

15.     Effective June 1, 2022, Pinetree leased Apartment G8 to Ms. Ghee for use as a private residence by her and her three children, Elijah, Joshua, and Mark.

16.     **Exhibit 5** is an authentic copy of the initial lease by which Pinetree Apartments leased Apartment G8 to Ms. Ghee (the "Initial Lease").[2]   The following year, the parties signed another lease, an authentic copy of which is attached as **Exhibit 6.**   The two leases (collectively referred to as the "Leases") appear to be largely the same except for the monthly rent payment amount.

17.     The Leases underscore Pinetree's common-law obligation to maintain areas in the control of the landlord and to abide by applicable maintenance and building codes (which refer to conditions materially affecting the "health" or "safety" of ordinary persons):

> Except for our duty to maintain in good and safe condition all electrical, plumbing, sanitary, heating, ventilating, air conditioning, and other facilities, and except for conditions materially affecting the health or safety of ordinary persons, you accept the apartment, fixtures, and furniture as is.

*Id.* at ¶ 26.

18.     The Leases also make clear that Ms. Ghee was not permitted to repair the deteriorating wood framing surrounding the sliding glass door:

> Unless authorized by statute or by us in writing, you must not perform any repairs, painting, wallpapering, carpeting, electrical changes, or otherwise alter our property.

---

[1] The LLC is referred to herein as "Pinetree," and the apartment complex is referred to as "Pinetree Apartments."

[2] The exhibit, like all attached exhibits referred to herein, is incorporated by reference.

*Id.*  Echoing common-law obligations of areas "not in the exclusive control of the tenant," the Leases state that Ms. Ghee "must not" perform any repairs that altered the property.  Thus, the Leases prohibited Ms. Ghee from removing the sheetrock to reach the deteriorated wooden framing had she known about it (which she did not).

Pinetree and the layout of Apartment G8

19.    Pinetree Apartments were initially constructed in 1995.

20.    Building G of Pinetree Apartments, where Ms. Ghee's apartment was located, included 14 apartments.

a.    Seven of Building G's apartments were at ground level, and the other seven were immediately above. Stairs reached the second-floor apartments and were accessible from a doorway next to the front entrance of the first-floor apartments.

b.    Each of the 14 apartments contained a primary bedroom and a second bedroom.

21.    The floor plan below (**Exhibit 7**) fairly and accurately depicts the floor plan of Apartment G8 when the apartment was initially constructed, when it was first occupied, and when the fire took place.



Riffe Fire Investigations case #2402131
Measurements by Brian Riffe
Not to scale
6-3-24

22.     Apartment G8 was on the first floor of Building G. It contained two bedrooms, each at the back of the apartment – the Primary Bedroom (mentioned previously and referred to in the Exhibit 7 floor plan as "Bedroom #1") and a second bedroom (the "Second Bedroom," referred to in the Exhibit 7 floor plan as "Bedroom #2").

23.     The Primary Bedroom had an attached full bath accessible only from the Primary Bedroom. The Second Bedroom had an attached full bath accessible through either of two doors: a door from the second bedroom or a door from the hall.

24.     The Primary Bedroom contained a sliding glass door (the "Sliding Glass Door") that opened onto a concrete pad outside Apartment G8.

25.     The Sliding Glass Door assembly[3] consisted of two panels of double-paned tempered glass. One panel was stationary, and the other moved when pushed to the left.

---

[3] The "Sliding Glass Door assembly" more broadly refers to the door's aluminum frame, a moveable door slab, a lock mechanism, and a fixed door slab.

26.     At all relevant times, the Sliding Glass Door was the only door in the Primary Bedroom leading directly to the outside of Apartment G8.

27.     At all relevant times, the only window in the Primary Bedroom was the stationary glass panel that was part of the Sliding Glass Door assembly.

<u>Termite infestation and water deterioration of</u>
<u>the Sliding Glass Door's supporting wooden framing</u>

28.     Pinetree controlled the space between the Primary Bedroom's interior and exterior back walls. Before Ms. Ghee took possession of Apartment G8, water had seeped into this space, and termites had entered. This combination of water and termites deteriorated the supporting wooden framing that held the Sliding Glass Door in place, causing it to become out of square and impeding its ability to slide.

