**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

NYEISHA S. GHEE,

        Plaintiff,

  v.

PINETREE APARTMENTS, LLC,

        Defendant.

Civil Action No.: 3:25-cv-17-RCY

**JURY TRIAL DEMANDED**

**<u>SECOND AMENDED COMPLAINT</u>**

COMES NOW Plaintiff Nyeisha S. Ghee ("Ms. Ghee"), by counsel, and moves this Court for judgment against Defendant Pinetree Apartments, LLC ("Pinetree"), for the reasons stated below:

## I.    <u>INTRODUCTION</u>

1.    Early on February 20, 2024, Ms. Ghee woke up to one of her sons yelling, "Fire!" Her two older sons quickly escaped through their apartment's front door. But when Ms. Ghee grabbed her youngest son, three-year-old Mark, who was in the living room where he had been sleeping, the flames rapidly filled the front doorway. With Mark in her arms, Ms. Ghee retreated into her bedroom (referred to herein as the "Primary Bedroom"). Still holding Mark, she checked to ensure the bar on the sliding glass door was up, then pushed the thumb latch down to unlock the door and slide it open. However, the door would not move. To use both hands to slide the door, she placed Mark on her bed, pushed the thumb latch down again, and tried to slide the door open, but it still would not budge. She desperately grabbed and then swung a floor lamp at the sliding glass door, but she was unable to break the tempered glass.

2.     While Ms. Ghee was attempting to wrestle open and then break the glass of the sliding glass door, Mark disappeared. She searched for him, going through the flaming front door to check if he had made it outside to safety, but he was not there. She then rushed back into the burning apartment and continued her search, suffering severe burns and smoke inhalation in the process. Despite her heroic efforts, Mark died in the fire. Firefighters later found his charred body on the floor near the front door.

3.     Ms. Ghee was unable to open the sliding glass door because the vertical and horizontal wooden framing around it had rotted due to termite infestation and water damage. The rotten wood sagged at one end, making the door out of square and preventing it from sliding on its track. About two months after the fire, Plaintiff's expert took a photograph (**<u>Exhibit 1</u>** shown below) of the damaged wood in the wall at the back of the Primary Bedroom. Before taking this photo, a putty knife was inserted into the wood to show the extent of the damage. Before the fire, sheetrock covered this damaged wood.



4.      Records show that for years, Pinetree Apartments experienced widespread issues with moisture, water damage near patio doors, termite infestation, wood rot requiring major carpentry repairs, and difficult-to-move sliding glass doors. These problems affected many buildings, including Ms. Ghee's apartment, G8. They were cumulative and additive, with each issue contributing to the others. Pinetree chose to address these problems on a piecemeal basis, seeking to save money, allowing dangerous conditions to worsen. In over ***thirty*** instances since 2019, outside contractors found significant damage above and around patio sliding glass doors. At a minimum, this required the contractors to remove vinyl siding to repair flashing and prevent further water damage.[1] The contractors frequently discovered rotten wood, including jack studs (vertical supports) and the wooden framing above the doors. Many times, the deterioration was so severe that complete replacement was necessary.

5.      As noted above, a post-fire inspection of the jack stud and 2 x 4s above the sliding glass door in Ms. Ghee's Primary Bedroom showed that they were rotten, in part due to termites and water infiltration, causing the sliding glass door to be out of square and not move. The inspection confirmed that Ms. Ghee's Unit G8 required, but did not receive, the same extensive repairs conducted in over two dozen other apartments.

6.      Indeed, the previous occupant of Ms. Ghee's apartment had reported extensive termite activity and damage to Pinetree. The tenant observed and reported termite damage above the sliding glass doors in both bedrooms. She also identified and reported termite damage to the beams supporting G7's wooden patio deck (the deck above G8's patio). However, instead of replacing the rotten jack stud and wood above the sliding glass door in the Primary Bedroom and

---

[1] Flashing is a thin piece of material, usually metal, installed to prevent water from entering at joints.

replacing the sliding glass door assembly, Pinetree and its agent, South Oxford Management, LLC ("South Oxford"), painted over the finished wood trim of the sliding door to hide the holes caused by termites, preventing Ms. Ghee from noticing the damage. Ms. Ghee was unaware of the severe damage to the wooden framing that surrounded and supported the sliding glass door. Additionally, this area was solely the responsibility of Pinetree and its agent, South Oxford.

7.      As a direct and proximate result of Pinetree's conduct described in this Second Amended Complaint, Ms. Ghee suffered burns to over 53 percent of her body, from her scalp to her feet. Her face was severely disfigured. All five fingers on her right hand had to be fully amputated, and three on her left hand had to be partially amputated. To date, Ms. Ghee has been hospitalized twice for a total of 110 days and has undergone multiple surgeries. Her medical bills currently exceed $2.7 million.

8.      The photo below shows Ms. Ghee and her son Mark in 2021 (before the fire). (**Exhibit 2**).



9.    The following photos (**Exhibits 3** and **4**) reveal some of Ms. Ghee's injuries.

 

## II.    JURISDICTION

10.    Pinetree, a limited liability company, has filed a statement with this Court asserting that at the time of Plaintiff's original filing of her Complaint in Virginia Circuit Court and then upon removal of the action to this Court, Pinetree's sole member was Clearfield/Pinetree Apartments LLC ("Clearfield"). ECF Nos. 12 and 13 (the latter filed Under Seal).  Pinetree has further represented that at the relevant times, Clearfield's members – dozens of individuals and entities – all resided outside of Virginia, the state of Plaintiff's citizenship.

11.    As a result of Pinetree's representation that all of its members reside outside of Virginia, and Plaintiff's assertion that the amount in controversy exceeds $75,000, pursuant to 28 U.S. Code § 1332, this Court has diversity jurisdiction over this matter.

## III.    VENUE

12.     Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in this district.

13.     Assignment to the Richmond Division of the Eastern District of Virginia is proper under Eastern District of Virginia Local Rules 3(B)(4) and 3(C) because a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in this division.

## IV.    PARTIES

14.     Plaintiff NYEISHA S. GHEE is, and was at all relevant times, a resident of Virginia. As noted above, Ms. Ghee's youngest son, Mark, died in the fire.  Ms. Ghee's remaining sons, Elijah and Joshua, are ages 12 and 10, respectively. Ms. Ghee's injuries have impeded her ability to carry out her functions of everyday living and greatly hindered her ability to care for both boys.

15.     At all relevant times, Defendant PINETREE APARTMENTS, LLC owned and operated Pinetree Apartments, a 147-unit complex located at 3100 Pinetree Drive in the City of Petersburg, Virginia.[2]

## V.    FACTS

### A.    Nyeisha Ghee attended Dinwiddie High School, worked at Walmart, and raised three boys as a single parent, including a special needs child.

16.     Nyeisha Ghee attended Dinwiddie County public schools. Working with an Individual Education Plan ("IEP"), she graduated from Dinwiddie High School in 2014.  She is a single parent. She raised three boys.  Her oldest son, Elijah, is a child with special needs.  Ms. Ghee and her mother, Lisa Campbell, lovingly devote substantial additional time to his care and development.

17.     In 2024, Ms. Ghee worked full-time at Walmart.  It was challenging for Ms. Ghee to provide for her family; Ms. Campbell helped with the household bills.

---

[2] The LLC is referred to herein as "Pinetree," and the apartment complex is referred to as "Pinetree Apartments."

**B.      Ms. Ghee sought financial assistance to lease a safe, clean apartment; she submitted an application to the Petersburg Redevelopment and Housing Authority.**

18.      To assist with housing costs, Ms. Ghee applied for financial assistance from the Petersburg Redevelopment and Housing Authority ("PRHA"). Ms. Ghee completed an application and provided the Authority with income and costs documents. She was approved and given a voucher for rental assistance along with a list of apartments accepting PRHA vouchers. Pinetree Apartments was among the apartments on the list. Pinetree Apartments held itself out as offering "dream" homes in the heart of Petersburg, Virginia.

