IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

NYEISHA S. GHEE,

     Plaintiff,

v.                                    Civil Action No.: 3:25-cv-17-RCY

PINETREE APARTMENTS, LLC,

     Defendant.

**PINETREE APARTMENTS, LLC'S BRIEF IN OPPOSITION**
**TO PLAINTIFF'S MOTION FOR LEAVE TO AMEND THE AMENDED COMPLAINT**

     Pinetree Apartments, LLC ("Pinetree" or "Defendant"), by counsel, hereby submits this Brief in Opposition to Plaintiff's Motion for Leave to Amend the Amended Complaint (ECF No. 37).

## I.     <u>INTRODUCTION</u>

     Plaintiff's third attempt to plead concealment claims, regardless of how framed (common law fraud, fraudulent concealment of a latent defect, or otherwise), requires proof that the alleged defect was not something Plaintiff knew about or had the means of knowing by ordinary inspection. This requirement was not pled in the first or second complaints and is not pled in the proposed third complaint. Indeed, Plaintiff admits she discovered all by herself that she could not open the sliding door (the "Sliding Door") in July 2023, which is 14 months after Pinetree painted the wood trim, and seven months before the fire. Something cannot both be readily discovered by a tenant before the claimed damages occurred, yet at the same time be a latent defect the landlord fraudulently concealed. Consequently, Plaintiff's concealment claims categorically fail because the alleged defect that caused her damages – the functionality of the Sliding Door – was not, and could never be, hidden from Plaintiff, and it was not.

The parties' landlord-tenant relationship is controlled by the operative lease agreement and the Virginia common law rule that a tenant assumes all risk for personal injury from defects in the apartment unless there is concealment. To avoid the lease and common law responsibilities placed on tenants, the various complaints assert that Pinetree intentionally concealed water and termite damage by painting over allegedly visible termite holes 21 months before the fire, and the combination of water and termites deteriorated the wooden framing that held the Sliding Door in place, causing it to come out of square and impeding its ability to slide. Plaintiff asserts that by painting over wood trim around the Sliding Door, Pinetree concealed the fact that the wood damage inside the back wall of the main bedroom interfered with the operation of the Sliding Door.

Now, Plaintiff moves to file a proposed Second Amended Complaint with information and records that contradicts what the Plaintiff is alleging they show. The records show that Pinetree[1] maintained the apartment complex by making repairs after receiving notice of issues, including responding to tenant complaints. The Plaintiff wants to use repairs in other apartments, mostly repairs not even in the same building as the Plaintiff's apartment unit, to create multiple trials within this trial. Even if there were issues with the other apartments, and even with other sliding doors, those other issues do not support Plaintiff's claims about the Sliding Door in Plaintiff's apartment. If anything, the new factual allegations show the exact opposite. When tenants at Pinetree had issues with the sliding doors that were reported through the complex's maintenance system, the issues were addressed, including by repairing sliding doors where needed.

More importantly, there is nothing in the proposed Second Amended Complaint that overcomes the arguments in Pinetree's pending Partial Motion to Dismiss, namely that Plaintiff

---

[1] Pinetree's management company, South Oxford Management, employed personnel and managed the property. For the purpose of this brief, Pinetree refers to both Pinetree Apartments, LLC, and South Oxford Management.

has failed to plead any reasonable inference of fraud or intentional misrepresentation regarding the Sliding Door. In fact, Plaintiff references the Petersburg Redevelopment and Housing Authority's inspection mere days before Plaintiff moved in, during which time it is confirmed by the records that the Sliding Door was functioning. Further, no apartment complex could reasonably hide (nor could a resident reasonably rely upon any representation regarding) a sliding door that does not work that is in the main bedroom of a two-bedroom apartment where the tenant resided for 20 months. Because these are fundamental legal flaws in all Plaintiff's causes of action alleging fraud or misrepresentation – including her newly added claim under the Virginia Consumer Protection Act – any amendment of the Amended Complaint is futile and should be denied.

## II.    BACKGROUND

Plaintiff filed her Complaint against Defendant in the Petersburg Circuit Court on or about December 19, 2024, which Defendant thereafter removed to this Court on January 13, 2025. *See* (ECF No. 1). On January 21, 2025, Defendant filed its first Partial Motion to Dismiss under Rule 12(b)(6). *See* (ECF No. 5-6). Plaintiff then filed an unopposed Motion to Amend the Complaint on February 21, 2025, (ECF No. 25), which was granted on February 25, 2025 (ECF No. 23), and Plaintiff's First Amended Complaint was filed on March 7, 2025 (ECF No. 24). Defendant thereafter filed a second Partial Motion to Dismiss Plaintiff's Amended Complaint on March 27, 2025 (ECF Nos. 26-27), which was fully briefed by April 25, 2025 (ECF No. 32). The Court has not issued a ruling upon Pinetree's Partial Motion to Dismiss the Amended Complaint.

