UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

NYEISHA S. GHEE,

      Plaintiff,

v.

      Civil Action No.: 3:25-cv-17-RCY

PINETREE APARTMENTS, LLC,

      Defendant.

**PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR LEAVE TO AMEND THE AMENDED COMPLAINT**

Plaintiff Nyeisha Ghee ("Ms. Ghee"), by counsel, hereby submits her Reply Memorandum in Support of her Motion for Leave to Amend the Amended Complaint.

## INTRODUCTION

Following the February 20, 2024 fire that resulted in the death of three-year-old Mark Ghee and serious burns to Ms. Ghee, extensive wood rot caused by termite and water damage was found in the wood framing surrounding the sliding glass door in the Primary Bedroom of Unit G8 ("Sliding Glass Door"). Plaintiff's expert states that this damage caused the Sliding Glass Door to be "out of square," preventing Ms. Ghee and her son Mark from escaping the burning apartment. Plaintiff's proposed Second Amended Complaint, ECF No. 38-1 (hereafter "SAC"), ¶ 126, ECF Nos. 46-2 and 46-3 (SAC Exhibits 32 and 33). Termite damage, located exactly where the expert found it in his post-fire inspection, had been previously observed by the former occupant of G8, Ms. Ghee's unit. ECF No. 38-1, SAC, ¶ 20, ECF Nos. 40-5 and 41-1 (SAC Exs. 5 and 6). Defendant Pinetree Apartments, LLC ("Defendant" and/or "Pinetree") was aware of excess moisture, termite infestations, and wood damage above and around the sliding glass doors throughout the complex. ECF No. 38-1, SAC, ¶ 45. However, Pinetree only made repairs on a piecemeal basis, presumably

to save money. *Id.*, at ¶ 4. Before Ms. Ghee's walkthrough of G8 prior to her move-in, Pinetree painted over termite holes above the Sliding Glass Door, concealing the dangerous conditions inside the wall. *Id.*, at ¶ 25. Months later, when preparing for a routine annual inspection, Ms. Ghee tried to open the Sliding Glass Door but could not get it to move. She did not know whether more aggressive effort would open the door. *Id.*, at ¶¶ 107-108. She reported this to a Pinetree maintenance worker, who assured her, "I got you," or words to that effect. *Id.*, at ¶ 110. Contrary to Pinetree's assertion, the foregoing factually supports Plaintiff's claims. Difficulty with moving the Sliding Glass Door months after moving in did not alert Ms. Ghee to the dangerous conditions within G8's walls, nor would it alert any reasonable tenant.

In her proposed SAC, Plaintiff details evidence showing termites swarming throughout the complex (*Id.*, at ¶¶ 49-66), water leaking in through the tops of the sliding glass doors (*Id.*, at ¶ 47. d.-e., ECF Nos. 43-2 - 43-4 (SAC Exs. 17-19)), waterlogged and decaying support structures (*Id.*, at ¶¶ 74-91), and tenants repeatedly complaining about these issues being ignored (*Id.*, at ¶ 47. b., d., h.). In response, Pinetree claims that the new evidence identified in the SAC shows it addressed concerns rather than ignored them. However, this is not what the Code inspectors, the housing authority, or the tenants have expressed. *Id.*, at ¶¶ 47. a.-k., 68-73. The SAC demonstrates that tenants felt their complaints about these issues went unaddressed by Pinetree. *Id.,* at ¶ 47. a.-k. Additionally, as noted in the SAC, outside contractors have found significant damage above and around patio sliding glass doors in dozens of instances after 2018 (Pinetree agreed to produce relevant documents beginning in 2019). *Id.*, at ¶¶ 74-91. The contractors often found rotten wood, including jack studs (vertical framing lumber that supports the ends of the header beam over the sliding glass door) and wooden framing around the doors. *Id.* These widespread structural issues could not be caused by tenants.

2

In its Introduction, Pinetree asserts that "[s]omething cannot both be readably [sic] discovered by a tenant before the claimed damages occurred, yet at the same time, be a latent defect the landlord fraudulently concealed." ECF No. 49, at 1. But the crumbling jack stud and two-by-fours could not have been readily discovered by Ms. Ghee. She was not permitted to remove the drywall to inspect the conditions inside the wall, nor did she have the knowledge to realize that such was necessary. Indeed, under the Leases, Ms. Ghee was not permitted to "perform any repairs, painting, … or otherwise alter our property." ECF No. 38-1, SAC, ¶ 98.