29.     Upon information and belief, before Ms. Ghee took possession of Apartment G8, termites ate holes in the finished wood trim around the Sliding Glass Door.  Also, before Ms. Ghee took possession of Apartment G8, these holes could be seen upon visual inspection of the back wall of the Primary Bedroom.  Unbeknownst to Ms. Ghee, on the day before she took possession of Apartment G8, Pinetree painted over the holes to conceal them so they could not be seen from inside the Primary Bedroom.

<u>Work orders were completed the day before Ms. Ghee moved in</u>

30.     Ms. Ghee took her walkthrough of Apartment G8 and signed her initial lease for the unit on June 1, 2022.  One day earlier, on May 31, 2022, the unit was the subject of several work orders.

31.     According to Work Order 693150, PT00002, copy attached as **<u>Exhibit 8</u>**, Pinetree performed certain repairs in Apartment G8 on May 31, 2022. The work order states "Brief Desc:

Inspection Repairs" and "Priority: High." The work order's "Problem Description" states: "The windows need to be fixed. They are difficult to open/close. MLUCAS."

32. According to Work Order 693151, PT00003, copy attached as **Exhibit 9**, Pinetree completed additional work in Apartment G8 on May 31, 2022. This work order states "Priority: High" and "Brief Desc: Chipping Paint." This work order's "Problem Description" reads: "MLUCAS--Chipping paint around window sills and sliding doors." Upon information and belief, the "chipping paint" was the damage caused by termites in the finished wood trim discussed above, painted over by Pinetree to conceal the termite damage.[4]

33. According to Work Order 693154, PT00004, copy attached as **Exhibit 10**, Pinetree performed additional work on Apartment G8 on May 31, 2022. This work order states "Priority: High" and "Brief Desc: sliding door locks." This work order's "Problem Description" states: "Fix both sliding doors. We need to ensure the locking mechanism works (MANDATORY)."

34. Any repair to the locking mechanism would have necessarily involved sliding the door. Thus, the Pinetree representative undertaking the repair would have known that the Sliding Glass Door did not slide easily, if at all, along its track.

---

[4] Ms. Ghee and her mother, Lisa Campbell, recall seeing "flying ants" by the windowsill close to the vertical track of the wide window at the front of the living room of Apartment G8. They saw holes in the windowsill and flying ants coming out of the holes. Ms. Campbell then went to the rental office and reported the flying ants. The female office worker in the rental office pulled out a piece of paper from a tray on the counter in the rental office and said, "I will put the work order in." Ms. Campbell then left. Ms. Campbell and Ms. Ghee are uncertain when these events took place, but they believe that it was around September 2022. As far as Ms. Ghee is aware, during the time she lived in Apartment G8, no exterminator or pest control person came to Apartment G8.

Also, Ms. Ghee saw ants on the floor in the Primary Bedroom on several occasions. The ants did not have wings. The ants were in front of that portion of the back wall that was to the right of the Sliding Glass Door as she faced the door. She does not recall seeing holes in the finished wood trim around the Sliding Glass Door.

35.    After May 31, 2022, no work was done on the Sliding Glass Door.  As the foregoing work orders and subsequent events indicate, before Ms. Ghee took possession of Apartment G8, Pinetree painted the finished wood trim of the Sliding Glass Door but left untouched the deteriorated supporting wooden framing behind the sheetrock of the back wall of the Primary Bedroom. Essentially, Pinetree slapped "lipstick on a pig" by painting over the damaged area.  This concealed the dangerous defect from Ms. Ghee.

36.    Pinetree's fraudulent actions and efforts to conceal the water and termite damage were compounded by Pinetree's numerous material violations of the applicable state maintenance and building Codes.  These Codes were intended to ensure the health and safety of Ms. Ghee and other invitees, but Pinetree violated them.  This concealed defect meant the only direct escape from the Primary Bedroom did not work when the fire took place.

<u>Applicable maintenance and building codes</u>

37.    Since September 1, 1973, the Virginia Uniform Statewide Building Code ("VUSBC") has been the governing building code in Virginia. The VUSBC is typically revised approximately every three years and serves as an administrative code that incorporates national model building and maintenance codes.