**C.      Pinetree assigned Unit G8 for Ms. Ghee and her children; the previous tenant of that unit had reported termite issues and damage near the sliding glass doors, but Pinetree did not take any action.**

19.      With the deadline of her voucher approaching, Ms. Ghee approached Pinetree Apartments concerning an apartment for her and her three children. Pinetree partners with PRHA to provide subsidized apartments for lower-income Central Virginians. Pinetree identified Unit G8, a then-vacant, two-bedroom apartment, for Ms. Ghee and her family. (In early June 2022, Ms. Ghee and her family would move into the unit.)

20.      During the period from approximately 2017 through the middle of 2019, Donisha Bugg lived in Apartment G8, the same apartment selected for Ms. Ghee and her family by Pinetree. In her Addendum to her Affidavit, **Exhibits 5** (Affidavit) and **6** (Addendum), Ms. Bugg stated that she saw "termite damage above the sliding glass door to my bedroom, as well as above the sliding glass door to my mother's bedroom." She "saw many small holes in the wood above the sliding glass door[s]" in both the Primary and Secondary bedrooms to the patio. On three to four occasions, she saw insects that she thought were termites. On approximately four occasions, Ms.

7

Bugg complained to Pinetree about termites and termite damage. Ms. Bugg never saw that the termite damage had been repaired.

21.     Further, from approximately 2014 to the summer of 2024, Eric Hansen lived in Pinetree Apartments, Apt. G4. On at least two occasions while on his deck smoking, Mr. Hansen saw a "whole bunch of termites swarming." **Exhibit 7**, Kunst Exhibit 3. This was in the springtime, in the morning. He also saw the wood on his deck deteriorating: "It was falling apart. All of the decks at Pinetree were deteriorating."

> **D.     Unit G8 initially failed a PRHA inspection; the apartment had severe chipping paint around the sliding glass doors, and they would not open.**

22.     PHRA inspects and approves housing prior to a tenant moving in. On May 24, 2024, PHRA employee Marrietta Paschal conducted an initial inspection of Pinetree Apartments Unit G8. The unit failed inspection. In an email describing the failed inspection, Ms. Paschal said the unit initially failed inspection "due to the sliding doors in the bedrooms and the window in the living room, having severe chipping, paint, as well as them being hard to open." An Inspection Checklist completed by Paschal indicates that Master Bedroom sliding glass door "can't open."  In the second bedroom, she wrote, "chipping paint around sliding door can't open/hard to open."

> **E.     Work orders were submitted on May 31, 2022; longstanding problems were not fixed, but instead, they were covered up.**

23.     On May 31, 2022, the unit was the subject of several work orders.

24.     According to Work Order 693150, attached as **Exhibit 8** and incorporated by reference[3], Pinetree performed certain repairs in Apartment G8 on May 31, 2022. The work order states "Brief Desc: Inspection Repairs" and "Priority: High."  The work order's "Problem Description" states: "The windows need to be fixed.  They are difficult to open/close. MLUCAS."

---

[3] All appended Exhibits are incorporated by reference.

25.     According to Work Order 693151, attached as **Exhibit 9**, Pinetree completed additional work in Apartment G8 on May 31, 2022.  This work order states "Priority: High" and "Brief Desc: Chipping Paint." This work order's "Problem Description" reads: "MLUCAS-- Chipping paint around window sills and sliding doors."   Upon information and belief, the "chipping paint" was the damage caused by termites in the finished wood trim discussed above, painted over by Pinetree to conceal the termite damage.[4]  Notably, on October 3, 2025, Pinetree produced a video of an irate tenant scolding an apparent Pinetree employee for painting over mold on her window seal. *See* **Exhibit 10**, attached hereto. In the video, the tenant shows the shoddy work.

26.     According to Work Order 693154, attached as **Exhibit 11**, Pinetree performed additional work on Apartment G8 on May 31, 2022. This work order states "Priority: High" and "Brief Desc: sliding door locks."  This work order's "Problem Description" states: "Fix both sliding doors.  We need to ensure the locking mechanism works (MANDATORY)."

27.     Any repair to the locking mechanism would have necessarily involved sliding the door.  Thus, the Pinetree representative undertaking the repair would have known that the sliding glass door did not slide easily, if at all, along its track.

**F.    During the June 1, 2022 walk-through, Ms. Ghee did not see the termite holes reported by Ms. Bugg as they had been painted over; lubricant was used to mask the out-of-square sliding glass door.**

---

[4]  Ms. Campbell recalls seeing "flying ants" by the windowsill close to the vertical track on the inside of the wide window at the front of the living room of Apartment G8. Ms. Campbell saw holes in the windowsill and flying ants coming out of the holes. Ms. Campbell is uncertain when this event took place, but she believes that it was around September 2022.

Also, Ms. Ghee saw ants on the floor in the Primary Bedroom on several occasions. The ants did not have wings. The ants were in front of that portion of the back wall that was to the right of the sliding glass door as she faced the door from inside her apartment. She does not recall seeing holes in the finished wood trim around the sliding glass door.

As far as Ms. Campbell and Ms. Ghee are aware, during the time Ms. Ghee lived in Apartment G8, no exterminator or pest control person came to Apartment G8.

28.    After May 31, 2022, no work was done on the sliding glass door.  As the foregoing work orders and subsequent events indicate, before Ms. Ghee took possession of Apartment G8, Pinetree painted the finished wood trim of the sliding glass door but left untouched the deteriorated supporting wooden framing behind the sheetrock[5] of the back wall of the Primary Bedroom. This can be discerned from the fact that when Ms. Ghee took possession of unit G8, the termite holes above and around the sliding glass doors were no longer discernible. Extensive repairs had not been undertaken. Lubricant was applied to the out-of-square doors. Only superficial touch-ups were done to the systemic problems present. Essentially, Pinetree slapped "lipstick on a pig" by painting over the damaged area.  This concealed the dangerous defect from Ms. Ghee.

29.    On or about June 1, 2022, an agent or employee of Pinetree gave Ms. Ghee a walk-through tour of Apartment G8.

30.    During the walk-through tour of Apartment G8, nothing was said to Ms. Ghee about the sliding glass doors, the water infiltration, the termites, the deteriorated and deteriorating supporting wooden framing, or that Pinetree had painted over termite holes in the finished wood trim.

31.    As stated above, this deterioration caused the supporting wooden framing around the sliding glass door to deflect, putting the frame out of square. As a result, the sliding glass door could not move along its track.

32.    At all relevant times, the termites, the entry point of the water infiltration that allowed the termites to thrive, the deteriorated and deteriorating supporting wooden framing, and

---

[5] "Sheetrock" is a brand name for drywall that has become colloquially synonymous with drywall. Both refer to a panel made of gypsum plaster pressed between two thick sheets of paper, widely used in the construction of interior walls and ceilings. The terms are used interchangeably here, as they are used interchangeably in the source documents.

access to each of them were inside the exterior rear wall of Apartment G7 or Apartment G8 and were in Pinetree's control.

33.    At all relevant times, Pinetree had the authority to prevent the water infiltration mentioned above, to eliminate the termites, to repair the wood rot damage, and to ensure the sliding glass doors functioned properly.

34.    The termites, the entry point of water infiltration that allowed them to thrive, the deteriorated and deteriorating supporting wood framing, and access to each of these were not known to or visible to Ms. Ghee before the fire, and she was not aware of them prior to the fire.

**G.    On June 1, 2022, Ms. Ghee signed the lease to rent Unit G8.**

35.    Effective June 1, 2022, Pinetree leased Apartment G8 to Ms. Ghee for use as a private residence by her and her three children, Elijah, Joshua, and Mark.

36.    **Exhibit 12** is an authentic copy of the initial lease by which Pinetree Apartments leased Apartment G8 to Ms. Ghee (the "Initial Lease").[6]   The following year, the parties signed another lease, an authentic copy of which is attached as **Exhibit 13**.   The two leases (collectively referred to as the "Leases") appear to be largely the same except for the monthly rent payment amount.

**H.    Unit G8 had two bedrooms with sliding glass doors leading to a patio.**

37.    Building G of Pinetree Apartments, where Ms. Ghee's apartment was located, included 14 apartments.   Seven of Building G's apartments were at ground level, and the other seven were immediately above. Stairs reached the second-floor apartments and were accessible from a doorway next to the front entrance of the first-floor apartments.   Each of the 14 apartments contained a primary bedroom and a second bedroom.