On May 27, 2025, the parties agreed via stipulation to open discovery before the Rule 16(b) conference. *See* (ECF No. 33). To date, Pinetree has produced over 5,000 pages of records, including maintenance records pertaining to other apartment units, as well as other buildings, than the unit and building in which the Plaintiff lived. As discussed below, these records – including

3

those cited within the Plaintiff's proffered Second Amended Complaint – show that Pinetree maintained and repaired other apartments. On October 6, 2025, Plaintiff moved for leave to amend (ECF No. 37), with a memorandum in support (ECF No. 38), and on October 15, 2025, Plaintiff submitted an amended memorandum in support (ECF No. 47).[2] For all the reasons stated below, Defendant opposes the Plaintiff's request for leave and requests that this Court deny entry of the proposed Second Amended Complaint.

---

[2] On October 6, 2025, at 12:10 pm, Plaintiff's counsel emailed defense counsel, indicating that Plaintiff planned to file for leave to amend the Complaint. Plaintiff first provided a copy of the proposed Second Amended Complaint at 2:54 pm that day, but without the attached exhibits. Plaintiff then filed the Motion for Leave for file the Second Amended Complaint with the Court at 4:21 pm (ECF No. 37). Counsel did not receive the exhibits until 4:41 pm, after the Motion for Leave had been filed. For all the reasons raised in this Opposition and Pinetree's other briefing, Pinetree could not consent to the Plaintiff's Motion, and defense counsel informed opposing counsel on October 14, 2025, that Defendant would be filing this Opposition.

Pinetree additionally objects to Plaintiff's "Amended" Memorandum in Support of Plaintiff's Motion for Leave to Amend the Amended Complaint. (ECF No. 47). There are no grounds in the Federal Rules of Civil Procedure or Local Rule 7 for an *amended* memorandum, and Plaintiff filed a memorandum with her motion for leave. (ECF No. 38). While it is common practice to file notices of supplemental authority that do not contain legal arguments and simply alert the Court to cases that were not available at the time of the original pleading, substantive briefs are not permitted under the Rules without the Court's permission. *See Ashghari-Kamrani v. United States Auto. Ass'n,* 2016 WL 8253884, at *2 (E.D. Va. Mar. 18, 2016) (considering a notice of supplemental authority). Plaintiff's Amended Memorandum is not a notice of correction or scrivener's error but constitutes an entirely new brief. Further, there are no provisions within the Federal Rules of Civil Procedure or the local rules for parties to amend briefing deadlines, even by agreement, unless such agreement is also approved and/or directed by the Court. *See* Local Rule 7 ("Unless otherwise directed by the Court …. No further briefs or written communications may be filed without first obtaining leave of Court.").

Plaintiff bases her "Amended" Memorandum on Defendant's refusal to consent, but this is not a recognized basis for filing an additional brief in support. Plaintiff granted Pinetree mere hours to reply before she filed her Motion, and thus she knew she did not have Defendant's consent. As such, Plaintiff does not have good grounds for filing an amended memorandum based on Defendant's lack of consent, even if the rules permitted such as a basis for filing. Defendant would request that the Court either strike Plaintiff's Amended Memorandum; treat the Amended Memorandum as Plaintiff's reply brief, waiving Plaintiff's opportunity for further response; or permit Defendant to file a sur-reply to Plaintiff's reply.

Defendant also observes that Plaintiff's current request is unlikely to be Plaintiff's last request to amend. Plaintiff submitted this Motion within three days of receiving a document production from Pinetree that she found "significant" (although the documents do not meet the threshold of relevance and cannot be admissible, as discussed below). *See* Pl.'s Am. Mot. (ECF No. 47, at 3). Such rapid requests for amendment foreshadow a future pattern that will unfairly burden the court and the defense significantly. The purpose of a Complaint is to create notice of the claims, including "a short and plain statement of the claim showing that the pleader is entitled to relief." Rule 8(a)(2). The Complaint does not need to set out in detail every single fact – just enough facts to show that she is entitled to relief. As discussed below, the current proposed amendment contains voluminous allegations that are not relevant and do not show that Plaintiff is entitled to relief, but the allegations will broaden the scope of the claims against Defendant if the Motion is granted. And if granted, Defendant expects broader discovery requests and future motions practice about even more irrelevant facts yet to be discovered as this litigation expands.

### III.    <u>LEGAL STANDARD</u>

A party can only amend its pleadings "with the opposing party's written consent or the court's leave." *See* Fed. R. Civ. P. 15(a)(2). The court's discretion depends on the justice of the request. *See id.* Appropriate reasons to deny the motion include that amendment would cause prejudice to the opposition party, the amendment is sought in bad faith, or the amendment would be futile. *See, e.g.*, *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 505 (4th Cir. 1986) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). A court should also deny amendment after repeated pleading failures. *See Echols v. CSX Transp., Inc.*, No. 3:16CV294, 2017 U.S. Dist. LEXIS 90851, *12 (E.D. Va. June 12, 2017) (citation omitted). A court provides a similar analysis as a Rule 12(b)(6) motion when determining futility of the amendment for a proposed complaint. *See United States*

*ex rel. Carter v. Halliburton Co.*, 144 F. Supp. 3d 869, 879 (E.D. Va. Nov. 12, 2015) (citation omitted) A request to amend a complaint that still fails to state a claim should be denied as futile. *See Letendre v. Parallon Enters., LLC*, No. 3:24CV184, 2025 U.S. Dist. LEXIS 59205, *43 (E.D. Va. Mar. 28, 2025) (citing *Perkins v. United States*, 55 F.3d 910, 917 (4th Cir. 1995).