Pinetree argues that "[t]he very moment in time that the defect allegedly arose (e.g., the operation of the Sliding Door became impeded) is the exact moment in time that the defect became equally discoverable to the Plaintiff." ECF No. 49, at 6. However, the defect was never equally discoverable to the Plaintiff and would not have been equally discoverable to any other reasonable tenant in her situation. Pinetree discovered the Sliding Glass Door's inoperability, at the latest, during the inspection prior to Ms. Ghee taking possession of the Unit. When that discovery was made, only Pinetree had the knowledge and ability to identify the underlying defect. Further, due to the widespread termite and water damage across the complex and Pinetree's discovery of termite holes around the Sliding Glass Door, Pinetree knew the underlying defect was water and/or termite damage deteriorating the structure of the door, with the inoperability of the door as a consequence of the defect. Only Pinetree knew about the widespread issues with sliding glass doors, caused by water and termite damage, at Pinetree Apartments. Instead of fixing the problem in G8, Pinetree painted over the termite holes and hid the issue from Ms. Ghee, just as it had painted over mold in the past.[1]

---

[1] Pinetree produced an undated video of an irate tenant scolding an apparent Pinetree employee for painting over mold on her window seal. *See* ECF No. 41-5.

3

**BACKGROUND**

By April 25, 2025, the parties had completed their briefing on Defendant's Partial Motion to Dismiss. Pursuant to the stipulation (ECF No. 33), on June 2, 2025, Plaintiff served discovery on Defendant Pinetree and subpoenaed records from certain third parties. Four months later, on October 3, 2025, after ongoing negotiations about the scope of discovery, Defendant Pinetree provided Plaintiff with the largest tranche of its production to date. The tranche included evidence of the widespread nature of the termite and water damage at Pinetree's apartment complex. Plaintiff's counsel believed it was important to present this new evidence to the Court promptly, along with her additional claim under the Virginia Consumer Protection Act, and drafted the SAC without delay. The Court should grant leave for the Plaintiff to amend and defer ruling on the plausibility of Plaintiff's claims until the benefit of a full motion to dismiss briefing can be completed. Courts often take this logical approach. *See Taylor v. Revature LLC*, No. 1:22-cv-1153, 2024 U.S. Dist. LEXIS 156859, *2-4 (E.D. Va. Aug. 30, 2024) (collecting cases).

At the top of page 5 of its Brief in Opposition to Plaintiff's Motion for Leave to Amend the Amended Complaint (Defendant's "Brief"), Defendant Pinetree contends that the Court should deny Plaintiff's Motion to Amend because Plaintiff acted "rapid[ly]" after receiving the new evidence, "foreshadow[ing] a future pattern that will unfairly burden the court and the defense significantly." ECF No. 49, at 5. Defendant Pinetree offers no justification for claiming that further motions to amend are probable, nor any authority indicating that such factors are relevant to the current motion. It also overlooks that a delay in filing the motion may have been grounds for denial. The Supreme Court has ruled that leave to amend may be denied if there is "undue delay, bad faith or dilatory motive" on the part of the Plaintiff. *Foman v. Davis*, 371 U.S. 178, 182 (1962). Furthermore, whether allowing leave to amend would be prejudicial "will often be determined by

4

the nature of the amendment and its timing." *Laber v. Harvey*, 438 F.3d 404, 427 (4th Cir. 2006). It would have been bad practice for counsel not to move promptly to bring impactful evidence and assert an additional claim before the Court, especially as the parties await the Court's opinion on Defendant's Partial Motion to Dismiss. To argue otherwise is nonsensical.

## ARGUMENT

**I.    Amendment of the complaint would not be futile.**

Federal Rule of Civil Procedure 15(a)(2) provides that "a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a). "The court should freely give leave when justice so requires." *Id*. Following that command, "[i]t is [the Fourth] Circuit's policy to liberally allow amendment in keeping with the spirit of Federal Rule of Civil Procedure 15(a)." *Galustian v. Peter,* 591 F.3d 724, 729 (4th Cir. 2010) (citation omitted). A district court should deny leave to amend only "when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile." *Abdul-Mumit v. Alexandria Hyundai, LLC*, 896 F.3d 278, 293 (4th Cir. 2018) (quoting *Johnson v. Oroweat Foods Co*., 785 F.2d 503, 509 (4th Cir. 1986)).