38.    The VUSBC further modifies national codes and outlines their application and enforcement within the state. From 1973 to 2003, the VUSBC adopted the Building Officials and Code Administrators ("BOCA") family of codes. Since 2003, the VUSBC has adopted the International Code family as its model code.

39.    When Building G was constructed in 1995, the 1993 edition of the VUSBC and the adopted and amended portions of the 1993 BOCA National Building Code were in effect. The 1993 VUSBC came into effect on April 1, 1994.

40.    At the time of the fire on February 20, 2024, the 2021 edition of the VUSBC was in effect.  The 2021 Virginia Property Maintenance Code, which incorporated the 2021 International Property Maintenance Code, was also in effect.

<u>Pinetree violated numerous health, safety, and welfare codes</u>

41.    The 2021 Virginia Property Maintenance Code Section 702.3 states:

**702.3 Doors**. Means of egress doors shall be maintained and, to the extent required by the code in effect at the time of construction, shall be readily openable from the side from which egress is to be made without needing keys, special knowledge, or effort.

In turn, the 2021 Virginia Property Maintenance Code on page 15 defines "maintained" as follows:

**MAINTAINED.** To keep unimpaired in an appropriate condition, operation, and continuance as installed in accordance with the applicable building code, or as previously approved, and in accordance with the applicable operational and maintenance provisions of this code.

The foregoing Code provisions are attached as **<u>Exhibit 11</u>**. However, as noted above, the Sliding Glass Door assembly was not maintained. Termites and water infiltration had deteriorated the supporting wooden framing that held the Sliding Glass Door frame in place. This failure to maintain constituted a violation of 2021 VPMC Section 702.3.

42.    Also, Pinetree violated Section 101.1 of the 1993 Virginia Uniform Statewide Building Code, which adopts Section 1010.4 of the 1993 BOCA National Building Code.[5]  Subject to exceptions that do not apply to Apartment G8, this Code section required that every residential sleeping room below the fourth story must be equipped with an operable means of emergency egress directly to the exterior, such as a door or operable window, and stated:

**1010.4 Emergency escape**: Every sleeping room below the fourth story in occupancies in Use Groups R and I-1 shall have at least one operable window or

---

[5] Section 101.1 of the 1993 Virginia Uniform Statewide Building Code is attached as **<u>Exhibit 12</u>**.

exterior door approved for emergency egress or rescue. The units shall be operable from the inside without the use of special knowledge, separate tools, or force greater than that which is required for normal operation of the window….

The foregoing Code provision is attached as **Exhibit 13**. In violation of Section 1010.4, there was no operable window or exterior door at the time of the fire. Specific exceptions to the provisions are not applicable in this matter.

The Sliding Glass Door

43.    Outside the Sliding Glass Door, the land was damp and sloped toward a boggy, swampy wooded area.

44.    In May 2022, when an agent or employee of Pinetree worked on the Sliding Glass Door, the door did not move easily along its track. This alerted the agent or employee that something was interfering with its movement, yet the agent or employee failed to adequately address the problem.

45.    During the fire, when Ms. Ghee tried to open the Sliding Glass Door, the supporting wood framing had deteriorated to the point that she could not make the Sliding Glass Door move.

46.    Attached as **Exhibit 14** is a photo that fairly and accurately depicts a portion of the Sliding Glass Door remaining after the fire.

Pinetree said nothing during Ms. Ghee's walk-through of Apartment G8

47.    On or about June 1, 2022, an agent or employee of Pinetree gave Ms. Ghee a walk-through tour of Apartment G8.

48.    During the walk-through tour of Apartment G8, nothing was said to Ms. Ghee about the Sliding Glass Door, the water infiltration, the termites, the deteriorated and deteriorating supporting wooden framing, or that Pinetree had painted over termite holes in the finished wood trim.

49.     As stated above, this deterioration caused the supporting wooden framing around the Sliding Glass Door to deflect, putting the frame out of the square. As a result, the Sliding Glass Door could not move along its track.