---

[6] The exhibit, like all attached exhibits referred to herein, is incorporated by reference.

38.    The floor plan below (**Exhibit 14**) fairly and accurately depicts the floor plan of Apartment G8 when the apartment was initially constructed, when it was first occupied, and when the fire took place.



Riffe Fire Investigations case #2402131
Measurements by Brian Riffe
Not to scale
6-3-24

39.    Apartment G8 was on the first floor of Building G. It contained two bedrooms, each at the back of the apartment – the Primary Bedroom (mentioned previously and referred to in the Exhibit 14 floor plan as "Bedroom #1") and a second bedroom (the "Second Bedroom," referred to in the Exhibit 14 floor plan as "Bedroom #2").

40.    The Primary Bedroom had an attached full bath accessible only from the Primary Bedroom. The Second Bedroom had an attached full bath accessible through either of two doors: a door from the second bedroom or a door from the hall.

**I.    The sliding glass doors.**

41.    The Primary Bedroom contained sliding glass doors that opened onto a concrete pad outside Apartment G8.

12

42.     The sliding glass door assembly[7] consisted of two panels of double-paned tempered glass. One panel was stationary, and the other moved when pushed to the left.

43.     At all relevant times, the sliding glass door was the only door in the Primary Bedroom leading directly to the outside of Apartment G8.

44.     At all relevant times, the only window in the Primary Bedroom was the stationary glass panel that was part of the sliding glass door assembly.

**J.     Pinetree Apartments had well-documented problems related to Ms. Ghee's claims that went unaddressed.**

45.     Documents obtained by the Plaintiff in discovery reveal that during the relevant period, Pinetree Apartments had: a) extensive issues with moisture and water damage, including near patio sliding glass doors; b) termite infestation and related wood damage; c) water rot requiring significant carpentry repairs above and near sliding glass doors; and d) immovable or difficult-to-move sliding glass doors. Each of these problems was documented throughout the Pinetree Apartment complex, affecting many buildings and units, including Ms. Ghee's apartment, G8. The issues were cumulative and additive, meaning each one worsened the others. In the case of Apt. G8, these problems prevented Ms. Ghee from opening the sliding glass door in the Primary Bedroom on the morning of the fire, which caused her horrific burns, months of hospitalization, intense pain, multiple surgeries, and permanent scarring over most of her body.

**K.     Pinetree Apartments were built on the edge of a vast swamp; moisture issues and water damage were reported by tenants throughout the Pinetree complex.**

---

[7] The "sliding glass door assembly" more broadly refers to the door's aluminum frame, a moveable door slab, a lock mechanism, and a fixed door slab.

46.     Pinetree Apartments were originally built in 1995. The complex was built on the edge of a large swamp. Aerial images of the complex, obtained from the Official Website of the City of Petersburg and attached as **Exhibit 15**, show seven of the 16 apartment buildings, including Building G, bordering either the swamp or its tributaries, runouts, and wetlands.

47.     Tenants at Pinetree Apartments frequently reported moisture problems, water leaks, and related damage, especially in master bedrooms near or above patio sliding glass doors. The complaints of moisture problems included Unit G8.  Included at **Exhibit 16** is a voicemail message from Diane Taylor, a prior resident of G8, stating, "there is black mold growing in our apartment."

    a.     There are numerous other examples of tenants reporting moisture problems, water, leaks, and related damage, especially near or above patio sliding glass doors. For example, on January 8, 2020, tenant Alyssa Allen sent Pinetree photos of mold on the edge of her patio sliding glass doors, along with pictures of her efforts to clean it.

    b.     On March 24, 2020, the tenant in Unit A2 reported "living room ceiling leak leaking." On October 18, 2020, the resident in Unit L8 observed, "[t]here appears to be black mold growing inside the windowsills of the windows and patios." The issue persisted. On January 6, 2021, the resident complained, "[t]here is also mold on the wall near the patio in the second room."

    c.     Similarly, on May 4, 2020, tenant Michael Artis sent Pinetree a video and picture of his wet floor at the base of his sliding glass door.

    d.     On July 21, 2020, Holly Johnson sent pictures to Pinetree showing water pouring into her apartment from around the edges of her master bedroom sliding glass doors. She said she was forced to "stuff plastic in the hole to cover it with tape to try to keep the water out." The photos are included at **Exhibit 17**. Ms. Johnson said she contacted management multiple times, and maintenance came by but said a contractor would need to fix the problem. She

14

emphasized, "my request to get this fixed continues to get ignored." She observed that water was "pouring in from outside when it rains."

e.    Also included herein are two undated videos produced by Pinetree. **Exhibits 18** and **19** are videos of water rapidly dripping through the top of a patio sliding glass door. **Exhibit 20** is a video showing water accumulating on the carpet near the corner of a sliding glass door. Additionally, **Exhibit 21** includes photos of extensive paint chipping around a sliding glass door.  **Exhibit 22** contains photos of water damage and chipping paint.

f.    On September 8, 2020, a service manager observed "rotten and decaying" facial boards caused by inadequate gutter cleaning. He also noted "water leaks around sliding glass doors around roof vent collars and along walls in the apartment."

g.    On October 18, 2020, the tenant in Unit L8 reported black mold growing inside the window seals of the windows and patio doors.

h.    On November 14, 2020, Keidre' Lewis-Davis sent an email to Pinetree with "Water coming inside my Apartment!!!" in the subject line. (Exclamation marks in original). She complained that for over a year, "water has been leaking through my patio door into my home causing mold and mildew." She was told that contractors were supposed to come and perform repairs, but "that never happened.  She added, "maintenance came by in November of last year and check it, but nothing was ever done to resolve the issue."

i.    On November 11, 2021, the resident in H10, Chametra Ligon, reported that she had "growth on all her windows and that way she was concerned because her and her son had been getting sick more often."

j.    On November 23, 2021, Pinetree employee Dionne Mason sent an email to Nadra Yohannes, South Oxford's Regional Manager, stating that she had contacted MBS, a

contractor employed by Pinetree to perform repairs, to submit an estimate regarding patio repairs. According to Mason, six units required repairs: E1, D3, H10, G3, G4, and M4, but she noted that "E1 had to be completed in 30 days." G4 was Eric Hansen's unit. In his attached affidavit, he observed that his unit and other decks were severely deteriorated. Pinetree did not appear to provide documentation proving that the decks mentioned above had all been repaired.

       k.    On September 24, 2023, resident Hester Graves in Unit H1 emailed Pinetree to report a leak in the master bedroom above the sliding glass door. Graves noted, "[w]hen you touch up over the door it's soft to the touch."

48.    As reflected in work orders, tenants in other units voiced similar complaints. For example, a March 24, 2023 work order for Unit L10 described that "ceiling need repaired (sic) in main bedroom (whole ceiling missing)," and that the "master bedroom ceiling peeling." A November 3, 2023 work order for Unit F8 noted the problem that "[a]round the windows and patio doors are showing signs of moisture." Similarly, the January 18, 2024, work order for Unit F1 noted that the "second bedroom around patio door has signs of moisture." The January 29, 2024 work order for Unit H8 also noted "front window and patio door mildew again." A February 13, 2024 work order for Unit F2 noted that "mold has collected on the window sills."

**L.    Termites had infested the buildings.**

49.    The moisture and wet conditions mentioned above attracted termites. There is significant evidence of termite infestation in the apartments and resulting damage, including near Ms. Ghee's apartment during the relevant period (the time preceding and during Ms. Ghee's occupancy of Unit G8).

50.    According to Plaintiff's expert, Robert Kunst, the most common type of termite in the Petersburg, Virginia area is the Eastern Subterranean Light Termite (Reticulitermes

virginicus). Kunst has provided an affidavit in this case, which is attached as **Exhibit 23**. Kunst notes that these termites are often found in damp environments, such as the site of the Pinetree complex.

51.    Kunst notes that it is not surprising that termites infested various Pinetree Apartment buildings. According to Kunst, Eastern Subterranean Light Termites easily travel from one building to another nearby, covering a radius of about half a mile from their nest. A Google Earth image showing approximately a half-mile radius from Apartment G8 is included at **Exhibit 15**.