## IV.    LEGAL ARGUMENT

### A.  Amendment of the Complaint Would Be Futile Because Plaintiff Has Still Failed to State a Claim for Concealment and/or Fraud.

Pinetree previously moved to partially dismiss Plaintiff's First Amended Complaint, including any claims for concealment or fraud. *See* (ECF Nos. 26-27). Using documents and information provided during the discovery process, Plaintiff now seeks to amend her Complaint in an attempt to keep her faulty fraud claims in play. However, amendment is futile because none of the additions in the proposed Second Amended Complaint overcome the core arguments originally raised in Pinetree's pending Partial Motion to Dismiss: that is, the inoperability of the Sliding Door is not the type of defect that can ever be hidden or latent, and thus, it can never be the object of fraudulent concealment. *See* Def.'s Mot. (ECF No. 27, at 8). Plaintiff herself easily discovered the alleged defect when she tried to open the door in July 2023. *See* 2d Am. Compl. ¶¶ 107-110. To the extent the Sliding Door could not be opened, Plaintiff could have discovered the alleged defect at any time she resided in the apartment. To the extent the Sliding Door was operable when she took possession, then there was no defect. The very moment in time that the defect allegedly arose (e.g., the operation of the Sliding Door became impeded) is the exact same moment in time that the defect became equally discoverable to the Plaintiff.[3] Because this is a core fact that

---

[3] Notably, Plaintiff signed a move-in Inventory and Condition Form as part of her lease that did not find any defects in the Sliding Door. *See* Lease (ECF No. 24-5, at 10-12).

6

cannot be altered, no matter how many additional facts Plaintiff adds to her complaint, any amendment to bring a fraudulent concealment claim is futile and should be denied.

No further discussion on the fraud claim should be necessary as it is legally insufficient.[4] However, in reality, the information and records added to the proposed Second Amended Complaint contradict Plaintiff's forcibly imposed narrative, and when viewed objectively, only serve to support that Pinetree consistently hired contractors and expended funds to perform repairs, including to the sliding doors and other apartment maintenance issues.

###### i.    *The Sliding Door Was Operable When Plaintiff Took Possession.*

The general rule in Virginia is that the tenant takes the premises in whatever condition it is in, "assuming all risk of personal injury from the defects therein." *Isbell v. Commercial Investment Associates, Inc.*, 273 Va. 605, 611-12 (2007) (quoting *Caudill v. Gibson Fuel Co.*, 185 Va. 233, 239-41 (1946)). Plaintiff's proposed Second Amended Complaint continues to seek ways around that general rule by suggesting some kind of fraud occurred – but to do so, Plaintiff ignores the inspection performed by the Petersburg Redevelopment and Housing Authority ("PRHA") before she took possession.

The PRHA inspection is a critical fact discussed in Plaintiff's Second Amended Complaint, but Plaintiff only selectively cites the correspondence from Marrietta Paschal, the PRHA housing inspector. *See* 2d Am. Compl. ¶ 22. The Court can "properly consider documents . . . referenced in the complaint" in resolving a motion to dismiss. *Sullivan v. Univ. of N.C. Health Care Sys.*, No. 1:22CV847, 2023 U.S. Dist. LEXIS 158991, *5 (M.D.N.C. Sept. 8, 2023) (quoting *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004)); *United States*

---

[4] Pinetree incorporates all arguments raised in its pending Motion to Dismiss in furtherance of this Opposition to Plaintiff's Motion for Leave to Amend. Should Plaintiff's Motion be granted and the Second Amended Complaint entered, Pinetree will file a Motion to Dismiss these claims.

*v. Chameleon, LLC*, No. 3:23-cv-763-HEH, 2024 U.S. Dist. LEXIS 145921, *13-14 (E.D.V.A. Aug. 15, 2024) (considering website contents when links to maps on the website were cited in a complaint); *Lokhova v. Halper*, 441 F. Supp. 3d 238, 252 (E.D.V.A. 2020) ("Without converting a motion to dismiss into a motion for summary judgment, a court may consider the attachments to the complaint, documents incorporated in the complaint by reference, and documents 'attached to the motion to dismiss, so long as they are integral to the complaint and authentic.'" (quoting *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007)). The full email from Ms. Paschal that is referenced in the Complaint reads as follows:

> The unit initially failed 05/24/2022 due to the sliding doors in the bedrooms and window in the living room having severe chipping paint, as well as them being hard to open. **Maintenance was able to get the windows/doors to open smoothly while I was present by lubricating the seals**. The attached videos are what they sent videos showing that the chipping paint was taken care of effective 05/31/2022.