Notably, "[a] proposed amendment is futile when it is 'clearly insufficient or frivolous on its face' or 'the claim it presents would not survive a motion to dismiss.'" *Save Our Sound OBX, Inc. v. N.C. DOT*, 914 F.3d 213, 228 (4th Cir. 2019) (quoting *Johnson v. Oroweat Foods Co*., 785 F.2d 503, 510 (4th Cir. 1986) and *Perkins v. United States*, 55 F.3d 910, 917 (4th Cir. 1995)). In addition, courts often choose to address futility arguments in the context of motions to dismiss instead of in the context of a motion to amend. *See Taylor v. Revature LLC*, No. 1:22-cv-1153, 2024 U.S. Dist. LEXIS 156859, *2-4 (E.D. Va. Aug. 30, 2024) (making such a determination and

5

discussing other courts doing the same). Plaintiff's proposed SAC is not "clearly insufficient or frivolous on its face" and the claims it presents would survive a motion to dismiss.

The proposed SAC was submitted in good faith to incorporate facts learned recently in discovery and to assert a claim under the Virginia Consumer Protection Act, the appropriateness of which is strongly indicated by the newly learned facts. Plaintiff's claims are not futile. Plaintiff expects to prevail at trial on these new and/or bolstered allegations, which resulted in horrific injuries to Ms. Ghee.

      **a.    A jury could reasonably conclude that the structural issues affecting the operation of the Sliding Glass Door existed when Ms. Ghee took possession of Unit G8.**

Defendant Pinetree, in contravention of the proper standard, reads documents in the light most favorable to it and makes inferences in its favor in order to quarrel with Plaintiff's claim that the Sliding Glass Door did not work properly when she took possession of Unit G8 in June 2022. Defendant Pinetree claims that Plaintiff "ignores the inspection performed by the Petersburg Redevelopment and Housing Authority ("PRHA") before she took possession." ECF No. 49, at 7. Defendant Pinetree then emphasizes the significance of the PRHA inspection by calling it a "critical fact." *Id*. But the contemporaneous documents do not support Pinetree's assertion.[2] On May 24, 2022,[3] PHRA employee Marrietta Paschal conducted an initial inspection of Pinetree Apartments Unit G8. ECF No. 38-1, SAC, ¶ 22. Importantly, that was the only day that Paschal personally inspected the unit. **Exhibit 1**, at PINETREE00614. The unit failed inspection on that day.

---

[2] Plaintiff observes that Defendant's inclusion of records relating to PRHA's May 2022 inspection is not complete. It does not include relevant emails regarding the inspection, nor the Inspection Checklist itself. For the same reasons stated in Defendant's Brief at 7-8 (ECF No. 49, at 7-8), Plaintiff includes as **Exhibit 1** relevant emails regarding the inspection (PINETREE00614-18) and includes as **Exhibit 2** the complete Inspection Checklist (SDT-PRHA00018-25), and incorporates the same herein by reference.
[3] Incorrectly noted in the SAC as May 24, 2024.

6

**Exhibit 2,** at SDT-PRHA00018. A contemporaneous Inspection Checklist completed by Paschal states that the Master Bedroom (referenced herein as the "Primary Bedroom") "sliding door **can't open.**" *Id.,* at SDT-PRHA00020 (Emphasis added). In the second bedroom, she wrote, "chipping paint around sliding door **can't open/hard to open.**" *Id.* (Emphasis added).

Then, a week later, on May 31, 2022, Paschal marked the deficiencies she noted on May 24 as receiving "Final Approval." *Id*. However, Paschal never returned to the apartment to see the deficiencies resolved. Instead, on May 31, 2022, she received two videos from Pinetree allegedly showing repairs for chipping paint and the replacement of a locking mechanism, but not demonstrating any repair to the functionality of the sliding glass doors that Paschal noted would not open. **Exhibit 1**, at PINETREE00615-18. In its Brief, Defendant Pinetree cites an email written by Paschal, not from the time of Paschal's May 24, 2022 inspection of Unit G8, but three years later. ECF No. 49, at 8, ECF 49-1. The email was sent to a PRHA executive after the agency received a subpoena *duces tecum* from Pinetree demanding materials related to the inspection of Ms. Ghee's apartment.