50.     At all relevant times, the termites, the entry point of the water infiltration that allowed the termites to thrive, the deteriorated and deteriorating supporting wooden framing, and access to each of them were inside the exterior rear wall of Apartment G7 or Apartment G8 and were in Pinetree's control.

51.     At all relevant times, Pinetree had the authority to prevent the water infiltration referred to above.

52.     At all relevant times, Pinetree had the authority to exterminate the termites referred to above.

53.     At all relevant times, Pinetree had the authority to make the Sliding Glass Door function properly.

54.     The termites, the entry point of the water infiltration that allowed the termites to thrive, the deteriorated and deteriorating supporting wood framing, and access to each of them were not known to or visible to Ms. Ghee before the fire, and she was not aware of them before the fire.

55.     Shortly before July 7, 2023, Pinetree posted a notice on the front door of Apartment G8 stating that it would perform an annual routine inspection of the apartment on a specified date.

56.     In response to this notice, Ms. Ghee looked around Apartment G8 to see what was not working. She tried to open the Sliding Glass Door but could not get it to move.

57.     Ms. Ghee took off from her work to be present when the inspection was scheduled, but no one came to her apartment to inspect that day. She assumed the inspection took place on another day while she was at work.

58.     Later in July of 2023, Ms. Ghee was standing in the doorway of Apartment G8 when a Pinetree maintenance man approached. She told him she could not open the sliding glass door in the Primary Bedroom and asked him to fix it.  He replied, "I got you," or words to that effect.

59.     After Ms. Ghee asked Pinetree's maintenance man to fix the sliding door so that it would open, she never tried to use it. This was because she feared snakes in the swamp behind her home.  She thought they were attracted to milk, a common folk superstition.  She never knew why the sliding door would not open the one time she tried to open it before the fire.

<u>The Fire</u>

60.     On February 19, 2024 (the day before the fire), Ms. Ghee worked as usual at her job at Walmart.   After work, she stopped by her mother's residence at about 6 p.m., picked up her three boys, and took them home to Apartment G8. She bathed three-year-old Mark and then went to bed at about 8 p.m.

61.     When Ms. Ghee first learned of the fire, she was asleep in her bed in the Primary Bedroom.

62.     As she slept, she was alerted to the fire when she heard Joshua (her middle son) yell, "Fire!"

63.     Upon learning of the fire, Ms. Ghee went into the living room to rescue her three boys.

64.     Only Mark was there when Ms. Ghee entered the living room, the two older boys having escaped through Apartment G8's front door.

65.     When Ms. Ghee entered the living room, she saw flames at Apartment G8's front door. As a result, she decided the safest course of action was to take Mark in her arms and exit through the Sliding Glass Door.

66.     Before trying to open the Sliding Glass Door, Ms. Ghee checked to ensure the bar was up and that there were no toys or anything else in the path to prevent it from sliding. Still holding Mark in her arms, she pushed the thumb latch down to unlock the door and tried to move it to her left, but it would not slide.

67.     She then placed Mark on her bed so she could use both hands to slide the door to the left.   But once again, she could not get the door to move.

68.     When Ms. Ghee turned to get Mark from her bed and exit Apartment G8 through the front door, Mark had disappeared in the smoke.  She searched and called for Mark but could not find him.

69.     Thinking that perhaps Mark had found his way through the smoke to the front door and safety, Ms. Ghee exited the apartment's front door, hoping to see Mark outside.

70.     But Mark was nowhere to be seen.  As a result, desperate and frantic to rescue Mark, Ms. Ghee re-entered her apartment and resumed her search for Mark.

71.     In the process of searching for Mark in her burning apartment, Ms. Ghee suffered horrendous burns.  The heat of the fire caused the skin of her face to melt.

72.     Finally, the heat and smoke were too much for Ms. Ghee to tolerate, and, emotionally distraught, she exited through the front door of Apartment G8 without Mark.

73.     Attached as **Exhibit 15** is a photograph that fairly and accurately depicts the exterior of Apartment G8 (the floor-level apartment) and reveals the destruction caused by the fire.