52.    Documents obtained from Pinetree's and South Oxford's external exterminator, PestNow, reveal that termites had infested the complex buildings. The documents include references to termite activity at Pinetree beginning in 2019.[8] The vast majority of the structures were affected.

53.    On February 25, 2019, during an inspection, a technician identified "live wood destroying insects" in Unit E3. He recommended treating the entire Building E for termites. On March 5, 2019, technicians applied a termite treatment to the exterior of Building E, which cost $2,040.

54.    The same situation then occurred with Building N. On March 13, 2019, during an inspection, a technician found evidence of wood-destroying insects and termite damage. Then, on March 18, 2019, technicians treated the exterior of Building N for termites for $3,000.

55.    Also on March 18, 2019, PestNow conducted a wood-destroying insect inspection of Buildings A through P and the clubhouse. Visible live termites were observed on the exterior

---

[8] Plaintiff agreed to restrict her request for documents to the time beginning in 2019, but a document produced by PestNow implies that there may have been earlier treatments and that the issue may extend far back in time.

foundations of Buildings B, C, **G**, J, K, O, and P. Treatment for termites was recommended for these structures. The inspection report noted that "some degree of damage, including hidden damage, may be present," and advised the buyer to "contact a qualified structural professional to determine the extent of the damage and the need for repairs if any questions arise" regarding the termite damage. The report also noted that the structures may have been previously treated for wood-destroying insects, evidenced by preexisting drill marks and old termite bait stations found.

56.     On April 4-5, 2019, technicians treated the entire exterior perimeter of buildings B, C, **G,** J, K, O, and P for termites. This extensive two-day treatment cost Pinetree $21,000. The previous termite treatment was billed as "Commercial Termite Treatment," but this work was billed as "Settlement Termite Treatment House." It appears that Pinetree management became aware of their costly termite problem and purchased warranties with PestNow, including a termite warranty for Building G specifically. PestNow's Termite Control Warranty with Pinetree Building G was issued on April 5, 2019. Pinetree secured individual termite warranties for its individual buildings before the buildings were combined under one warranty.

57.     Following the initial warranty agreements, on April 26, 2019, termite treatment was performed at the Pinetree pool house and invoiced as "Warranty Work Termite," with $0 due upon treatment. The following year, on May 6, 2020, a technician performed an exterior termite reinspection of Building **G**, invoiced for $98. The invoice notes that "Pinetree staff is aware that if an interior inspection is needed that they are to contact us. The annual [warranty] inspection for termites is only an exterior inspection."

58.     On February 5, 2021, Kim Saunders, a tenant in F6, reported "some type of insect that appears to look like termites not sure." **<u>Exhibit 24</u>** is a voice-mail message from Ms. Saunders complaining, "the termites have taken over." She reported them crawling on the kitchen floor and

bathroom. *Id.* The assigned Pinetree technician reported finding bugs that "look like flying ants." During a home inspection on February 17, 2021, a PestNow technician then found "swarmer termites in bathroom tub in Unit F6." A photo of the swarming termites is included at **Exhibit 25**. He recommended a full perimeter soil treatment trench. He warned, "termites are very likely to swarm again after treatment." He then treated the exterior of Building F for termites on February 23, 2021.[9]

59.     According to documents subpoenaed from PestNow, the next termite sighting was on March 7, 2023. A technician was treating units for roaches when he found evidence of termite activity along a window frame inside Unit C8. On March 13, 2023, the unit's exterior and interior were treated for termites.

60.     A technician performed a termite reinspection later the same year, on September 25, 2023. He found evidence of termites, termite shelter tubes, and termite galleries in the pool house; the exposed wood in the interior of the pool house was treated two days later.

61.     On February 13, 2024, Pinetree Property Manager Crystal Spruill emailed PestNow requesting an inspection for Units F6 and E8 after tenant complaints. Two days later, PestNow inspected unit F6 and found no signs of active termites. It was not specified if this was an interior or exterior inspection.

62.     Spruill informed South Oxford Regional Manager Nadra Yohannes on March 8, 2023, that "Apt C8 is swarming with termites." PestNow supervisor Rhonda Grubbs stated that she spoke to the tech, and he confirmed they were termites.

---

[9] The entry indicates that even when termites are present in the interior, PestNow only treated the exterior.  The documents indicate that Pinetree may have made insufficient requests upon PestNow to treat the interior spaces of the buildings.

63.     On March 30, 2024, there was an exterior termite reinspection with no termite activity visible.

64.     With regard to Unit O5, on May 8, 2024, the tenant reported "thousands ants coming from the balcony door &amp; (sic) around the trim of the carpet by the balcony is where they be it&apos;s (sic) a hole that they coming thru they near my dresser…" Though Pinetree's work order notes that the unit was "added to the extermination list," there are no corresponding work orders from PestNow showing that any inspection for O5 was requested or completed.

65.     The most recent record of PestNow's termite work shows that, on February 13, 2025, a technician performed an exterior inspection of all Pinetree buildings and found termite activity in Units F6 and E3. The technician again notes that "Property management is aware that this inspection is only an exterior inspection. Inspections for the interior must be requested by management." Upon information and belief, PestNow only incidentally found termites in apartment interiors when their technicians were already in the interiors to inspect and/or treat other pests.

66.     The above records show that Pinetree Apartments were overrun by termites during the relevant period. Thus, there is both documented termite damage throughout the Pinetree complex during the relevant time period and sworn statements from former tenants concerning the same. Further, the extensive exterior termite treatments performed by PestNow suggest Pinetree was fully aware of the issue. And PestNow explicitly informed Pinetree of the structural risks of wood-destroying insects to their apartment buildings and the hidden damage that can occur.

**M.    Problems with the sliding glass doors were reported regularly.**

67.     Documents produced by Pinetree on September 22, 2025, refer to numerous problems with sliding glass doors, including that the doors could not be opened or were damaged

by moisture. These problems include: Unit E10, April 1, 2021 (Screen door "does not move" "unable to open"); Unit H1, March 28, 2022 ("patio door won't open"); Unit F1, June 20, 2023 and July 7, 2023 ("master bedroom sliding door will not open correctly and will not open"); Unit L10, July 27, 2023 ("master bedroom sliding door does not open or close like it is jammed"); Unit O8, September 28, 2023 ("latches on patio door is broken on both doors"); Unit F1, Jan. 18, 2024 ("master bedroom patio door has a huge crack and will not open," the matter was termed a "window moisture issue" by the Pinetree technician, the door was repaired by MBS Construction); Unit F2, Feb. 13, 2024 ("patio door needs to be replaced").

### N. Pinetree Apartments' sliding glass doors failed Code inspection.

68.    Indicative of systemic problems, Pinetree Apartments' sliding glass doors failed City Code inspection. The City of Petersburg Code Compliance Division inspected certain units at Pinetree Apartments. During an October 5, 2021, inspection of Unit E1, the City's Code Compliance inspector documented "damaged drywall located above rear exit, causing damage to wall and door frame." In the hallway, the inspector observed "multiple holes … in and along laundry room ceiling due to water damage." The inspector ordered, "**all affected material needs to be Cut out, replaced, and sealed to prevent organic growth.**" (Emphasis in original). A $300 fine was imposed for the violation. The inspector also noted that the rear sliding door was "improperly fitted" and "swollen" from "constant contact with water." An additional $300 fine was imposed for that violation. The inspector identified multiple code violations and imposed fines totaling $800.

### O. Pinetree Apartments frequently failed PRHA move-in inspections.

69. Pinetree Apartments frequently failed PHRA move-in inspections. For instance, on March 19, 2020, Unit A7 failed inspection after Inspector Robin Hood identified issues such as "floor weak at bathroom entry" and "sliding door lock not working properly in master bedroom."

70. On July 13, 2022, Housing Inspector Marrietta Paschal emailed Pinetree Apartments regarding reinspection notices for three units she inspected in June 2022. Paschal cautioned, "I will be back out next week and if the units do not pass, I will unfortunately have to place them in abatement and hold HAP funds until they are corrected."