SDT-PRHA00002 (**Exhibit A**) (emphasis added). Ms. Pascal was provided with a video of the Sliding Door showing the repair work as part of the approval process. *See* SDT-PRHA00014 (**Exhibit B, C**). Unit G-8 passed inspection in accordance with the requisite health and safety standards. *See* PINETREE00595 (**Exhibit D**). The very purpose of the inspection conducted by Ms. Paschal and the PRHA was to ensure that the unit was a "safe, habitable dwelling[]" that was "functionally adequate, operable, and free of health and safety hazards." *See* 24 C.F.R. § 5.703(a). Ms. Paschal considered that any alleged health and safety concerns – and specifically any concerns with the Sliding Door – were fully resolved when Plaintiff took possession of the apartment.

The PRHA inspection conclusively established that Unit G-8 was fit and habitable for Plaintiff, with a specific finding that the Sliding Door was operational. **This completely eliminates any potential for fraudulent concealment under Virginia law.** Despite Plaintiff's attempts to broaden the factual horizon, the defect is very narrow: the operability of the Sliding Door in Unit G-8. Plaintiff herself defines the defect: "namely, water damage and termites that were causing the

supporting wooden framing behind the sheetrock to deteriorate and deflect, <u>thereby interfering with the operation of the sliding glass door</u>." *See* 2nd Am. Compl. ¶ 142 (emphasis added); *see also id.* ¶ 135 ("namely, that there were termites and related water infiltration and deteriorated wood inside the back wall of the Primary Bedroom, <u>which, in turn, interfered with the operation of the sliding glass door</u>"). Absent any effect on the Sliding Door, there is no defect. Termite and water damage did not separately create the alleged fire and egress risk. Without an actual impact on egress, there is no defect that goes to potential health and safety. Plenty of apartment buildings like Pinetree (which was built in 1995) have periodic termite and water damage issues that have been treated and do not cause ongoing issues and cannot be considered defects to every apartment unit (and to units in entirely separate apartment buildings) in the same complex.

Plaintiff argues that Pinetree's repairs during the PRHA inspection were temporary and required further investigation. *See* 2d Am. Compl. ¶ 28. Again, Plaintiff wants to contrive meaning beyond what the factual records show. How could a reasonable maintenance person think a functional sliding door requires any further attention when simultaneously the PRHA inspector passed the unit after specifically considering the issue resolved? To argue otherwise is nothing more than a baseless accusation.

A property owner is not required to provide an egress point that will never need maintenance or repairs. This would be a nebulous vague standard because all physical structures may require repairs. Not every sliding door problem means you need a brand-new one. In most cases, a simple repair can get things back on track—literally. An apartment complex, like any property owner, may choose to make a repair that fixes the problem short of replacement, including when the repair could last a shorter duration than replacement. Problems like a dirty or broken roller, bent tracks, broken lock, or misalignment can cause a door to stick; problems that can be

fixed by cleaning the tracks, replacing the rollers, realigning the door, replacing the locking mechanism, or other fixes. These are traditional repair situations where fixing to maintain the functioning of the sliding door is the first and best option. While Plaintiff may want to create a nebulous vague standard of care, the applicable Virginia law does not require a property owner to provide an egress point that will never have or develop future maintenance issues.

Moreover, Plaintiff's call for further investigation goes only to her allegations of negligence – e.g., the scope of Pinetree's duty – but it does not show *fraud*. Fraudulent concealment requires that Pinetree "willfully and deliberately concealed the material fact while knowing that Plaintiff was acting on the assumption that the fact did not exist." *Guy v. Tidewater Inv. Props.*, 41 Va. Cir. 218, 220-221 (Norfolk 1996); *Cohn v. Knowledge Connections, Inc.*, 266 Va. 362, 368 (2003) (requiring the defendant make a "knowing and deliberate decision not to disclose a material fact" (quoting *Lambert v. Downtown Garage*, 262 Va. 701, 714) (2001)); *see also Bank of Montreal v. Signet Bank*, 193 F.3d 818, 827 (4th Cir. 1999); *N. Va. Eye Inst., P.C. v. Cynosure, LLC*, No. 5:21-cv-00008, 2021 U.S. Dist. LEXIS 75804, at *13 (W.D. Va. Apr. 20, 2021) ("[C]oncealment . . . always involves deliberate nondisclosure designed to prevent another from learning the truth." (quoting *Van Deusen v. Snead*, 247 Va. 324, 441 (Va. 1994)). No matter what additional facts Plaintiff proposes adding, Pinetree did not intentionally conceal anything.

Even if Plaintiff's various additions to the Second Amended Complaint are considered, as discussed extensively in Pinetree's Partial Motion to Dismiss (ECF Nos. 26-27), an apartment complex like Pinetree cannot be charged with intentionally concealing a defect that Plaintiff could have discovered – and indeed, did discover – by simply attempting to open the Sliding Door. It is not reasonable for a resident to rely on representations (particularly silent ones) regarding something Plaintiff was able to easily discover by inspection. In *Kuczmanski v. Gill*, the Supreme

Court of Virginia found that the seller was not responsible for affirmative misrepresentations about the presence of storm windows because "the missing windows were an open and obvious defect which could have been discovered by the [plaintiffs] by even a cursory inspection of the premises." *Kuczmanski v. Gill*, 225 Va. 367, 370 (1982) (applying the doctrine of caveat emptor and finding the plaintiffs "were not entitled to rely on this statement instead of ascertaining the true facts for themselves"). As bears repeating, nothing Pinetree could have done would have concealed an inoperable Sliding Door in the main bedroom of the apartment where Plaintiff slept for 20 months before the fire.