Due to shortcomings in the inspection process, Paschal explained in her June 9, 2025 email, "The unit initially failed 05/24/2022 due to the sliding doors in the bedrooms and window in the living room having severe chipping paint, as well as them being hard to open." ECF No. 49-1. This statement aligns with her contemporaneous Inspection Checklist. Paschal then added, "Maintenance was able to get the windows/doors to open smoothly while I was present by lubricating the seals. The attached videos are what they sent[,] videos showing that the chipping paint was taken care of effective 05/31/2022." *Id.* But there is no contemporaneous evidence supporting the claim that "Maintenance was able to get the windows/doors to open smoothly while [Paschal] was present by lubricating the seals." *Id.* The contemporaneous Inspection Checklist

7

confirms the unit failed inspection due to the deficiencies listed, including that the Primary Bedroom sliding glass door "can't open," and that these issues were not noted as resolved until May 31, 2022. **Exhibit 2,** at SDT-PRHA00020. However, on that date, Paschal never revisited the unit, and the videos she received did not demonstrate that the doors could be opened, let alone move smoothly. **Exhibit 1**, at PINETREE00616, -18. Therefore, the evidence shows that the Plaintiff's account of the May 24, 2022 PRHA inspection of Unit G8 is most convincing. At a minimum, once all inferences are drawn in Plaintiff's favor — which must be done at this stage — Plaintiff has pled sufficient evidence to show that the structural issues with the Sliding Glass Door and the surrounding wooden frame existed when Ms. Ghee moved into the unit.

At the top of page 9 of its Brief, Pinetree asserts, "[a] rotten header that simply caused water leakage but *did not* cause the [S]liding [Glass] [D]oor to become difficult to open is not relevant to Plaintiff's claims in this lawsuit." ECF No. 49, at 16 (emphasis in original). Pinetree contends that no matter the frequency or severity of wood rot around patio sliding glass doors, it is irrelevant unless the evidence shows that the rot interfered with the movement of the doors. *Id.* This is incorrect. Wood framing is built around sliding glass doors to support the structure. When that wooden framing rots, the building's weight may no longer be supported, causing deformation and compression of the sliding glass doors and preventing them from sliding properly. *See* Plaintiff's expert's affidavit at ECF No. 38-1, ECF Nos. 46-2 and 46-3 (SAC Exs. 32 and 33). The wood rot will *inevitably* affect the sliding of the doors, just like unrefrigerated cheese will inevitably grow mold. And it did affect the Sliding Glass Door before Ms. Ghee took possession of G8, as discussed above.

Through its argument, Defendant Pinetree makes Plaintiff Ghee's point. Her discovery in July 2023 that the Sliding Glass Door did not move belied the true danger – that the jack stud and

8

two-by-fours above the Sliding Glass Door were rotten, in part due to termites and water infiltration, causing the Sliding Glass Door to be out of square and not move. *Id.*, at ¶¶ 5, 126, ECF Nos. 46-2 and 46-3 (SAC Exs. 32 and 33). Ms. Ghee did not know, and a reasonable tenant would not know, about the serious underlying structural problem behind the wall surrounding the Sliding Glass Door.

The error of Pinetree's position is further revealed by its statement, "[a]bsent any effect on the Sliding [Glass] Door, there is no defect." ECF No. 49, at 9. This not only highlights a flaw in Pinetree's reasoning but also reflects its apathetic response to the hidden issues inside Ms. Ghee's Primary Bedroom wall—specifically water damage, termite infestation, wood rot, and door compression. Contrary to Pinetree's claim, rotting structural beams—especially those above and around the only direct escape from the bedroom during a fire—constitute a defect, and a major one at that. Importantly, Ms. Ghee would have no way of knowing that the jack stud and other wood framing surrounding the Sliding Glass Door were rotten. A reasonable person in her position would not have been able to glean those underlying issues simply from the door not moving. Finally, this issue is one for the jury to decide.