<u>Hospitalizations</u>

74.     From the scene of the fire, Ms. Ghee was transported by ambulance to Bon Secours-

Southside Medical Center.   She was immediately intubated due to the soot and swelling in her

vocal cords. After intubation, she had to be resuscitated following cardiac arrest due to her respiratory system failing from her inhalation of the smoke.

75.    Ms. Ghee was then transported to the VCU Burn Center. Within hours of arriving at the ER, she underwent her first surgical escharotomy, consisting of 22 incisions into her burned skin. This was the first of multiple surgeries that removed her burnt skin to replace it with skin grafts and artificial grafts. Further surgery required amputation on both hands – three fingers on her left hand and every finger on her right hand were amputated.

76.    Ms. Ghee endured ***eleven*** total surgeries during her initial 69-day hospitalization. For much of this time, she was restrained to her bed because her pain agitated her to the point of her bucking, pulling on her lines and tubes. Her injuries prevented her from communicating except with head nods, unable to express the incomprehensible pain she suffered. She was unable to speak at all for 21 days after the fire, requiring her to work with a speech therapist to regain her voice eventually.

77.    During her initial hospitalization, she also underwent two bronchoscopies and two tracheostomies. She endured a collapsed left lung, prolonged intubation, and tube feeding.  She also suffered great psychological pain during her hospitalization. She could not sleep due to flashbacks and nightmares about the incident, and her condition further prevented her from grappling with the loss of her son. She was not informed until the 25th day of her hospitalization that Mark died in the fire. She and her mother both struggled to let her surviving sons visit her in her disfigured condition.

<u>Going forward</u>

78.    When the planned procedures and therapy are completed, 80 to 85 percent of Ms. Ghee's body will be covered in scars of different colors, textures, and shapes. Her body and life

have been altered forever; she has and will always have horrifying permanent scarring, missing fingers, nightmares, flashbacks, and PTSD.

## VI.    COUNTS

### Count 1

### Common Law Fraud

79.    The Plaintiff incorporates paragraphs 1-78 as if set forth in full in this Count.

80.    By painting over the holes eaten by the termites in the finished wood trim around the Sliding Glass Door, Pinetree concealed a material fact from Ms. Ghee – namely, that there were termites and related water infiltration and deteriorated wood inside the back wall of the Primary Bedroom, which, in turn, interfered with the operation of the Sliding Glass Door.

81.    Pinetree's concealment was intentional and was intended to mislead Ms. Ghee.

82.    Ms. Ghee relied on Pinetree to provide her and her sons with a safe apartment.  She would not have moved into the apartment if she had known that behind the sheetrock there were termites that interfered with the operation of the Sliding Glass Door.  But by painting over the termite holes, Pinetree made sure that she would not know this information, and, before the fire, she never learned this information from any source.

83.    Pinetree's fraudulent conduct caused Ms. Ghee to suffer horrific injuries and incur millions of dollars in medical bills.

84.    Pinetree's conduct described above constitutes willful and wanton conduct, demonstrates a conscious disregard for the rights of others (including Ms. Ghee), and supports the imposition of punitive damages.

85.    As a direct and proximate result of Pinetree's fraud, Ms. Ghee has ongoing and continuous permanent damages and injuries and, as such, is entitled to recover and seeks recovery of the following:

a.   Compensation for severe bodily injuries;

b.   Past and future medical bills and expenses;

c.   Pain and suffering;

d.   Punitive damages; and

e.   Any and all other relief that this Court deems appropriate.

## Count 2

### Concealment of a Latent Defect

86.    The Plaintiff incorporates paragraphs 1-78 as if set forth in full in this Count.

87.    When Pinetree transferred possession of Apartment G8 to Ms. Ghee on June 1, 2022, there was a latent defect inside the sheetrocked back wall of the Primary Bedroom—namely, termites that were causing the supporting wooden framing behind the sheetrock to deteriorate and deflect, thereby interfering with the operation of the Sliding Glass Door.

88.     When Pinetree transferred possession of Apartment G8 to Ms. Ghee on June 1, 2022, Pinetree knew of this latent structural defect, but Ms. Ghee did not and could not have discovered it upon reasonable inspection.