71. Pinetree did not seem to take PRHA inspections seriously. On July 20, 2022, Paschal expressed frustration about a failed inspection of Unit D3 for John Smith. Paschal told the Pinetree Apartments Manager and the South Oxford Regional Manager, "I came out to reinspect on July 20, 2022 and nothing had been taken care of…" She noted, "this unit is not up to HQS standards" and warned, "if it has not been taken care of I will have to place it in abatement, and the client will be issued a voucher to move and search for a new unit."

72. On July 20, 2022, another apartment, much like G8, needed reinspection. On February 8, 2024, Lonnie Stevenson, a Coordinator with Petersburg Code Enforcement, informed Pinetree Apartments that Rachel Hines, the tenant in Unit F2, complained, among other things, that the windows and patio door "haven't been repaired which is causing mold moisture and cold air to pass through."

73. Even when units passed PRHA inspection, required repairs were identified by Inspector Paschal. For example, on April 1, 2024, the inspected unit passed inspection but "with comments." Paschal sent Pinetree a picture of the wall and trim by the sliding door in the master bedroom. Paschal observed, "you stated that you would have the contractors come out to make the repairs and send a picture of when it is done."

**P.    The aforementioned problems required costly construction to repair.**

74.    Moisture issues and shoddy workmanship around patio deck sliding glass doors required extensive repairs by multiple construction contractors.    These repairs preceded Ms. Ghee's original occupancy (June 2022) and continued through, and after, the date of the fire (Feb. 20, 2024). According to contractors, the wood surrounding the doors was oftentimes "rotten" – the same as Ms. Ghee's allegations in the current case.

75.    In July 2019, extensive repairs were made to Unit N1, presumably to the sliding glass door, as the repair description notes "Framing and Sheathing," "Door," and "Vinyl Siding." Importantly, the band board was entirely replaced, costing Pinetree $4,067.55; the repair in total cost $7,557.55.  The band board was horizontal framing above the sliding glass door. The repair duplicates the findings of Plaintiff's experts in Unit G8 after the fire.

76.    On September 25, 2020, Pinetree received a signed proposal to repair "Multiple Patio door Leaks." An email indicated that eight units were affected. An October 21, 2020 invoice indicates that units G1 and G4 were among the eight units affected. The work involved removing the existing siding, adding flashing around patio doors, and reinstalling the existing siding. Mueller Builders' invoice for the work totaled $6,800.

77.    On March 1, 2021, Arthur Mendez, a contractor hired by Pinetree to investigate water damage in the apartments, found extensive and costly damage. In Unit E3, he observed water collecting on the inside of the windows, cells, and drywall jams. In Unit H4, he determined that the vented soffit and fascia were damaged. In Unit K8, Mendez found water penetrating the wall from the deck above. He saw "splashing on the concrete patio and penetrating the gaps in the sill and siding." He proposed replacing the "water damaged materials," including drywall, and adding flashing beneath the siding.

78.     Later in the year, Mendez recommended even more extensive repairs for water damage to Unit H5. On September 15, 2021, he recommended a comprehensive 11-item demolition and repair plan for the roof, soffit, gutter, and porch/balcony, totaling $21,043. Photos show water damage and mold on the apartment's exterior.

79.     On June 10, 2021, Mueller Builders invoiced Pinetree for the following: "removed siding, installed new flashing around patio doors, then reinstalled the siding on six (6) units." The cost of the work totaled $4,250.

80.     On February 8, 2022, the tenant in D3 reported to Pinetree the following problem concerning his patio door in the master bedroom: "there is a hole in the wall near it from previous leak that never got repaired."

81.     In or about March 2022, THS National, LLC repaired the patio door in unit E1 (and possibly E2) for "rotten framing." The work totaled $6,768.

82.     MBS Construction ("MBS") also performed a significant amount of carpentry repairs at Pinetree. Extensive repairs to the area above and around the sliding glass in Unit O10 were made by MBS in April 20, 2022. The invoice for the work totaled $6,000. MBS "[r]emoved sheet rock from ceiling of bedroom and around patio door in bedroom, […] repaired sheet rock around second bedroom sliding patio door. … Repaired flashing on patio above patio doors to resolve leak issue. That will included (sic) removing vinyl siding and reinstalling. **Replaced studs in the wall and header across patio door in first bedroom.**" (Emphasis added.) A "header" is a horizontal beam that carries the load above the sliding glass door assembly, and is supported by jack studs. Both were replaced. The reference is exactly where decaying wood was found above the sliding glass door in G8 following the fire.

83.     A month later, MBS carried out another demolition and repair above the sliding glass door of Unit P1.  On May 23, 2022, MBS invoiced a $4,000 repair that "[r]emoved sliding glass patio door cut out sheet rock, removed **rotten header above door**, removed insulation from exterior wall removed **rotten** door jack removed backside of vinyl siding from the exterior. Replaced **rotten** two by fours in the wall, Reinstalled new insulation. Reinstalled vinyl siding and J channel, reinstall patio door, **replaced sheet rock** around patio door and mud and tape one coat. Repaired flashing on patio above door." (Emphasis added.)  Again, a rotten header above the sliding glass door was replaced.  Again, that is the same damage found above the Primary Bedroom sliding glass door in Ms. Ghee's apartment.  Her apartment required the same type of repair, but it was not done.

84.     A June 21, 2022 invoice for $3,400 notes a repair to the siding above the patio door in Unit F8. The construction worker(s) "cut out sheet rock above patio sliding door, [and] **cut out rotten header above patio door**…," then replaced and reinstalled materials. (Emphasis added). An August 2, 2022 invoice for unit C12 notes that they "**cut out wet, damaged sheet rock from ceiling of bedroom and above patio door**" and "[r]emoved exterior siding above patio sliding door." (Emphasis added). They then replaced the header and installed new Tyvek and flashing above the patio door, costing Pinetree $3,200 in total. Another work invoice for $4,375 from August 2, 2022 on unit D3 describes that they "**cut out and removed wet damaged sheet rock from around both bedroom patio doors**," and "also kilzed and bleached around bedroom number one patio door." (Emphasis added). An August 17, 2022 work invoice on unit O10 details removing "vinyl siding from above sliding glass door, removed flashing from underneath patio band board, reflash above door and added new Tyvek to wall."

85.    A February 6, 2023 work invoice on unit K1 outlines removing the master bedroom sliding patio door and repairing the jamb leg and patio door roller and repairing sheet rock around the interior of patio door.[10] Another February 6, 2023 work invoice on unit M3 details that they "sealed, flashing and patio and vinyl corner coming down side of upper balcony." This repair cost $3,200. A work invoice on unit E8 from March 10, 2023 describes work done, including "cleaned moldy areas from patio, sliding glass doors in both rooms, repaired minor sheet rock repair. Sealed and painted areas." A May 11, 2023 work invoice on unit O10 notes that they "repaired flashing and installed Tyvek… installed flashing under bottom layer of shingles from where first row of shingles and starter was installed wrong. … Repaired flashing under sliding glass door and sealed."

86.    The work invoice from June 26, 2023 on unit K8 notes that they "repaired flashing across both patios above sliding glass doors. **Replaced Rottenwood (sic) above master bedroom, patio door and replaced. Celtics on area**. Installed Tyvek on walls of both patio door areas." The invoice totaled $3,200. (Emphasis added). An October 31, 2023 work invoice on unit D5 recounts that they "repaired sheet rock above patio door. Repaired siding and flashing, above patio also had to repair gutter." Another October 31, 2023 work invoice on unit H1 totaling $4,200 notes that they "cut out and Removed damaged sheet rock from bedroom wall above patio door. removed 4 x 4 post under exterior deck that was not installed properly. … Replaced all **rotted** Celtics…" (Emphasis added).

---

[10] Included at **Exhibit 26** is a recording of the tenant in Unit K1 calling for "like the 5th time" regarding a patio door master bedroom leak.  She reported water coming in. She observed that the leak occurred every time it rains.