### ii. *The Narrative in Plaintiff's Complaint Shows that Pinetree Made Repairs to Other Apartment Units.*

Plaintiff's proposed Second Amended Complaint foreshadows how Plaintiff seeks to transform this case into multiple mini-trials about unrelated repairs to other apartments with no nexus to the alleged defect in Plaintiff's apartment unit. The Court does not need to consider each and every repair to see that Plaintiff is relying on <u>other apartments where repairs were made</u> to argue that additional repairs should have been made to Plaintiff's apartment unit. For example, Plaintiff notes thirty instances in which outside contractors made various repairs to water leaks above the sliding doors. *See* 2d Am. Compl. ¶ 4. Plaintiff then walks through a narrative that, rather than show any negligence on the part of Pinetree, shows an apartment complex actively addressing reported water leaks. *See id.* ¶¶ 74-93. Indeed, various emails referenced in Plaintiff's Second Amended Complaint detail how apartments were assessed for similar issues and bids sent for repair. *See id.* ¶ 76. That Plaintiff's apartment was not on any list is telling. It just does not fit Plaintiff's narrative of making a systemic defect argument instead of actually pleading specific allegations to the claimed defect in Plaintiff's apartment unit.

Even farther afield, Plaintiff accuses Pinetree of being slow to make unrelated repairs to other apartment units. Such repairs were completed to other apartments before the fire, and Pinetree was cognizant of the timeframe needed to conduct the repairs.[5] Any emails criticizing the speed of third-party contractors instead shows that Pinetree prioritized efficient repair personnel and wanted repairs completed expeditiously. *See id.* ¶ 94. Pinetree also generally started using MBS Contractors, which had a good turn-around time for repairs, *compare id.* ¶ 93 (noting that MBS was asked to inspect Unit D-3 for water damage on April 28, 2022), with *id.* ¶ 84 (describing MBS invoice for Unit D-3 on August 2, 2022). The negative online review system referenced by the Plaintiff also shows that Pinetree quickly responded to tenant complaints, however they came in. Plaintiff's narrative – which is a scattershot attempt to malign Pinetree's character, as prohibited under Federal Rule of Evidence 404 – is simply not reflected in the documents she uses to support that narrative. The Court should stop Plaintiff from going down this slippery slope. Otherwise, the parties will be putting on evidence at trial on the timeliness of third-party contractors to complete repairs to issues in other apartment units. This case must focus on Plaintiff claims against Pinetree for the alleged defect in the Plaintiff's apartment unit, and not go off-course.

Plaintiff also infuses her Second Amended Complaint with the costs of various repair projects to other apartments. If anything, this shows that Pinetree was willing (and in fact did) pay for any repairs. For example, Plaintiff notes that Pinetree paid $7,557.55 to repair Unit N-1 in July 2019, *id.* ¶ 75; that Pinetree paid $6,768 to repair Unit E-1 in March 2022, *id.* ¶ 81; and that Pinetree paid $6,000 to repair Unit O-10 in April 2022, *id.* ¶ 82. In total, Plaintiff references over $75,000 in repair invoices that were charged since 2019. *See id.* ¶¶ 75-93. Pinetree clearly paid for third-

---

[5] The Court should also take judicial notice that this was during the COVID and post-COVID era, when contractors were notoriously difficult to arrange.

party contractors when repairs were identified, and instead of showing negligence as to Unit G-8, Plaintiff's narrative supports that Unit G-8 was one of the many units that did not need such repairs. The third-party contractors did not even list the Plaintiff's apartment unit for Pinetree to deny the repair based on the cost. Again, Plaintiff wants to go down any path to paint Pinetree in a false light, except for that path that focuses on the elements of the claims asserted on the alleged defect in the Plaintiff's apartment.

The termite treatment similarly shows that Pinetree addressed issues at the apartment complex. Plaintiff identifies that in April 2019, Pinetree spent $21,000 ensuring that the exteriors of various buildings (including Building G) were treated, and thereafter took the forward-thinking approach of securing termite warranties to prevent future issues. *See id.* ¶ 56. Building G was invoiced the following year under the termite inspection warranty, without any issues found. *See id.* ¶ 57. In March 2024, an exterior inspection again showed no visible termite activity. *Id.* ¶ 63. Every occurrence of termite sightings after 2019 are for different buildings than Building G, where Plaintiff resided, and mention termite issues that were treated under the PestNow termite warranty. *See id.* ¶¶ 56-66. Plaintiff does not point to a single termite issue recorded by PestNow, Pinetree's termite contractor, that concerns Building G while Plaintiff was in residence. Like the sliding door issues, any reference to termites in Pinetree's records shows that Pinetree was taking the responsible approach in addressing reported termite issues. This pattern of response and repair undercuts Plaintiff's superimposed narrative of fraud. Plaintiff cannot use records of termites and termite services over the years in other apartments (and other buildings) to prove that the Plaintiff's apartment unit had termites during a specific time frame before the fire. As discussed below, Plaintiff cannot prove a specific defect by showing the existence of other, unrelated alleged defects

I-2983797.1

elsewhere in the complex. The law does not substitute synchronicity for requiring proof a defect and causation.