At page 10 of its Brief, Defendant attempts to undercut Plaintiff's fraud claim. But Pinetree's reference to the applicable law shows that Plaintiff has indeed asserted a proper fraud claim. Specifically, "Pinetree 'willfully and deliberately concealed the material fact,'" namely, water and termite damage to the wood structure framing the Sliding Glass Door, and also their effect on the operation of the door, "while knowing that Plaintiff was acting on the assumption that the fact did not exist." ECF No. 49, at 10, quoting *Guy v. Tidewater Inv. Props.*, 41 Va. Cir. 218, 220-221 (Norfolk 1996). Defendant's reference to the Virginia Supreme Court's holding in

9

*Kuczmanski v. Gill*, 225 Va. 367, 370 (1982) concerning an open and obvious defect is not at all persuasive, as the defects within G8's walls were not open and obvious. *Id.,* at 11.

      **b.**    **The discovery of rotten wood, including jack studs (vertical supports) and the wooden framing above patio sliding glass doors is not evidence in Pinetree's favor. Nor does it support Pinetree's futility assertion.**

The proposed SAC includes more than 30 instances after 2018 where outside contractors identified significant damage above and around patio sliding glass doors. ECF No. 38-1, SAC, ¶¶ 74-91. The contractors often found rotting wood, including jack studs (vertical supports) and the wooden framing above the doors. *Id.* Continuing its effort to debate the facts during a phase of litigation where all well-pleaded allegations in the complaint are accepted as true and all reasonable factual inferences are drawn in Plaintiff's favor, Defendant Pinetree argues that the need for extensive repairs above and around other patio sliding glass doors during the relevant period is either irrelevant or works in its favor; it cannot decide which. ECF No. 49, at 2, 4, 12. But again, Pinetree does not strengthen its futility argument by arguing with Plaintiff's well-pleaded facts. Instead, Pinetree's effort only underscores that it lacks a legitimate argument at this stage and only has an argument for the jury.

At the top of page 12 of its Brief, Defendant Pinetree argues that it promptly made repairs to the apartment units, was "cognizant of the timeframe" needed for repairs, "prioritized efficient repair personnel," selected a contractor that "had a good turnaround time for repairs," and recasts its many negative online reviews as evidence that it responded quickly to tenant complaints. *Id.*, at 12. As mentioned earlier, Pinetree's October 3 production revealed multiple instances after 2018 where outside contractors identified significant damage around the patio sliding glass doors, including rotten jack studs (vertical supports) and the wooden framing above the doors. ECF No. 38-1, SAC, ¶¶ 74-91. So, to recap, at least 30 times after 2018, professional contractors found

extensive damage in the same area of Pinetree Apartment units where Plaintiff's expert observed rotted horizontal two-by-fours and jack studs in Unit G8. This is also the same area where tenants complained of termites and where the previous tenant of G8 saw termite holes, which then disappeared after Pinetree employees conducted cosmetic touch-up painting immediately prior to Ms. Ghee's walk-through. *Id.*, at ¶ 20, ECF Nos. 40-5 and 41-1 (SAC Exs. 5 and 6). In its Brief, Pinetree ignores this and instead congratulates itself for performing certain repairs. ECF No. 49, at 12. As for the fact that no repairs were made at Unit G8, Pinetree claims it "was one of the many units that did not need such repairs." *Id.*, at 13. There is no factual basis for this claim. The evidence, detailed throughout the proposed SAC and referenced here, shows otherwise.

At the bottom of page 13 of its Brief, Pinetree touts its termite treatment efforts. *Id.* The evidence in the proposed SAC details, and Defendant's argument concedes, that termites infested the complex. Moisture, water, and/or termite infestation and damage weakened the wooden structure surrounding the patio sliding glass doors, causing weight to be placed on the doors, which impeded their movement and, in turn, eliminated the only direct escape route outside from the apartment bedrooms. Any abatement efforts claimed by Pinetree were ineffective, as shown by the more than 30 times contractors found wood rot or other serious damage around patio sliding glass doors in the five years before the fire. One reason termites thrived in the Pinetree buildings is that costly exterior termite treatments and even inspections were not regularly done. In its Brief, Defendant argues that "Plaintiff does not point to a single termite issue recorded by PestNow…that concerns Building G while Plaintiff was in residence." *Id*. However, in the same paragraph, Defendant concedes that PestNow did not conduct any treatment or inspection of Building G between 2021 and the date of the fire. *Id*. Further, while PestNow's records evidence the history of termite infestations at Pinetree, they still do not capture the extent of termite damage and the

11

simultaneously occurring water damage, which are evidenced by the contractor maintenance records, the testimony of the tenants, and the expert findings.