89.    Pinetree had a duty to disclose this latent defect, but Pinetree purposefully failed to do so.

90.    Although not required as an element of this cause of action, Plaintiff notes that Ms. Ghee relied on Pinetree to provide her and her sons with a safe apartment.  She would not have moved into the apartment if she had known that behind the sheetrock there were termites that interfered with the operation of the Sliding Glass Door.  But Pinetree never told her this, and, before the fire, she never learned this information from any source.

91.     The conduct of Pinetree described above constitutes willful and wanton conduct. It demonstrates a conscious disregard for the rights of others (including Ms. Ghee).

92.     As a direct and proximate result of Pinetree's failure to disclose this latent defect, Ms. Ghee has ongoing and continuous permanent damages and injuries and, as such, is entitled to recover and seeks recovery of the following:

    a.   Compensation for severe bodily injuries;

    b.   Past and future medical bills and expenses;

    c.   Pain and suffering;

    d.   Punitive damages; and

    e.   Any and all other relief that this Court deems appropriate.

## Count 3

### Failure to Maintain the Inside of the Back Wall of the Primary Bedroom, An Area in Pinetree's Control

93.     The Plaintiff incorporates paragraphs 1-78 as if set forth in full in this Count.

94.     The termites, the deteriorated and deteriorating supporting wood framing, and access to them being inside the back wall of the Primary Bedroom, and the inside of this back wall being in Pinetree's control, Pinetree owed Ms. Ghee the duty, after transferring possession of Apartment G8 to her, to exercise ordinary care and diligence to maintain the inside of the back wall of the Primary Bedroom in a reasonably safe condition.

95.     As described throughout the Amended Complaint, Pinetree negligently breached the duty described above.

96.     The conduct of Pinetree described above constitutes willful and wanton conduct. It demonstrates a conscious disregard for the rights of others (including Ms. Ghee).

21

97.     As a direct and proximate result of Pinetree's conduct described above in this count, Ms. Ghee has ongoing and continuous permanent damages and injuries, and as such is entitled to recover and seeks recovery of the following:

    a.   Compensation for severe bodily injuries;

    b.   Past and future medical bills and expenses;

    c.   Pain and suffering;

    d.   Punitive damages; and

    e.   Any and all other relief that this Court deems appropriate.

WHEREFORE, Plaintiff Nyeisha S. Ghee demands judgment against the defendant Pinetree Apartments LLC in the amount of thirty million dollars ($30,000,000) in compensatory damages, plus three hundred and fifty thousand dollars ($350,000) in punitive damages, plus interest from February 20, 2024, costs, and other relief that this Court deems appropriate.

Trial by jury is demanded.

Respectfully submitted,

NYEISHA S. GHEE

By*:   /s/ Mark J. Krudys*
        Counsel

Charles H. Cuthbert, Jr. (VSB# 14519)
Richard M. Cuthbert (VSB# 82025)
CUTHBERT LAW OFFICES
A Professional Corporation
220 North Sycamore Street
Petersburg, Virginia 23803-3228
Phone: (804) 733-3100
Fax: (804) 732-4658
ccuthbert@cuthbertlaw.com
rcuthbert@cuthbertlaw.com

Mark J. Krudys (VSB# 30718)
Danny Zemel (VSB# 95073)
THE KRUDYS LAW FIRM, PLC

Truist Place, 919 East Main Street, Suite 2020
Richmond, VA, 23219
Phone: (804) 774-7950
Fax: (804) 381-4458
Email: mkrudys@krudys.com; dzemel@krudys.com
*Counsel for Plaintiff*

**<u>Certificate of Service</u>**

I hereby certify that on this 7th day of March 2025, I have electronically filed the foregoing

with the Clerk of Court using the CM/ECF system, which will send notification of such filing to

all parties of record.


    */s/ Mark J. Krudys*
Mark J. Krudys (VSB# 30718)
THE KRUDYS LAW FIRM, PLC
Truist Place, 919 East Main Street, Suite 2020
Richmond, VA, 23219
Phone: (804) 774-7950
Fax: (804) 381-4458
Email: mkrudys@krudys.com
*Counsel for Plaintiff*