87.     A December 4, 2023 work invoice on unit J6 outlines that they "repaired patio door header. Replaced flashing and installed tyvex (sic) on exterior wall. … Repaired sheetrock on wall around patio door." A work invoice from February 23, 2024 on unit J3 notes work done, including "removed two sections of glass panel from patio sliding door repaired roller guides on patio door and repaired roller wheels on patio door. Reinstall patio doors into the frame adjusted lock on the patio door."

88.     The May 30, 2024 work invoice on unit H3 notes that they "cut out and removed interior sheet rock above patio door and section on ceiling. … **Cut out and removed all rotten wall sheeting**. **Removed double 2 x 10 rotten header removed section of rotten wall plate on top**…. Installed a drip edge on top under the patio decking boards." (Emphasis added). These repairs cost $5,275.

89.     A work invoice from May 31, 2024 on unit E1 notes that they "repaired wall and installed wall wrap also replaced flashing and drip edge. Replace one piece of vinyl siding that was nailed through the face."

90.     A work invoice on unit O6 from August 2, 2024 outlines that they "**removed flashing drip edge that was installed upside down underneath the band board of patio**. Reinstalled flashing correctly…. Repaired sheet rock in both bedrooms around patio doors. Cleaned and painted one coat over discoloration on sheet rock." (Emphasis added).

91.     Subsequent to the fire, problems with sliding glass doors persisted. An April 4, 2025 work invoice on unit N2 notes that they "removed glass patio door. Removed door rollers from patio door leveled patio door threshold door was not level purchased and installed two new rollers onto patio door…"

**Q.     Pinetree recognized that patio sliding glass doors needed immediate repairs.**

27

92.    In August 2020, Pinetree Apartments Manager Ebone Gamby identified eight units across multiple buildings with leaking patio doors. She observed that three "are having the worst problem, but the other five are headed down the same path."

93.    On April 28, 2022, South Oxford Regional Manager Nadra Yohannes asked MBS to inspect the patio door in Unit D3, stating, "we have water damage that needs repair."

### R.    Pinetree knew that it was not making timely repairs of its patio sliding glass doors.

94.    Pinetree knew it was not making repairs promptly and internally blamed one of its contractors in emails. Pinetree Apartments Manager Dionne Mason wrote in a December 29, 2021 email to South Oxford's Regional Manager about the patio door repairs needed for Unit E1, complaining that "Mueller [a contractor] has not been dependable for months. The delay can result in a fine for Pinetree and could cause a strain on the property manager and inspector working relationship, by any and everything going forward to be written up, with no lee way (sic), strict deadlines once the trust is broken between the property manager and inspectors."[11]

### S.    Pinetree carried out repairs on a piecemeal basis, presumably to save money.

95.    The foregoing documents indicate that the areas above Pinetree Apartments' sliding glass doors regularly collected water, creating the conditions favored by termites. According to the documents, rotten wood was regularly found in the area around and above the sliding glass doors. Indeed, there are at least **eighteen instances** of issues (moisture, wood rot, etc.) near/with sliding

---

[11] Although the documents show that Pinetree was slow to respond to maintenance requests, it quickly noticed negative online reviews. Pinetree had hired a company to monitor its reviews and worried about negative feedback. (PINETREE003071).

glass doors during the relevant time period. The documents and events cited above substantiate Plaintiff's assertion that Pinetree slow-walked repairs[12] and hid wood damage from Ms. Ghee.

96.     Thus, the conditions found in the wooden support above the sliding glass door in Ms. Ghee's Primary Bedroom was not a one-time event, but instead typical for the units. Indeed, the breadth of the problem and MBS's criticism of the original carpentry work indicate that the foregoing problems may have been widespread.  *See,* for example, the notes accompanying the August 2, 2024 repairs to unit O6, stating, "Removed flashing drip edge that was installed upside down underneath the band board of patio."

**T.     Problems in the walls are the obligation of the lessor/owner.**

97.     The Leases underscore Pinetree's common-law obligation to maintain areas in the control of the landlord and to abide by applicable maintenance and building codes (which refer to conditions materially affecting the "health" or "safety" of ordinary persons):

> Except for our duty to maintain in good and safe condition all electrical, plumbing, sanitary, heating, ventilating, air conditioning, and other facilities, and except for conditions materially affecting the health or safety of ordinary persons, you accept the apartment, fixtures, and furniture as is.

98.     The Leases also make clear that Ms. Ghee was not permitted to repair the deteriorating wood framing surrounding the sliding glass door:

> Unless authorized by statute or by us in writing, you must not perform any repairs, painting, wallpapering, carpeting, electrical changes, or otherwise alter our property.

---

[12] Pinetree needed Beachwold Residential's approval to carry out necessary repairs around the patio doors. (Beachwold Residential owns South Oxford.) On April 12, 2022, South Oxford Regional Manager Nadra Yohannes emailed Rob Glass, Vice President of Asset Management at Beachwold Residential. Yohannes informed Glass that Pinetree's Unit 10 "has severe water damage around both patio doors. It's similar to the issues we've had with the other units. Estimated cost is $6,800, material and labor included... Do you approve with moving forward[?]" Subsequently, Glass negotiated with a contractor to perform the repairs. Glass told MBS, "[w]e are pretty tight on budget here, if I give you both jobs to complete together and one project while you were out there, can you knock it down to $10,000 total?"

*Id.* Indeed, Ms. Ghee was not permitted to make "any" repairs.

99.     Echoing common-law obligations of areas "not in the exclusive control of the tenant," the Leases state that Ms. Ghee "must not" perform any repairs that altered the property. Thus, the Leases prohibited Ms. Ghee from removing the sheetrock to reach the deteriorated wooden framing had she known about it (which she did not).

**U.     The Building Code required operative sliding glass doors.**

100.     Pinetree's fraudulent actions and efforts to conceal the water and termite damage were compounded by Pinetree's numerous material violations of the applicable state maintenance and building Codes.  These Codes were intended to ensure the health and safety of Ms. Ghee and other invitees, but Pinetree violated them.  This concealed defect meant the only direct escape from the Primary Bedroom did not work when the fire took place.

101.     Since September 1, 1973, the Virginia Uniform Statewide Building Code ("VUSBC") has been the governing building code in Virginia. The VUSBC is typically revised approximately every three years and serves as an administrative code that incorporates national model building and maintenance codes.

102.     The VUSBC further modifies national codes and outlines their application and enforcement within the state. From 1973 to 2003, the VUSBC adopted the Building Officials and Code Administrators ("BOCA") family of codes. Since 2003, the VUSBC has adopted the International Code family as its model code.

103.     When Building G was constructed in 1995, the 1993 edition of the VUSBC and the adopted and amended portions of the 1993 BOCA National Building Code were in effect. The 1993 VUSBC came into effect on April 1, 1994.

104.    At the time of the fire on February 20, 2024, the 2021 edition of the VUSBC was in effect. The 2021 Virginia Property Maintenance Code, which incorporated the 2021 International Property Maintenance Code, was also in effect.

105.    The 2021 Virginia Property Maintenance Code Section 702.3 states:

**702.3 Doors**. Means of egress doors shall be maintained and, to the extent required by the code in effect at the time of construction, shall be readily openable from the side from which egress is to be made without needing keys, special knowledge, or effort.

In turn, the 2021 Virginia Property Maintenance Code on page 15 defines "maintained" as follows:

**MAINTAINED.** To keep unimpaired in an appropriate condition, operation, and continuance as installed in accordance with the applicable building code, or as previously approved, and in accordance with the applicable operational and maintenance provisions of this code.

The foregoing Code provisions are attached as **Exhibit 27**. However, as noted above, the sliding glass door assembly was not maintained. Termites and water infiltration had deteriorated the supporting wooden framing that held the sliding glass door frame in place. This failure to maintain constituted a violation of 2021 VPMC Section 702.3.

106.    Also, Pinetree violated Section 101.1 of the 1993 Virginia Uniform Statewide Building Code, which adopts Section 1010.4 of the 1993 BOCA National Building Code.[13] Subject to exceptions that do not apply to Apartment G8, this Code section required that every residential sleeping room below the fourth story must be equipped with an operable means of emergency egress directly to the exterior, such as a door or operable window, and stated:

**1010.4 Emergency escape**: Every sleeping room below the fourth story in occupancies in Use Groups R and I-1 shall have at least one operable window or exterior door approved for emergency egress or rescue. The units shall be operable

---

[13] Section 101.1 of the 1993 Virginia Uniform Statewide Building Code is attached as **Exhibit 28**.

from the inside without the use of special knowledge, separate tools, or force greater than that which is required for normal operation of the window….