### iii.    The Repairs Are Not Analogous to the Defect Alleged in the Second Amended Complaint.

As part of the parties' negotiations on the scope of discovery, Pinetree agreed to produce repair records relating to sliding doors in other apartments and other buildings. Pinetree's agreement in discovery does not pertain to admissibility – and none of these other repairs should be admissible because Plaintiff cannot even meet the base requirement of relevance. Plaintiffs are not generally permitted to introduce evidence of other issues unless they occurred as a result of the same or similar defects to the one alleged by the plaintiff in the subject case.

The Supreme Court of Virginia has held that "[e]vidence of other similar accidents or occurrences, when relevant, is admissible to show that the defendant had notice and actual knowledge of a defective condition[.]" *Roll "R" Way Rinks, Inc. v. Smith*, 218 Va. 321, 325 (1977) (quoting *Spurlin v. Richardson*, 203 Va. 984, 989 (1962)). However, the Court also observed:

> [I]t is well settled that evidence of prior accidents or occurrences is **not admissible** and can have **no effect** in establishing the defendant's knowledge of a danger unless the plaintiff shows that those prior accidents or occurrences happened at substantially the same place and under substantially the same circumstances, and had been caused by the same or similar defects and dangers as those in issue, or by acts of the same person.

*Id.* (quoting *Spurlin*, 203 Va. at 989) (emphasis added). The defect must be the same, and there must be testimony regarding the cause of the defect. *Funkhouser v. Ford Motor Co.*, 285 Va. 272, 275 (2013) (noting that "he cannot show that the fires were caused by the same or similar defects"). One analogous Georgia case found that although there were other incidents of "falling walls" at an apartment complex, the plaintiff was unable to show that the "missing or different blocks in other walls were in that state because of original construction, alteration, vandalism, collisions

with the wall, or … deterioration. . . . **There is no showing of substantial similarity**[.]" *Smith v. Hous. Auth.*, 212 Ga. App. 503, 505 (1994) (emphasis added).

Plaintiff has a single theory in this case about the alleged defect – that "water and termite damage caused the wood wall framing to shift, resulting in compression and deformation of the sliding glass door frame[.]" *See* 2d Am. Compl. ¶ 126. This is a very specific causal chain, requiring (at minimum) for any apt comparison under Virginia law (1) that there was both water and termite damage; (2) that resulting wood damage placed pressure on the Sliding Door's frame; (3) that the pressure caused the Sliding Door's frame to compress and shift out of square; and (4) that the Sliding Door would not open because of the compression (hereafter "Compression Issue"). *See id.* Plaintiff has even provided in the Second Amended Complaint a diagram from her expert, Mr. Holland, detailing the very specific causal chain that is required. *See id.* However, Plaintiff has not provided a single comparator apartment in which the Compression Issue occurred without damage being open and obvious to the resident.

Despite providing a detailed description of the alleged Compression Issue, the majority of the complaints from Pinetree residents cited in the proposed Second Amended Complaint have nothing to do with compression of the sliding door. For example, although Plaintiff cites several repairs that were completed by MBS Construction Services, Mueller Builders, and THS National to the area around the sliding doors, these repairs are generally not connected to a complaint that the sliding door would not open because of the header damage, *i.e.*, the Compression Issue. For example, Plaintiff spends half a page on the MBS Construction June 2022 invoice for carpentry repairs to Unit O-10. *See* 2d Am. Compl. ¶ 82; *see also id.* at ¶¶ 84, 85. However, nowhere does the proposed Second Amended Complaint refer to a complaint that the sliding door in Unit O-10 was "out of square" or would not open – that is, there is no connection to the Compression Issue.

Similarly, Unit K-1 received sheet rock repair, but the tenant complained only about a leak around the patio master bedroom door – an issue that was visible to the resident and did not concern the alleged Compression Issue in Plaintiff's apartment. *See* 2d Am. Compl. ¶¶ 85 & n.10 (noting that she "observed that the leak occurred every time it rains"). A rotten header that simply caused water leakage but *did not* cause the sliding door to become difficult to open is not relevant to Plaintiff's claims in this lawsuit.

There are relatively few complaints that the sliding doors would not open – indeed, only <u>four</u> issues are cited in the Second Amended Complaint regarding this specific issue, all in Paragraph No. 67. *See* 2d Am. Compl. ¶ 67. These include the following units, none of which are in Building G, and which occurred across four years: Unit E-10 (2021); Unit H-1 (2022); Unit F-1 (2023, 2024); Unit L-10 (2023). (Notably Unit E-10 involves a complaint relating to the <u>screen</u> door, and Unit F-1 had a visible crack that might have contributed to the issue.) Further, Plaintiff has not traced these *specific complaints* regarding the door not opening to the alleged Compression Issue. For example, Unit F-1 called out about the patio door, as quoted in the Second Amended Complaint, *see* 2d Am. Compl. ¶ 67, but on the same work order it notes that the resident was able to fix the issue themselves and cancelled the request, *see* PINETREE2247 (**Exhibit E**). Without correlation to the alleged Compression Issue, there cannot even be facial relevance. *See Roll "R" Way Rinks, Inc.*, 218 Va. at 325. As discussed above, it is not enough that Plaintiff point to just one factor when she has alleged a very specific defect and causal chain. Plaintiff cannot use unrelated defects and other causal chains to support her claims against Pinetree.