### c. A jury could reasonably conclude that the extensive repairs needed above and around other patio sliding glass doors were the same kind of repairs required above and around the sliding glass door in Ms. Ghee's Primary Bedroom.

Undeterred in its efforts to argue with the well-pleaded facts in the proposed SAC, on page 14 of its Brief, Defendant claims that none of the repair records relating to sliding doors, other apartments, and other buildings "should be admissible." ECF No. 49, at 14. By its language, Pinetree makes clear that it is not arguing that Plaintiff's proposed amendment is futile, but contends that certain facts are not admissible. This is an obvious evidentiary issue (indeed, Defendant directly presents it that way), which can be taken up at trial. "A proposed amendment is futile when it is 'clearly insufficient or frivolous on its face' or '**the claim it presents** would not survive a motion to dismiss.'" *Save Our Sound OBX,* 914 F.3d at 228 (emphasis added). The test is not whether the individual evidence identified in the proposed amendment is admissible. According to the criteria of *Save our Sound*, this Court should ask if the challenged claims in the proposed SAC would survive a motion to dismiss. If they would, and there is no prejudice to the opposing party or bad faith by the moving party, the Fourth Circuit's policy of liberally permitting amendment applies.

Because Pinetree devotes four pages of its Brief to the admissibility of repairs to other patio sliding glass doors during the relevant period, Plaintiff will add to her observations and argument. ECF No. 49, at 14-17. Except for variances in layout, the apartment buildings and individual units at Pinetree Apartments were the same; they had the same siding, the same windows, the same sliding glass doors, and were constructed in the same manner and at the same time. One assertion in the proposed SAC that Pinetree does not challenge is that during the relevant period, in over 30

12

different instances, extensive damage including wood rot was found in the area above and around patio sliding glass doors. How is it that these defects were so widespread? Clearly, the sliding glass doors and the areas around them were not properly installed, constructed, or maintained over time.[4] Despite this systemic issue throughout the complex, Pinetree claims that the same defect somehow did not affect Building G and specifically Unit G8. Besides Pollyanna thinking, Pinetree's claim does not match the evidence. The Sliding Glass Door did not slide, neither when Ms. Ghee took possession of the premises, nor afterward. Termites had tunneled into the area above the Sliding Glass Door, as former tenant Donisha Bugg swore in her statements. ECF No. 38-1, SAC, ¶ 20, ECF Nos. 40-5 and 41-1 (SAC Exs. 5 and 6). Additionally, during the fire, the Sliding Glass Door would not move, even when Ms. Ghee tried to open it with both hands and all her strength, as flames neared her and her son Mark.

Then, Plaintiff's expert found water and termite damage to the jack stud and the wooden framing above the Sliding Glass Door. ECF No. 46-3, at 2-3 (SAC Ex. 33). According to the expert, water and termite damage caused the wood wall framing to shift, resulting in compression and deformation of the Sliding Glass Door frame, as shown in ECF No. 46-2 (SAC Ex. 32). In his accompanying Affidavit, ECF No. 46-3, at 3 (SAC Ex. 33), Plaintiff's expert opines that the foregoing caused the door to be out of square and unable to move.

Contrary to its claims otherwise, Defendant had notice and actual knowledge of the defective condition. The defect was the same, or, in the words of the Georgia state case cited by Pinetree, "substantially similar" throughout the complex. *See Smith v. Hous. Auth.,* 212 Ga. App.

---

[4] Among other evidence supporting this conclusion is a May 11, 2023 work invoice on Unit O10, which notes that contractors "repaired flashing and installed Tyvek… installed flashing under bottom layer of shingles from where first row of shingles and starter was installed wrong. … Repaired flashing under sliding glass door and sealed." ECF No. 38-1, SAC, ¶ 85.

503, 505 (1994), cited in Defendant's Brief, ECF No. 49, at 14-15. The damage had the same cause (moisture/water/termite damage), occurred at the same time (January 2019 through February 2024), and was in the same place (above and beside patio sliding glass doors), which compromised the structure of the building, resulting in the need for repair and/or replacement. Plaintiff's termite expert observed that termite damage can, and has, interfered with the operation of sliding glass doors. ECF No. 44-3, at 3 (SAC Ex. 23). Obviously, if the wood rot in the framing of the patio sliding glass doors is permitted to persist, it will result in compression upon the door, making it unable to move. Whether the more than 30 instances of repairs around Pinetree Apartments' patio sliding glass doors are substantially similar to the damage around the Primary Bedroom sliding glass door in G8 is, at most, an evidentiary issue for trial and does not support a claim of futility.