The foregoing Code provision is attached as **Exhibit 29**. In violation of Section 1010.4, there was no operable window or exterior door at the time of the fire. Specific exceptions to the provisions are not applicable in this matter.

**V.    A Pinetree representative indicated that he would fix the sliding glass doors, but never did so.**

107.    Shortly before July 7, 2023, Pinetree posted a notice on the front door of Apartment G8 stating that it would perform an annual routine inspection of the apartment on a specified date.

108.    In response to this notice, Ms. Ghee looked around Apartment G8 to see what was not working. She tried to open the sliding glass door, but could not get it to move. She did not know if it was a temporary issue or a permanent one, nor if a more aggressive effort would move the door.

109.    Ms. Ghee took off from her work to be present when the inspection was scheduled, but no one came to her apartment to inspect that day. She assumed the inspection took place on another day while she was at work.

110.    Later in July of 2023, Ms. Ghee was standing in the doorway of Apartment G8 when a Pinetree maintenance man approached. She told him she could not open the sliding glass door in the Primary Bedroom and asked him to fix it. He replied, "I got you," or words to that effect.

111.    After Ms. Ghee asked Pinetree's maintenance man to fix the sliding door so that it would open, she never tried to use it. This was because she feared snakes in the swamp behind her home. She thought they were attracted to milk, a common folk superstition. She never knew why the sliding door would not open the one time she tried to open it before the fire.

**W.    During the fire, Ms. Ghee could not open the sliding glass door.**

112.     On February 19, 2024 (the day before the fire), Ms. Ghee worked as usual at her job at Walmart.   After work, she stopped by her mother's residence at about 6 p.m., picked up her three boys, and took them home to Apartment G8. She bathed three-year-old Mark and then went to bed at about 8 p.m.

113.     When Ms. Ghee first learned of the fire, she was asleep in her bed in the Primary Bedroom.

114.     As she slept, she was alerted to the fire when she heard Joshua (her middle son) yell, "Fire!"

115.     Upon learning of the fire, Ms. Ghee went into the living room to rescue her three boys.

116.     Only Mark was there when Ms. Ghee entered the living room, the two older boys having escaped through Apartment G8's front door.

117.     When Ms. Ghee entered the living room, she saw flames at Apartment G8's front door. As a result, she decided the safest course of action was to take Mark in her arms and exit through the sliding glass door.

118.     Before trying to open the sliding glass door, Ms. Ghee checked to ensure the bar was up and that there were no toys or anything else in the path to prevent it from sliding. Still holding Mark in her arms, she pushed the thumb latch down to unlock the door and tried to move it to her left, but it would not slide.

119.     She then placed Mark on her bed so she could use both hands to slide the door to the left.   But once again, she could not get the door to move.

120.     When Ms. Ghee turned to get Mark from her bed and exit Apartment G8 through the front door, Mark had disappeared in the smoke.  She searched and called for Mark but could not find him.

121.    Thinking that perhaps Mark had found his way through the smoke to the front door and safety, Ms. Ghee exited the apartment's flaming front door, hoping to see Mark outside.

122.    But Mark was nowhere to be seen.  As a result, desperate and frantic to rescue Mark, Ms. Ghee re-entered her apartment and resumed her search for Mark.

123.    In the process of searching for Mark in her burning apartment, Ms. Ghee suffered horrendous burns.  The heat of the fire caused the skin of her face to melt.

124.    Finally, the heat and smoke were too much for Ms. Ghee to tolerate, and, distraught, she exited through the front door of Apartment G8 without Mark.

125.    Attached as **Exhibit 30** is a photograph that fairly and accurately depicts the exterior of Apartment G8 (the floor-level apartment), which reveals the destruction caused by the fire. **Exhibit 31** is a short video capturing the intensity of the fire.



**X.     A post-fire inspection by an expert revealed rotten wood in the wooden framing of the sliding glass door in the Primary Bedroom.**

126.    Two months after the fire, Plaintiff's expert Dano Holland examined Unit G8. He found water and termite damage to the jack stud (the vertical piece of framing lumber that supports the ends of the header beam over the sliding door) and the wooden framing above the sliding glass

35

door in the Primary Bedroom. *See* the diagram below, identified as **Exhibit 32**. The water and termite damage caused the wood wall framing to shift, resulting in compression and deformation of the sliding glass door frame, as shown in the Exhibit. In his accompanying Affidavit, attached as **Exhibit 33**, Mr. Holland opines that the foregoing caused the door to be out of square and unable to move.



**SLIDING GLASS DOOR IN REAR WALL OF MASTER BEDROOM**

**Y.     As a result of being unable to open the sliding glass door in the Primary Bedroom, Ms. Ghee suffered significant injuries.**

127.    From the scene of the fire, Ms. Ghee was transported by ambulance to Bon Secours-Southside Medical Center.  She was immediately intubated due to the soot and swelling in her

vocal cords. After intubation, she had to be resuscitated following cardiac arrest due to her respiratory system failing from her inhalation of the smoke.

128.    Ms. Ghee was then transported to the VCU Burn Center. Within hours of arriving at the ER, she underwent her first surgical escharotomy, consisting of 22 incisions into her burned skin. This was the first of multiple surgeries that removed her burnt skin to replace it with skin grafts and artificial grafts. Further surgery required amputation on both hands – partial amputation of her fingers on her left hand and full amputation of every finger on her right hand.

129.    Ms. Ghee endured *eleven* total surgeries during her initial 69-day hospitalization. For much of this time, she was restrained to her bed because her pain agitated her to the point of her bucking, pulling on her lines and tubes. Her injuries prevented her from communicating except with head nods, unable to express the incomprehensible pain she suffered. She was unable to speak at all for 21 days after the fire, requiring her to work with a speech therapist to regain her voice eventually.

130.    During her initial hospitalization, she also underwent two bronchoscopies and two tracheostomies. She endured a collapsed left lung, prolonged intubation, and tube feeding.  She also suffered great psychological pain during her hospitalization. She could not sleep due to flashbacks and nightmares about the incident, and her condition further prevented her from grappling with the loss of her son. She was not informed until the 25th day of her hospitalization that Mark died in the fire. She and her mother both struggled to let her surviving sons visit her in her disfigured condition.

### Z.    Ms. Ghee's life going forward.

131.    When the planned procedures and therapy are completed, 80 to 85 percent of Ms. Ghee's body will be covered in scars of different colors, textures, and shapes. Her body and life

have been altered forever; she has and will always have horrifying permanent scarring, missing fingers, nightmares, flashbacks, and PTSD. She can no longer work, and her ability to provide childcare and to perform physical tasks has been significantly impaired.

**AA. Ms. Ghee suffered severe injuries because Pinetree failed to provide her and her family with safe premises. Moreover, Pinetree did not disclose and concealed significant termite and water damage behind the walls of her apartment.**

132. The evidence indicates that water and termites had infiltrated/infested the supporting wooden framing behind the sheetrock wall, causing it to rot. This supporting wooden framing was intended to hold the sliding door's frame in place. Despite receiving substantial evidence that the supporting wooden framing above and to the side of the sliding glass doors was eaten away by termites and soaked with water damage,[14] Pinetree never engaged MBS or any other outside contractor to make the necessary repairs. Instead, the documents show that Pinetree made repairs in the apartment complex on a piecemeal basis, undoubtedly to save money.[15] As to the deterioration surrounding the sliding glass door in Ms. Ghee's Primary Bedroom, Pinetree only had its maintenance personnel perform superficial painting intended to hide the problem.

133. As noted above, Pinetree controlled the space between the interior and exterior back walls of the Primary Bedroom. Pinetree was solely responsible for maintaining this area to ensure, among other things, that the wood framing did not interfere with the movement of the sliding glass

---

[14] Among other times, in May 2022, an agent or employee of Pinetree worked on the sliding glass door, because the door did not move easily along its track. This alerted the agent or employee that something was interfering with its movement, yet the agent or employee failed to adequately address the problem.