Neither are the leak complaints that Plaintiff references analogous. The entire crux of Plaintiff's Second Amended Complaint is that the alleged defect with the Sliding Door was *hidden* from her. However, Plaintiff cites in support defects that were open and obvious to the other

16

residents. For example, Holly Johnson reported that there was "water pouring in from the outside when it rains" and that she used plastic and tape to cover the leaks. *See* Pl.'s Ex. 17. (Notably, Ms. Johnson does not complain that the sliding door could not open, meaning this complaint is not relevant to the Compression Issue.) Unlike Plaintiff's allegations, the defect in Ms. Johnson's apartment was not hidden – the water was running out of the sliding door into the bedroom. The fact that the water damage was so obvious in this unit shows that Unit G-8 was not experiencing similar leaks. Plaintiff never reported (and still does not claim she saw) any active leaks around the Sliding Door. The complete and ongoing[6] absence of exterior signs of wood damage mean Plaintiff's alleged Compression Issue is not the same issue cited in these other tenant complaints made about different apartments in separate apartment buildings.

Despite a 44-page draft pleading (not counting the pages of the multiple exhibits), Plaintiff is far short of establishing that the alleged Compression Issue with the sliding doors were "typical" within the complex. *Id.* ¶ 96. Plaintiff has not identified a single apartment that is a true comparator to her narrow complaint: a sliding door that would not open because of the Compression Issue but for which the defect remained hidden. Even if she could identify an actual comparator that meets the high standard for admissibility as a similar defect, Plaintiff cannot show notice as to Unit G-8 because, as detailed above, the Sliding Door could "open smoothly" when Plaintiff took possession of the apartment. *See* SDT-PRHA00002 (Exhibit A) (emphasis added). The date upon which the PRHA performed the inspection is the relevant timeframe for Plaintiff taking possession of the apartment. Because all reasonable inferences support that the Sliding Door was operable, Plaintiff is subject to the general rule that a tenant takes the apartment as it is.

---

[6] Even 20 months after the damage was allegedly painted over, Plaintiff maintains there was still no outward evidence of damage. Common sense dictates that an uncontrolled water leak, if it existed, would easily seep through a layer of paint after 20 months of exposure to the elements.

**B.  The Virginia Consumer Protection Act Claim Does Not Apply to Pinetree in this Context.**

Only one cause of action is new to Plaintiff's proposed Second Amended Complaint – the proposed action under the Virginia Consumer Protection Act, Virginia Code Section 59.1-200(14). However, this section is not applicable to Plaintiff's claims in this lawsuit. As a preliminary matter, the VCPA states that the Act does not apply to landlord-tenant relationships "unless the act or practice of a landlord constitutes a misrepresentation or fraudulent act or practice under § 59.1-200." Va. Code Ann. § 59.1-199. Section 200 is narrow, and Section 200(14), upon which Plaintiff attempts to rely, is even more narrow, stating the following:

> The following fraudulent acts or practices committed by a supplier[7] in connection with a consumer transaction[8] are hereby declared unlawful: . . . Using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction;

Even assuming that Plaintiff can say Pinetree is a "supplier" of goods[9] and services[10] under the Act, she cannot show a misrepresentation in connection in a consumer transaction.

Plaintiff fails to define in her proposed Second Amended Complaint what the alleged "consumer transaction" is, but for the sake of argument, Defendant assumes she means the lease

---

[7] A "supplier" is "a seller, lessor, licensor, or professional that advertises, solicits, or engages in consumer transactions, or a manufacturer, distributor, or licensor that advertises and sells, leases, or licenses goods or services to be resold, leased, or sublicensed by other persons in consumer transactions." Va. Code § 59.1-198.

[8] The term "Consumer transaction" is subject to six (6) different definitions, of which the relevant ones include only the first definition: "The advertisement, sale, lease, license, or offering for sale, lease, or license, of goods or services to be used primarily for personal, family, or household purposes[.]" Va. Code § 59.1-198.

[9] "Goods" means real, personal, or mixed property, tangible or intangible. Va. Code § 59.1-198.

[10] "Services" means work performed in the supplier's business or occupation. Va. Code § 59.1-198.