Defendant's citation to *Roll "R" Way Rinks, Inc. v. Smith* supports Plaintiff's assertions, as the water and termite damage, including wood rot, did happen "at substantially the same place and under substantially the same circumstances," and "had been caused by the same or similar defects and dangers as those in issue," including by the "acts of the same person." 218 Va. 321, 325 (1977), ECF No. 49, at 14. Specifically, substantial wood and structural damage was found in the same area of over 30 apartments during the same period. Further, in all instances, the apartments were owned and operated by Pinetree.

At pages 16 and 17 of its Brief, Pinetree seeks to dismiss the relevance of evidence of truly deplorable conditions inside Pinetree Apartments, to include a video of water pouring in through the top of a sliding glass door and tenant Holly Johnson's desperate efforts to use plastic and tape to cover the area. ECF No. 49, at 16-17, *See* ECF No. 43-2 (SAC Ex. 17). Because Ms. Ghee did not experience water pouring into her apartment through the Sliding Glass Door, Pinetree absurdly asserts that she could not have had water leaking into the wall. ECF No. 49, at 17. Of course, water

14

could have, and did, cause deterioration in the Primary Bedroom wall of Ms. Ghee's apartment without also pouring into her apartment or causing damage noticeable by her or any reasonable tenant. Pinetree may not dismiss the relevance of Ms. Johnson's complaints detailed in the proposed SAC, nor should it have ignored her complaints at the time. (Ms. Johnson complained to Pinetree that her requests continued "to get ignored.") ECF No. 38-1, SAC, ¶ 47. d.

At note 6, Pinetree argues that if there was no water damage visible on the wall inside Ms. Ghee's apartment, water could not have leaked into the wall. ECF No. 49, at 17, note 6. That is obviously not true and strongly suggests why over 30 apartments were repaired, but the others were not. Until water damage was clearly visible inside the apartment, Pinetree apparently believed that it was a condition that could be ignored.

## II.    Plaintiff's proposed SAC properly pleads a claim under the Virginia Consumer Protection Act ("VCPA").

The VCPA was enacted "to expand the remedies afforded to consumers and to relax the restrictions imposed upon them by common law." *Owens v. DRS Auto. Fantomworks, Inc.*, 288 Va. 489, 497 (2014). The Supreme Court of Virginia has acknowledged the "legislature's express directive that we apply the VCPA as remedial legislation" and how this directive supports conclusions that are "more favorable to the injured plaintiff." *Ballagh v. Fauber Enters.*, 290 Va. 120, 126 (2015). Contrary to that explicit directive, Defendant argues that the exception to the VCPA concerning landlord-tenant transactions added by the General Assembly—an exception that specifically preserves many claims—removes the ability to bring any claim under the VCPA related to landlord-tenant transactions. This interpretation contradicts the clear language of the exception and the purpose of the VCPA.

15

### a. The VCPA applies to this transaction.

Defendant's argument that the VCPA does not apply to the consumer transaction of signing a lease holds no water. As the Defendant itself notes, the VCPA includes a specific exception for landlord-tenant transactions that prevents such claims unless there is a misrepresentation or fraudulent act or practice. This means that transactions involving a misrepresentation or fraudulent act or practice must be covered under the VCPA. The fact that Defendant believes the exception does not sufficiently cover or leaves too many landlord-tenant transactions within the scope of the VCPA is an issue that it may take up with the General Assembly, not something for a federal court to decide as a policy matter.

This commonsense conclusion is borne out by Virginia court decisions involving the VCPA. In *Stith v. Liberty Pointe LP*, the plaintiff alleged that the defendant "failed to provide habitable conditions at the time of leasing the unit." 110 Va. Cir. 141 (Va. Cir. Ct. 2022) (Petersburg). The court found that such an allegation properly stated a cause of action under the VCPA. Likewise, in *Guy v. Tidewater Investment Properties*, the plaintiff alleged that "fraudulent concealment and/or omissions regarding the lead paint hazards and the supposed repair of the hazard are equivalent to verbal misrepresentations of material facts" and thus they could bring a claim under the VCPA. 41 Va. Cir. 218, 230 (Va. Cir. Ct. 1996) (Norfolk). The *Guy* court also noted that "[t]he Virginia Supreme Court has continually emphasized in the fraud context that concealment can be the equivalent of an express misrepresentation." *Id*. (string citation omitted). These two rulings are consistent with the broader legal principle. *See Yong Su Park v. Gates Hudson & Assoc.*, 83 Va. Cir. 45, 49 (Va. Cir. Ct. 2011) (Fairfax) (holding concealment of bedbug infestation stated a claim under the VCPA).