[15] Eric Hansen noted that all of the Pinetree upper wooden patio decks were in need of substantial repairs, but work was done on a piecemeal basis. Documents confirm the need for the repairs. On April 27, 2022, the tenant of Unit M4 complained that there was a "hole in patio wood." Similarly, on January 5, 2024, the tenant of Unit B5 complained, "when you step onto patio, there's a hole when you step down."

door. Its failure to maintain this area caused Ms. Ghee to be unable to open the door during the fire, resulting in her severe injuries.

VI.    **COUNTS**

**Count I**

Common Law Fraud

134.    The Plaintiff incorporates paragraphs 1-133 as if set forth in full in this Count.

135.    By painting over the holes eaten by the termites in the finished wood trim around the sliding glass door, Pinetree concealed a material fact from Ms. Ghee – namely, that there were termites and related water infiltration and deteriorated wood inside the back wall of the Primary Bedroom, which, in turn, interfered with the operation of the sliding glass door.

136.    Pinetree's concealment was intentional and was intended to mislead Ms. Ghee.

137.    Ms. Ghee relied on Pinetree to provide her and her sons with a safe apartment. She would not have moved into the apartment if she had known that behind the sheetrock, there was wood damage and termites that interfered with the operation of the sliding glass door. But by painting over the termite holes, Pinetree made sure that she would not know this information, and, before the fire, she never learned this information from any source.

138.    Pinetree's fraudulent conduct caused Ms. Ghee to suffer horrific injuries and incur millions of dollars in medical bills.

139.    Pinetree's conduct described above constitutes willful and wanton conduct, demonstrates a conscious disregard for the rights of others (including Ms. Ghee), and supports the imposition of punitive damages.

140.    As a direct and proximate result of Pinetree's fraud, Ms. Ghee has ongoing and continuous permanent damages and injuries and, as such, is entitled to recover and seeks recovery of the following:

    a.      Compensation for severe bodily injuries;

    b.      Past and future medical bills and expenses;

    c.      Pain and suffering;

    d.      Punitive damages; and

    e.      Any and all other relief that this Court deems appropriate.

## Count II

### Concealment of a Latent Defect

141.    The Plaintiff incorporates paragraphs 1-133 as if set forth in full in this Count.

142.    When Pinetree transferred possession of Apartment G8 to Ms. Ghee on June 1, 2022, there was a latent defect inside the sheetrocked back wall of the Primary Bedroom—namely, water damage and termites that were causing the supporting wooden framing behind the sheetrock to deteriorate and deflect, thereby interfering with the operation of the sliding glass door.

143.     When Pinetree transferred possession of Apartment G8 to Ms. Ghee on June 1, 2022, Pinetree knew of this latent structural defect, but Ms. Ghee did not and could not have discovered it upon reasonable inspection.

144.    Pinetree had a duty to disclose this latent defect, but Pinetree purposefully failed to do so.

145.    Although not required as an element of this cause of action, Plaintiff notes that Ms. Ghee relied on Pinetree to provide her and her sons with a safe apartment.  She would not have moved into the apartment if she had known that behind the sheetrock there were termites that interfered with the operation of the sliding glass door.  But Pinetree never told her this, and, before the fire, she never learned this information from any source.

146.    The conduct of Pinetree described above constitutes willful and wanton conduct. It demonstrates a conscious disregard for the rights of others (including Ms. Ghee).

147.    As a direct and proximate result of Pinetree's failure to disclose this latent defect, Ms. Ghee has ongoing and continuous permanent damages and injuries, and as such, is entitled to recover and seeks recovery of the following:

a.   Compensation for severe bodily injuries;

b.   Past and future medical bills and expenses;

c.   Pain and suffering;

d.   Punitive damages; and

e.   Any and all other relief that this Court deems appropriate.

## **Count III**

### Failure to Maintain the Inside of the Back Wall of the Primary Bedroom, An Area in Pinetree's Control

148.    The Plaintiff incorporates paragraphs 1-133 as if set forth in full in this Count.

149.    The termites, the deteriorated and rotting supporting wood framing, and access to them being inside the back wall of the Primary Bedroom, and the inside of this back wall being in Pinetree's control, Pinetree owed Ms. Ghee the duty, after transferring possession of Apartment G8 to her, to exercise ordinary care and diligence to maintain the inside of the back wall of the Primary Bedroom in a reasonably safe condition.

150.    As described throughout the Second Amended Complaint, Pinetree negligently breached the duty described above.

151.    The conduct of Pinetree described above constitutes willful and wanton conduct. It demonstrates a conscious disregard for the rights of others (including Ms. Ghee).

41

152.     As a direct and proximate result of Pinetree's conduct described above in this count, Ms. Ghee has ongoing and continuous permanent damages and injuries, and as such is entitled to recover and seeks recovery of the following:

      a.     Compensation for severe bodily injuries;

      b.     Past and future medical bills and expenses;

      c.     Pain and suffering;

      d.     Punitive damages; and

      e.     Any and all other relief that this Court deems appropriate.

## **Count IV**

### Violations of the Virginia Consumer Protection Act

153.     The Plaintiff incorporates paragraphs 1-147 as if set forth in full in this Count.

154.     Pinetree actively concealed the termite damage to the walls of Ms. Ghee's apartment in violation of Virginia Code Section 59.1-200(14).

155.     Ms. Ghee relied on Pinetree to provide her and her sons with a safe apartment. She would not have moved into the apartment if she had known that behind the sheetrock there was water damage and termites that interfered with the operation of the sliding glass door. But by painting over the termite holes, Pinetree made sure that she would not know this information. Pinetree concealed a material fact from Ms. Ghee – namely, that there were termites and related water infiltration and deteriorated wood inside the back wall of the Primary Bedroom, which, in turn, interfered with the operation of the sliding glass door.

156.     Pinetree's fraudulent act caused Ms. Ghee to suffer horrific injuries, be in great pain, and incur millions of dollars in medical bills.

157.    Because Pinetree's violation of the Virginia Consumer Protection Act was willful, Ms. Ghee is entitled to treble compensatory damages.

158.    In addition, Ms. Ghee is entitled to her reasonable attorneys' fees and court costs for this Count.

WHEREFORE, Plaintiff Nyeisha S. Ghee demands judgment against the defendant Pinetree Apartments, LLC in the amount of sixty million dollars ($60,000,000) in compensatory damages, plus three hundred and fifty thousand dollars ($350,000) in punitive damages, plus interest from February 20, 2024, costs, and other relief that this Court deems appropriate.

Trial by jury is demanded.

Respectfully submitted,

NYEISHA S. GHEE

By:   /s/ Mark J. Krudys
                Counsel

Charles H. Cuthbert, Jr. (VSB# 14519)
Richard M. Cuthbert (VSB# 82025)
CUTHBERT LAW OFFICES
A Professional Corporation
220 North Sycamore Street
Petersburg, Virginia 23803-3228
Phone: (804) 733-3100
Fax: (804) 732-4658
ccuthbert@cuthbertlaw.com
rcuthbert@cuthbertlaw.com

Mark J. Krudys (VSB# 30718)
Danny Zemel (VSB# 95073)
THE KRUDYS LAW FIRM, PLC
Truist Place, 919 East Main Street, Suite 2020
Richmond, VA, 23219
Phone: (804) 774-7950
Fax: (804) 381-4458
Email: mkrudys@krudys.com; dzemel@krudys.com
Counsel for Plaintiff

**<u>Certificate of Service</u>**

I hereby certify that on this 6th day of October 2025, I have electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all parties of record.

<div style="margin-left: 45%;">

   *<u>/s/ Mark J. Krudys</u>*
Mark J. Krudys (VSB# 30718)
THE KRUDYS LAW FIRM, PLC
Truist Place, 919 East Main Street, Suite 2020
Richmond, VA, 23219
Phone: (804) 774-7950
Fax: (804) 381-4458
Email: mkrudys@krudys.com
*Counsel for Plaintiff*

</div>