I-2983797.1

of an allegedly "safe apartment" that she learned later was not safe. *See* 2d Am. Compl. ¶ 155. This is not the type of "consumer transaction" contemplated under the VCPA, which specifically exempted from coverage the lease of apartments generally covered by the Virginia Residential Landlord Tenant Act. *See* Va. Code Ann. § 59.1-199. If the Court were to consider every leasing of an apartment to be a potential misrepresentation whenever the traditional rule of *caveat emptor* controls, then the exemption for the Virginia Landlord Tenant Act would have no meaning at all. A cannon of construction is that all words must have meaning (and generally their plain meaning) without absurd result. *Cf. Lawlor v. Commonwealth*, 285 Va. 187, 237 (2013) ("[T]he plain, obvious, and rational meaning of a statute is to be preferred over any curious, narrow, or strained construction, and a statute should never be construed in a way that leads to absurd results." (quoting *Meeks v. Commonwealth*, 274 Va. 798, 802 (2007)); *Platt v. Union P. R. Co.*, 99 U.S. 48, 59 (1878) ("[N]o words are to be treated as surplusage[.]"); *United States v. Goldenberg*, 168 U.S. 95, 102 (1897) (emphasizing importance of "obvious and natural import of the language, giving to it the ordinary grammatical construction"). The court should not consider an alleged generic misrepresentation (and a silent one) that an apartment was "safe" to be the type of misrepresentation that would trigger the VCPA.

To get around the exception, Plaintiff must point to a unique consumer transaction that was marred by a misrepresentation, which she cannot do. This omission was discussed at length in Pinetree's Motion to Dismiss, and it is not remedied in the proposed Second Amended Complaint. Plaintiff has not pled any facts supporting a reasonable inference that Pinetree acted with specific intent to defraud her. "[U]nlike fraud for affirmative misrepresentations, concealment requires a showing of intent to conceal a material fact; reckless nondisclosure is not actionable." *Western Capital Partners, LLC v. Allegiance Title & Escrow, Inc.*, 520 F. Supp. 2d 777, 782 (E.D. Va.

19

2007) (quoting *Bank of Montreal v. Signet Bank*, 193 F.3d 818, 827 (4th Cir. 1999)). If the Court were to allow Plaintiff to amend her Complaint to bring a VCPA claim, that VCPA claim would fail for all the reasons that the proposed Second Amended Complaint still fails to state fraud and concealment claims against Pinetree.

The current request to amend the Complaint is Plaintiff's second request with the Court. Pinetree has been forced to brief the Motion to Dismiss *twice* already and will now be required to draft a third Motion to Dismiss if this request for leave is granted – without the proposed Second Amended Complaint including any facts that address the core defect in her prior pleadings. Further, Plaintiff's proposed Second Amended Complaint is full of unrelated issues, as described above, which will turn any Motion to Dismiss or other briefing into an extremely fact-specific and detailed pleading. If the case proceeds past the Motion to Dismiss stage, it promises disputes over the scope of discovery and motions practice to prevent Plaintiff from creating multiple mini-trials on unrelated issues. The Court should refuse to grant the Plaintiff's request for leave to amend the Complaint yet again.

## V.    CONCLUSION

For the foregoing reasons, and any reasons stated at any hearing on this matter, the defendant, Pinetree Apartments, LLC, by counsel, respectfully requests this Court DENY Plaintiff's Motion for Leave to Amend the Amended Complaint, and order such other and further relief as the Court may deem appropriate.

This 17th Day of October, 2025.

Respectfully submitted,

**PINETREE APARTMENTS, LLC**

By:    */s/ Joseph P. Moriarty*

I-2983797.1

Joseph P. Moriarty (VSB No. 68465)
Kevin M. Kennedy (VSB No. 75071)
Kelley Holland (VSB No. 79627)
Bryn L. Clegg (VSB No. 96923)
WILLCOX & SAVAGE, P.C.
440 Monticello Avenue, Suite 2200
Norfolk, Virginia 23510-2243
Telephone: (757) 628-5500
Facsimile: (757) 628-5566
jmoriarty@wilsav.com
kkennedy@wilsav.com
bclegg@wilsav.com
kholland@wilsav.com
*Counsel for Defendant Pinetree Apartments, LLC*

21

## <u>CERTIFICATION</u>

I hereby certify that on this 17th day of October, 2025, I electronically filed the forgoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

Charles H Cuthbert, Jr. (VSB No. 14519)
Richard M. Cuthbert (VSB No. 82025)
Cuthbert Law Offices, P.C.
220 North Sycamore Street
Petersburg, VA 23803-3228
Telephone:  804-733-3100
Facsimile:  804-732-4658
ccuthbert@cuthbertlaw.com
rcuthbert@cuthbertlaw.com

Mark J. Krudys (VSB No. 30718)
Daniel Guinnane Zemel (VSB No. 95073)
The Krudys Law Firm, PLC
Truist Place
919 East Main Street, Suite 2020
Richmond, VA 23219
Telephone:  804-774-7950
Facsimile:  804-381-4458
mkrudys@krudys.com
dzemel@krudys.com

*Counsel for Plaintiff*

*/s/ Joseph P. Moriarty*
Joseph P. Moriarty (VSB No. 68465)
Kevin M. Kennedy (VSB No. 75701)
Kelley Holland (VSB No. 79627)
Bryn L. Clegg (VSB No. 96923)
WILLCOX SAVAGE, P.C.
440 Monticello Avenue, Suite 2200
Norfolk, Virginia 23510-2243
Telephone: (757) 628-5500
Facsimile: (757) 628-5566
jmoriarty@wilsav.com
kkennedy@wilsav.com
bclegg@wilsav.com
kholland@wilsav.com
*Counsel for Defendant Pinetree Apartments, LLC*

I-2983797.1