Federal courts have consistently concluded that the VCPA applies to all forms of fraud and misrepresentation within landlord-tenant transactions. In *Miller v. Charles E. Smith Management Incorporated*, the Fourth Circuit reversed a district court decision and permitted a claim against a landlord based on fraudulent misrepresentation under the VCPA. No. 96-2636, 1999 U.S. App. LEXIS 1013, *7-8 (4th Cir. Jan. 26, 1999) (unpublished). Similarly, this district reached the same conclusion in *Smith v. 4037 Lamplighter DR, LLC*, ruling that misrepresentation and deceptive practices could constitute fraud and state a claim under the VCPA, but that the plaintiff had not pled sufficient facts to establish such fraud. No. 3:24-cv-580, 2025 U.S. Dist. LEXIS 13200, *30-31 (E.D. Va. Jan. 24, 2025). In summary, the VCPA applies to this case if the Plaintiff can demonstrate that the Defendant made a misrepresentation or otherwise committed fraud, which includes concealment.

### b.     Plaintiff has sufficiently pled a VCPA claim.

As the Supreme Court of Virginia explained in *Owens v. DRS Automotive Fantomworks, Inc.*, while proof of fraud is "sufficient to establish a violation of the VCPA…the VCPA's proscription of conduct by suppliers in consumer transactions extends considerably beyond fraud." 288 Va. 489, 497 (2014). Misrepresentations, as explicitly contemplated in the landlord-tenant exception, also violate the VCPA. And unlike in issues of fraud, these misrepresentations do not necessarily have to be made "knowingly or with the intent to deceive" because if a plaintiff proves willfulness, they are entitled to treble damages. *Id*. (citing Va. Code. § 59.1-204(A)). More importantly, VCPA claims only require proof by a preponderance of the evidence, unlike the clear and convincing standard necessary for common law fraud. *Ballagh v. Fauber Enterprises*, 290 Va. 120, 127 (2015). Therefore, Plaintiff's fraud and VCPA claims are separate and not intertwined.

17

For the reasons stated above, Plaintiff has adequately alleged common law fraud and has certainly met the even lower standard required for a VCPA claim.

## CONCLUSION

Plaintiff respectfully requests that the Court grant her Motion for Leave to Amend the Amended Complaint, declare Defendant's Partial 12(b)(6) Motion to Dismiss Plaintiff's Complaint moot, and grant any other relief the Court finds just and proper.

                      Respectfully submitted,

                      NYEISHA S. GHEE

                      By:    */s/ Mark J. Krudys*
                             Counsel

Charles H. Cuthbert, Jr. (VSB # 14519)
Richard M. Cuthbert (VSB # 82025)
Cuthbert Law Offices
A Professional Corporation
220 North Sycamore Street
Petersburg, Virginia 23803-3228
(804) 733-3100
Fax #: (804) 732-4658
ccuthbert@cuthbertlaw.com
rcuthbert@cuthbertlaw.com

Mark J. Krudys (VSB#30718)
Daniel Zemel (VSB#95073)
The Krudys Law Firm, PLC
Truist Place
919 East Main Street, Suite 2020
Richmond, VA, 23219
Phone: (804) 774-7950
Fax:    (804) 381-4458
Email: mkrudys@krudys.com; dzemel@krudys.com
*Counsel for Plaintiff*

**Certificate of Service**

I hereby certify that on this 23rd day of October 2025, I have electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all parties of record.

    */s/ Mark J. Krudys*
Mark J. Krudys (VSB# 30718)
The Krudys Law Firm, PLC
Truist Place
919 East Main Street, Suite 2020
Richmond, Virginia 23219
804.774.7950 Phone
804.381.4458 Fax
mkrudys@krudys.com
*Counsel for Plaintiff*