**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

NYEISHA S. GHEE,

        Plaintiff,

                                     Civil Action No.: 3:25-cv-17-RCY

    v.

                                    **JURY TRIAL DEMANDED**

PINETREE APARTMENTS, LLC,

CLEARFIELD/PINETREE APARTMENTS, LLC,

BEACHWOLD PARTNERS, LP,

BEACHWOLD HOLDINGS, LLC,

BEACHWOLD RESIDENTIAL, LLC,

SOUTH OXFORD MANAGEMENT, LLC,

NADRA YOHANNES,

RICKY MCCONNELL,

ALVIN PEEBLES, and

PESTNOW OF CENTRAL VIRGINIA, LLC,

        Defendants.

## THIRD AMENDED COMPLAINT

COMES NOW Plaintiff Nyeisha S. Ghee ("Ms. Ghee"), by counsel, and moves this Court for judgment against Defendants Pinetree Apartments, LLC ("Pinetree"), Clearfield/Pinetree Apartments, LLC ("Clearfield"), Beachwold Partners, LP ("Beachwold Partners"), Beachwold Holdings, LLC ("Beachwold Holdings"), Beachwold Residential, LLC ("Beachwold Residential"), South Oxford Management, LLC ("South Oxford"), Nadra Yohannes ("Yohannes"), Ricky McConnell ("McConnell"), Alvin Peebles ("Peebles"), and PestNow of

Central Virginia, LLC ("PestNow"), for the reasons stated below:

## I.    <u>INTRODUCTION</u>

1.    On February 20, 2024, Ms. Ghee was horribly burned, and her three-year-old son, Mark, died in a fire at Apartment G8 in Pinetree Apartments—a ground-floor unit that she rented. When a fierce fire was discovered in the middle of the night, Ms. Ghee's two older sons escaped through the front door of the apartment. Ms. Ghee and Mark were in the primary bedroom (the "Primary Bedroom") and tried to escape through a sliding glass door that led outside. However, no matter how hard she tried or how many times she attempted, the door simply wouldn't open. Ms. Ghee then realized that she and Mark would have to run through the flame-engulfed apartment to escape out the front door. But when she turned from the sliding glass door to grab Mark for their escape, he was gone. Firefighters later found his body on the floor, not far from the front door.

2.    The sliding glass door that turned Ms. Ghee's bedroom into a fiery prison was not a new problem. Not only did Ms. Ghee's door have a history of problems, but sliding doors all over Pinetree Apartments had the same problem: they wouldn't open. The reason was widespread, systemic problems with water intrusion and termite infestations. Improperly installed flashing around patio sliding glass doors was directing water into the walls instead of away from them. The accumulation of water-attracted termites that chewed away at the waterlogged wood framing supporting the sliding glass doors. Defendant PestNow, a third-party exterminator, failed to follow the instructions for applying termiticide and failed to stop the termite damage. From 2019 through early 2024 and beyond, dozens of times, contractors pulled back the siding around the sliding glass doors and found wood "decay" and "rot"—their words—including the horizontal headers above the sliding glass doors and the vertical jack studs beside the doors.

3.    Rot and decay at these locations caused the wooden frame around the sliding glass

doors to shift out of square, preventing the doors from moving. About three months after the fire, Plaintiff's expert took a photo, shown below, of the damaged wood in the wall at the back of the Primary Bedroom in Ms. Ghee's apartment. Before taking this photo, Plaintiff's expert inserted a putty knife into the wood to show the extent of the damage. Before the fire, drywall covered this damaged wood.



4.      These problems were well known to management at Pinetree. Tenants flooded the email inboxes and voicemails of the manager (as well as third-party apartment review websites) with complaints about water leaking into their units through the walls surrounding their patio sliding glass doors. They included numerous photos and videos with their complaints, showing damaged, soggy carpets and black mold in the affected areas. Management, described below as a network of interconnected companies, most bearing the name "Beachwold,"[1] knew about sliding

---

[1] Pinetree, Clearfield, Beachwold Partners, Beachwold Holdings, Beachwold Residential, and South Oxford are referred to herein as the "Beachwold Defendants." Three New Yorkers,

glass door problems, both in general and with regard to Ms. Ghee's specific door.

5.      Yet, instead of properly addressing these systemic problems, Pinetree's management chose to make cheap, cosmetic fixes that *hid* the damage instead of addressing the underlying problem with the doors. In Ms. Ghee's apartment, this included *painting over termite holes* beside the door the day before she took possession of the apartment.  As a result, Ms. Ghee never knew the structural trap in which she was living with her three boys until the night of February 20, 2024—when it was too late to make a difference.

6.      PestNow also contributed to Ms. Ghee's injuries in multiple ways, including by applying termiticide only to the exterior of Building G without inspecting or treating the interior of Unit G8 and Building G's other units, by not applying termiticide at the joints of Building G's abutting concrete slabs, and by allowing its technicians to apply termiticides at the perimeter of Building G even though they were not certified to apply termiticides.  In short, PestNow knowingly skirted state law and the standard of care intended to protect the public. PestNow's failures and negligence in termite treatment contributed to the termite damage that affected Unit G8's sliding glass door and caused Ms. Ghee extensive injuries.

7.      As a direct and proximate result of Defendants' conduct described herein, Ms. Ghee suffered burns to over 53 percent of her body, from her scalp to her feet. Her face was severely disfigured. All five fingers on her right hand had to be fully amputated, and three on her left hand had to be partially amputated. To date, Ms. Ghee has been hospitalized twice for a total of 110 days and has undergone multiple surgeries. Her medical bills currently exceed $2.7 million.

8.      The photo below shows Ms. Ghee and her son Mark in 2021 (before the fire).[2]

---

referred to as "Ownership" by employees  – Gideon Friedman, Amir Hazan, and Chuck Rubenstein – assembled and control the Beachwold Defendants.

[2]  Other photos of Ms. Ghee and her sons are attached as Exhibit 1. All exhibits referred



9.    The following photos reveal some of Ms. Ghee's injuries.





to herein are incorporated by reference.

## II.    <u>JURISDICTION</u>

10.    On or about December 19, 2024, Plaintiff Ms. Ghee filed a personal injury action in Petersburg Circuit Court. Citing diversity citizenship, on January 13, 2025, Defendant Pinetree Apartments, LLC ("Pinetree") removed the action to this Court. (ECF No. 1).

11.    Plaintiff has moved for leave to file this, her Third Amended Complaint ("TAC"), which, among other things, seeks to add certain non-diverse defendants. The joinder of such parties is permitted by 28 U.S.C. § 1447(e), which provides, "if after removal the plaintiff seeks to join additional defendants whose joinder would destroy subject matter jurisdiction, the court may deny joinder, or permit joinder and remand the action to the State court." Plaintiff has requested that this Court grant Plaintiff leave to file this TAC, permit the joinder of certain nondiverse defendants, and remand the action to Petersburg Circuit Court, which court would have personal and subject-matter jurisdiction over the parties pursuant to Virginia Code § 8.01-328.1.

## III.    <u>VENUE</u>

12.    Following Defendant Pinetree's removal of this action, this matter has been before this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in this district.

13.    Assignment to the Richmond Division of the Eastern District of Virginia was proper under Eastern District of Virginia Local Rules 3(B)(4) and 3(C) because a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in this division.

14.    If remanded, venue of this action would be proper in the Petersburg Circuit Court pursuant to Virginia Code § 8.01-262 (4) as the cause of action arose in the City of Petersburg.

## IV.    <u>PARTIES</u>

### A.    **Plaintiff**

6

15.    Plaintiff NYEISHA S. GHEE is, and was at all relevant times, a resident of Virginia. She currently resides in Dinwiddie County.  As noted above, Ms. Ghee's youngest son, Mark, died in the fire.  Ms. Ghee's remaining sons, Elijah and Joshua, are ages 12 and 10, respectively. Ms. Ghee's injuries have impeded her ability to carry out her functions of everyday living and greatly hindered her ability to care for her two surviving boys.

**B.    Defendants**

16.    At all relevant times, Defendant PINETREE APARTMENTS, LLC was a Virginia limited liability company.

17.    At all relevant times, Pinetree had one LLC member, Defendant CLEARFIELD/PINETREE APARTMENTS, LLC, another Virginia LLC.

18.    At all relevant times, Clearfield had 33 members, including Defendant BEACHWOLD PARTNERS, LP, a New York limited partnership with a Park Avenue, New York address.

19.    At all relevant times, Defendant BEACHWOLD HOLDINGS, LLC was a Texas limited liability company.

20.    At all relevant times, Defendant BEACHWOLD RESIDENTIAL, LLC was a Delaware limited liability company with the same Park Avenue address as Beachwold Partners.

21.    At all relevant times, Defendant SOUTH OXFORD MANAGEMENT, LLC, was a Texas limited liability company with the same Park Avenue address as Beachwold Partners and Beachwold Residential. South Oxford was listed as the sole "Manager" on both leases signed by Ms. Ghee.

22.     At all relevant times, Defendant NADRA YOHANNES ("Yohannes") was South Oxford's Regional Manager.  At all relevant times, she has resided in Toano, Virginia (and currently resides there). Her portfolio of properties included Pinetree Apartments.

23.     At all relevant times, Defendants RICKY MCCONNELL ("McConnell") and ALVIN PEEBLES ("Peebles") were Virginia residents who served as Maintenance Technicians or Maintenance Supervisors at Pinetree Apartments. Both currently reside in Virginia.

24.     At all relevant times, Defendant PESTNOW OF CENTRAL VIRGINIA, LLC was a Virginia limited liability company, with its principal place of business and territory in Central Virginia. PestNow was hired to control pests, including termites, at Pinetree Apartments.

## V.    FACTS

### A.    Nyeisha Ghee attended Dinwiddie High School, worked at Walmart, and raised three boys as a single parent, including a special needs child.

25.     Nyeisha Ghee attended Dinwiddie County public schools. Working with an Individual Education Plan ("IEP"), she graduated from Dinwiddie High School in 2014. She is a single parent. She raised three boys.  Her oldest son, Elijah, is a child with special needs.  Ms. Ghee and her mother, Lisa Campbell, lovingly devote substantial additional time to his care and development.

26.     In 2024, Ms. Ghee worked full-time at Walmart.  It was challenging for Ms. Ghee to provide for her family; Ms. Campbell helped with the household bills.

### B.    Ms. Ghee sought financial assistance to lease a safe, clean apartment; she submitted an application to the Petersburg Redevelopment and Housing Authority.

27.     To assist with housing costs, Ms. Ghee applied for financial assistance from the Petersburg Redevelopment and Housing Authority ("PRHA"). Ms. Ghee completed an application and provided the Authority with income and costs documents.  She was approved and given a voucher for rental assistance along with a list of apartments accepting PRHA vouchers.  Pinetree Apartments

was among the apartments on the list. Pinetree Apartments held itself out as offering "dream" homes in the heart of Petersburg, Virginia.

28.    Pinetree selected Unit G8, a vacant first-floor, two-bedroom apartment, for Ms. Ghee and her family. In early June 2022, Ms. Ghee and her family moved into Unit G8.

### C.    Termite holes and the sliding glass door's deteriorating wooden framing were hidden from Ms. Ghee.

29.    From around 2017 until mid-2019, Donisha Bugg lived in Unit G8, the same unit assigned to Ms. Ghee and her family by South Oxford. During her tenancy, Ms. Bugg observed "termite damage above the sliding glass door to my bedroom, as well as above the sliding glass door to my mother's bedroom." She also noted "many small holes in the wood above the sliding glass doors" in both the Primary and Secondary bedrooms leading to the patio. On three to four occasions, she saw insects she believed were termites. On about four occasions, Ms. Bugg informed Pinetree of termite issues and corresponding damage in Unit G8. However, Ms. Bugg never saw evidence that the termite damage had been repaired.[3]

30.    Petersburg Redevelopment and Housing Authority ("PRHA") inspects and approves housing prior to a tenant moving in. On May 24, 2022, PRHA employee Marrietta Paschal conducted an initial inspection of Unit G8. The unit failed inspection. Ms. Paschal stated in an email that the unit initially failed inspection "due to the sliding doors in the bedrooms and the window in the living room having severe chipping, paint, as well as them being hard to open." During her May 24, 2022 inspection, Paschal completed an Inspection Checklist, in which she noted the Master Bedroom sliding glass door "can't open." Regarding the Second Bedroom, she wrote, "chipping paint around sliding door can't open/hard to open."

---

[3] From approximately 2014 to the summer of 2024, Eric Hansen lived in Pinetree Apartments Unit G4. On at least two occasions while smoking on his deck outside the sliding glass door, Mr. Hansen saw a "whole bunch of termites swarming."

31.    After the inspection, on May 31, 2022, South Oxford employees made multiple work order entries regarding repairs in Unit G8, all categorized as "Priority: High." One work order, referring to the PRHA inspection, noted "Brief Desc: Inspection Repairs." The "Problem Description" states: "The windows need to be fixed. They are difficult to open/close."

32.    Another May 31, 2022 work order states "Brief Desc: Chipping Paint." The "Problem Description" reads: "Chipping paint around window sills and sliding doors." Upon information and belief, the "chipping paint" was the damage caused by termites in the drywall and finished wood trim,[4] which South Oxford employees simply painted over to conceal the termite damage.[5] They painted over the visible termite damage, but left untouched the termite-damaged deteriorated wooden framing behind the drywall inside the back wall of the Primary Bedroom. By the time Ms. Ghee took possession of Unit G8 in June 2022, the termite holes above and around the sliding glass doors were made invisible to her and her family.

33.    Another May 31, 2022 Unit G8 work order notes "sliding door locks" in the "Brief Desc." The "Problem Description" states, "Fix both sliding doors. We need to ensure the locking mechanism works (MANDATORY)."

34.    Any repair to the locking mechanism would have necessarily involved sliding the door. Therefore, the South Oxford employee undertaking the repair on May 31, 2022, would have known that the sliding glass door did not slide easily, if at all, along its track. Upon information

---

[4] Indeed, at deposition, PestNow's corporate representative testified: "A lot of times when termites enter the interior of a structure they will eat the wood" resulting in "divots" or "bubbling" of the paint. "They'll eat the paper on the drywall, which will cause the paint to bubble or blister."

[5] Multiple prior tenants have stated that Pinetree painted over mold in their apartments. See the affidavits of Debra Smith and Vanessa Schane, Exhibit 2 and 3 attached hereto, as well as the video of an irate tenant, which is attached as Exhibit 4, which can be viewed at the following link: https://youtube.com/watch/D_Ylm9BBntA.

and belief, the sliding glass door was not repaired, but simply lubricated on its sliding track to temporarily permit movement.

35.    After May 31, 2022, no work was done on the sliding glass door in the Primary Bedroom.

36.    On or about June 1, 2022, two South Oxford employees gave Ms. Ghee a walkthrough tour of Unit G8. She was not informed of any of the issues with the apartment discussed above and she was not otherwise aware of them.

37.    Around July 7, 2023, South Oxford posted a notice on the front door of Unit G8 stating that it would conduct an annual routine inspection of the unit. In response to this notice, Ms. Ghee looked around Unit G8 to identify any issues. She tried to open the sliding glass door but could not get it to move. She did not know whether it was a temporary or permanent issue, or whether a more aggressive effort would move the door. Ms. Ghee took time off from work to be present for the scheduled inspection, but no one came to her apartment that day. She assumed the inspection took place on another day while she was at work.

38.    Later in July 2023, Ms. Ghee was standing in the doorway of Unit G8 when a South Oxford maintenance worker approached, who matched the description of South Oxford employee William Norris, Jr. She told him she could not open the sliding glass door in the Primary Bedroom and asked him to fix it. He replied, "I got you," or words to that effect. After Ms. Ghee asked the maintenance worker to fix the sliding door so it would open, she never attempted to use it other than at the time of the fire. This was because she feared snakes in the swamp behind her home.[6]

---

[6] Ms. Ghee's fear of snakes is not unfounded. A 2019 PestNow report describing the status of several Pinetree units noted "G8-Snakes." Further, records show an emergency work order made in 2017 for a previous G8 tenant who saw "a snake in front of her door." Other tenants also reported snakes.

Ms. Ghee never knew why the sliding door would not open the one time she tried to open it before the fire.

39.    At all relevant times, the termites, the entry point of the water infiltration that allowed the termites to thrive, the deteriorated and deteriorating supporting wooden framing, and access to each of them were within the exterior rear wall of Unit G8, and/or Units G6 and G7, and were under the Beachwold Defendants' control.

40.    At all relevant times, the Beachwold Defendants had the authority and obligation to prevent the water infiltration described above, to treat for termites, to repair the wood rot, and to ensure the sliding glass doors functioned properly.[7]

41.    The termites, the entry point of water infiltration that allowed them to thrive, the deterioration to the supporting wood framing, and access to each of these were not known to or visible to Ms. Ghee before the fire, and she was unaware of them before the fire.

42.    Effective June 1, 2022, Pinetree leased Unit G8 to Ms. Ghee for use as a private residence by her and her three children, Elijah, Joshua, and Mark.

---

[7] Among other life safety regulations, at the time of the February 20, 2024 fire, the 2021 Virginia Property Maintenance Code was in effect. The 2021 Virginia Property Maintenance Code Section 702.3 states:

> **702.3 Doors**. Means of egress doors shall be maintained and, to the extent required by the code in effect at the time of construction, shall be readily openable from the side from which egress is to be made without needing keys, special knowledge, or effort.

In turn, the 2021 Virginia Property Maintenance Code, on page 15, defines "maintained" as follows:

> **MAINTAINED.** To keep unimpaired in an appropriate condition, operation, and continuance as installed in accordance with the applicable building code, or as previously approved, and in accordance with the applicable operational and maintenance provisions of this code.

However, as noted herein, the sliding glass door assembly in Unit G8 was not maintained. Termites and water infiltration had deteriorated the supporting wooden framing that held the sliding glass door frame in place. This failure to maintain constituted a violation of 2021 VPMC Section 702.3.

43.    The floor plan below depicts the general layout of Unit G8 as it was constructed, when it was first occupied, and when the fire occurred.



Riffe Fire Investigations case #2402131
Measurements by Brian Riffe
Not to scale
6-3-24

44.    The Primary Bedroom contained a sliding glass door that opened onto a concrete patio outside Apartment G8. The sliding glass door assembly consisted of two double-paned tempered glass panels. One panel was stationary, and the other moved when pushed to the left. The sliding glass door was the only exit that led directly from the Primary Bedroom to the exterior of Unit G8.

**D.    The Pinetree Apartments, built on the edge of a swamp, were plagued with moisture problems. Tenants frequently made complaints.**

45.    At all relevant times, throughout the Pinetree Apartments complex there were: a) improperly installed flashing around patio sliding glass doors; b) extensive moisture and water damage, including near patio sliding glass doors; c) termite infestation and related wood damage; d)

water rot requiring significant carpentry repairs above and near sliding glass doors; and e) immovable or difficult-to-move sliding glass doors. These problems were caused in part by improperly installed flashing that channeled rainwater into the buildings rather than away from them. Each of these problems was documented throughout the Pinetree Apartment complex, affecting many buildings and units, including Unit G8. The issues were cumulative and additive, meaning each one worsened the others. In the case of Unit G8, these problems prevented Ms. Ghee from opening the sliding glass door in the Primary Bedroom on the morning of the fire, leading to her injuries and Mark's death.

46. Pinetree Apartments were built in 1995. The complex was built on the edge of Blackwater Swamp, a large swamp in southeastern Virginia. Accordingly, tenants at Pinetree Apartments frequently reported moisture problems, mold, water leaks, termites, and related damage, especially in first floor primary bedrooms around patio sliding glass doors. William Norris, a South Oxford Maintenance Technician, testified that tenants had regularly been complaining about the issues for years. Moisture would come into the units and the inside of the walls when it rained. For example, Diane Taylor, a prior resident of Unit G8, left a voicemail with South Oxford stating, "there is black mold growing in our apartment." *See* Exhibit 5, which can be viewed at the following link: https://youtu.be/jD6xjxt11BE.

47. The below demonstrates numerous other examples of tenants reporting moisture problems, water leaks, and related damage, especially around patio sliding glass doors.

a. On January 8, 2020, a tenant sent Pinetree and South Oxford photos of mold on the edge of her patio sliding glass doors and pictures of her efforts to clean it. *See* Exhibit 6, attached hereto.

b. On or around May 4, 2020, a tenant informed South Oxford of the wet floor at the base of his sliding glass door. Pinetree and South Oxford received a video from the tenant

showing water accumulating on the carpet bordering the sliding glass door along with mold growing on the door frame. The video is attached hereto as <u>Exhibit 7</u>, which can be viewed at the following link: https://youtu.be/9lM6sVF4ACE.

        c.     On July 21, 2020, a tenant sent pictures to Pinetree and South Oxford showing water pouring into her apartment from around the edges of her primary bedroom sliding glass doors. She said she was forced to "stuff plastic in the whole [*sic*] and cover it with tape to try to keep the water out." The tenant said she contacted management multiple times and that maintenance came by but said a contractor would need to fix the problem. She emphasized, "[m]y request to get this fixed continues to get ignored." She observed that water was "pouring in from the outside when it rains." Photos she sent to Pinetree and South Oxford are shown below.

 

        d.     At an unknown time, Pinetree and South Oxford also received videos from a tenant of water rapidly coming in through the top of a patio sliding door. The videos are attached

as <u>Exhibits 8 and 9</u>, which can be viewed at the following links, respectively: https://youtu.be/B2cCkeA9BiA and https://youtu.be/bXZwYMJFijg.

      e.      On October 18, 2020, the resident in Unit L8 observed, "[t]here appears to be black mold growing inside the windowsills of the windows and patios." On January 6, 2021, the same resident stated, "[t]here is also mold on the wall near the patio in the second room."

      f.      On November 14, 2020, a tenant complained that for over a year, "water has been leaking through my patio door into my home causing mold and mildew." She was told that contractors were supposed to come and perform repairs but "that never happened." She added, "maintenance came by in November of last year and check it, but nothing was ever done to resolve the issue."

      g.      On November 11, 2021, another resident reported that she had "growth on all her windows and that way she was concerned because her and her son had been getting sick more often."

      h.      On September 24, 2023, the resident in Unit H1 emailed Pinetree and South Oxford to report a leak in the master bedroom above the sliding glass door. She noted, "[w]hen you touch up over the door it's soft to the touch."

      i.      On or about January 18, 2024, the tenant in Unit F1 reported, the "master bedroom patio door has a huge crack and will not open." The matter was termed a "window moisture issue" by the Pinetree technician.

48.      Pinetree's corporate representative testified that maintenance requests by tenants would be logged in an electronic system to create and manage work orders. The tenant could submit a work order online, or the tenant would contact the leasing office and an employee may

enter the work order. A sample of work orders shows that Pinetree was continually dealing with tenant complaints of moisture problems, mold, water leaks, termites, and related damage.

49.     A November 3, 2023 work order for Unit F8 noted that the areas "[a]round the windows and patio doors are showing signs of moisture."

a.     A January 18, 2024 work order for Unit F1 noted that the "second bedroom around patio door has signs of moisture."

b.     A January 29, 2024 work order for Unit H8 also noted "front window and patio door mildew again."

c.     And a February 13, 2024 work order for Unit F2 noted that "mold has collected on the window sills."

50.     The foregoing work orders are a *tiny* sample of work orders concerning moisture, mold, and water leaks surrounding patio sliding glass doors compiled by Pinetree.  Indeed, in 2017 and 2018, over *40* work orders were created concerning such issues. A condensed spreadsheet listing of relevant work orders in those years that has been compiled by Plaintiff is attached as Exhibit 10.

**E.     Termites infested the Pinetree Apartments; Defendant PestNow illegally varied from termiticide application requirements.**

51.     From at least 2019 until the fire, moisture and wet conditions attracted termites to Pinetree Apartments and the termites damaged the apartments, including Unit G8. Pinetree utilized a third-party exterminator, Defendant PestNow, to eradicate termites using termiticide.

52.     At all relevant times, the application and use of termiticides were tightly regulated by Virginia. Among other requirements, the containers of the termiticide used by PestNow were labeled with instructions that Virginia law required PestNow to follow. The following paragraphs

demonstrate PestNow's consistent disregard for the labelled instructions in treating numerous termite infestations at Pinetree Apartments.

53.    According to Plaintiff's expert Robert Kunst, the most common termite in the Petersburg, Virginia, area is the Eastern Subterranean Light Termite. Kunst provided an affidavit in this case stating that these termites are often found in damp environments, such as the Pinetree Apartments complex adjacent to the Blackwater Swamp. The affidavit is attached as Exhibit 11. According to Kunst, Eastern Subterranean Light Termites readily move from one building to another, travelling an average radius of approximately half a mile from their nest. This range easily covers the buildings at Pinetree Apartments and goes well beyond their bounds.

54.    Documents from Defendant PestNow reveal that termites infested Pinetree Apartments as early as 2019. On February 25, 2019, after complaints of termites inside Unit E3, Defendant PestNow inspected the unit and found "active termites inside the unit as well as on the exterior of the building."

55.    On March 5, 2019, PestNow technicians applied termiticide to the exterior of Building E and the interior of only Unit E3. There is no indication that other units in Building E were inspected to determine if interior treatment was needed.

56.    The termiticide instructions mandated that if the exterior of a building was treated with a termiticide, the interior of the building must be inspected as well.[8] However, PestNow did not inspect the inside of units unless it was already inside the unit for other pest control or if

---

[8] Virginia Code § 3.2-3939(B) provides "it is unlawful for any person to use or cause to be used any pesticide in a manner inconsistent with its labeling or regulations of the board, provided that such deviation may include provision set forth in section 2 (ee) of the Federal Insecticide, Fungicide and Rodenticide Act (7 U.S.C. § 136 et seq.)"

Beachwold Defendants specifically asked it to do so. In almost all instances, the Beachwold Defendants made no such request.

57.     Further, each Pinetree Apartment building is built on a main slab with multiple abutting concrete slabs. When PestNow applied termiticide at the exterior of a building in the Pinetree Apartment complex, the termiticide label and the standard of care required PestNow to drill holes between the abutting slabs when applying the termiticide. PestNow did not do this.

58.     Additionally, one or more PestNow's technicians who applied a termiticide at Pinetree Apartments were not Certified Applicators as required by *Virginia Code* § 3.2–3932.  *See* the transcript of the deposition of the corporate representative of PestNow at 32:6-32:18, stating that PestNow technician Jeff Zalinski was not a Certified Applicator. PestNow's failure to follow the termiticide label instructions continued as it responded to Pinetree's termite infestations through and after the February 20, 2024 fire, as demonstrated below.

59.     On March 13, 2019, during an inspection of Building N, a PestNow technician "found live termites on the interior of Unit 1 and also termite damage to the wall studs of Unit 1. He also found live termites between units 7 & 8." There is no indication that the interiors of any units within Building N were inspected other than Unit N1. PestNow's plan to treat only the exterior building without inspecting the units inside violates the termiticide label instructions.

60.     On March 18, 2019, PestNow conducted a wood-destroying insect inspection of Buildings A-P and clubhouse. Visible live termites were observed on the exterior foundations of Buildings B, C, G, J, K, O, and P.  Building J had active termites under the splash guard on the exterior foundation. PestNow recommended treatment for termites for these structures. The inspection report noted that "some degree of damage, including hidden damage, may be present," and advised the buyer to "contact a qualified structural professional to determine the extent of the

damage and the need for repairs if any questions arise" regarding the termite damage. The report also noted that the structures may have been previously treated for wood-destroying insects, evidenced by preexisting drill marks and old termite bait stations found.

61.     PestNow technicians treated the exterior perimeter of buildings B, C, G, J, K, O, and P on April 4-5, 2019. PestNow again failed to follow the termiticide label instructions by not inspecting the buildings' interiors when treating their exteriors, and by failing to drill holes in the abutting concrete slabs at the perimeter of each of these buildings.

62.     The following year, on May 6, 2020, a technician performed an exterior termite reinspection of Building G. The invoice notes that "Pinetree staff is aware that if an interior inspection is needed that they are to contact us. The annual inspection for termites is only an exterior inspection."

63.     By mid-2020, Pinetree's termite problems were well known. On July 9, 2020, Beachwold Residential employee Ashlee Vega emailed Defendant Nadra Yohannes, the South Oxford Regional Manager assigned to Pinetree Apartments, regarding "Termite Reports for Clearfield and Pinetree," stating, "the lender just asked us to have a new inspection done for Pinetree because the last one was completed in 2019 and there was evidence in some buildings of termites. Hopefully, one can be scheduled fairly soon. Let me know if and when the inspectors would be able to go out to Pinetree."[9]

64.     On February 5, 2021, a tenant in Unit F6 reported "some type of insect that appears to look like termites not sure." The tenant complained that "the termites have taken over." She

---

[9] The next day, on July 10, 2020, a PestNow invoice says that no wood destroying insects were found at Pinetree Apartments. The lack of visible termites only indicates that no live termite activity was seen at the time of the inspection. Plaintiff's termite expert Robert Kunst stated in his affidavit that Subterranean Termites normally swarm in the springtime. Live termites continued to be seen in the following years.

reported them crawling on the kitchen floor and bathroom. The assigned South Oxford employee William Norris reported finding bugs that "look like flying ants." During a home inspection on February 17, 2021, a PestNow technician found "swarmer termites in bathroom tub in Unit F6." He recommended a full-perimeter soil-treatment trench around Building F. He warned, "termites are very likely to swarm again after treatment."[10] He then treated the exterior of Building F for termites on February 23, 2021. There is no indication the other units in Building F were inspected, despite the swarm being discovered in Unit F6's interior.

65.    On March 8, 2023, Pinetree Property Manager Crystal Spruill informed Yohannes that "Apt C8 is swarming with termites." PestNow invoiced Pinetree for cockroach treatment in select units in multiple buildings throughout the complex. While treating for cockroaches, PestNow also noted there was live termite activity seen only in Unit C8. PestNow then conducted "warranty treatment" for Unit C8 and Building C. There is no indication the other units in Building C were inspected for termites.

66.    A PestNow technician performed a termite reinspection on September 25, 2023. He found evidence of termites, termite shelter tubes, and termite galleries in the pool house. Two days later, the exposed wood in the pool house interior was treated.

67.    On May 8, 2024, the tenant in Unit O5 reported "thousands ants coming from the balcony door &amp; (*sic*) around the trim of the carpet by the balcony is where they be it&apos;s (*sic*) a hole that they coming thru they near my dresser…."  Although Pinetree's work order notes that the unit was "added to the extermination list," there is no corresponding paperwork showing that any inspection of Unit  O5 was requested or completed.

---

[10] Indeed, PestNow's Service Summary Report for March 2, 2021 indicates that F6 reports "Termites seen again."

68.    As a direct and proximate result of PestNow's disregard of label instructions and Virginia law, termites continued to destroy the areas inside the wall surrounding the sliding glass door in Ms. Ghee's Primary Bedroom, eventually resulting in her injuries and Mark's death.

**F.    Patio sliding glass doors did not open and failed city compliance inspections and PRHA move-in inspections.**

69.    Numerous problems existed with sliding glass doors at the Pinetree Apartments complex, including dozens of sliding glass doors that could not be opened or were damaged by moisture.

70.    Indicative of the systemic problems, a Pinetree Apartments' sliding glass door failed the City of Petersburg Code Compliance Division's inspection. During an October 5, 2021, inspection of Unit E1, the City's Code Compliance inspector documented "damaged drywall located above rear exit, causing damage to wall and door frame" in the rear bedroom. In the hallway, the inspector observed "multiple holes … in and along laundry room ceiling due to water damage." The inspector ordered that, **"all affected material needs to be Cut out, replaced, and sealed to prevent organic growth."** (Emphasis in original). A $300 fine was imposed for the violation. The inspector also noted that the rear sliding door was "improperly fitted" and "swollen" from "constant contact with water." An additional $300 fine was imposed for that violation. The inspector identified multiple code violations and imposed fines totaling $800.

71.    Similarly, Pinetree Apartments also frequently failed PRHA move-in inspections.

**G.    Outside contractors repeatedly reported rotten wood framing around patio sliding glass doors and improperly installed flashing that channeled rainwater into areas around patio sliding glass doors rather than away from those areas.**

72.    Pinetree contracted with multiple construction companies to repair the symptoms of the systemic water and termite damage around patio sliding glass doors on a piecemeal basis. These repairs began well before Ms. Ghee and Mark's original occupancy (June 2022) and

continued through, and after, the date of the fire (February 20, 2024). According to contractors, the wood surrounding the sliding glass doors was often "rotten" – the same as the allegations in this Third Amended Complaint. Pinetree Apartments Maintenance Technicians McConnell and Norris have testified that water intrusion around patio sliding glass doors was caused by incorrectly installed flashing. Norris explained, "when the building was built, whomever contractor was didn't flash the door, putting the flashing in properly around, at the – at the sliding glass door. And now, the water, instead of running away from the building onto the vinyl, is actually going behind the vinyl." Norris said that the problem has been known since at least 2018. Indeed, according to multiple contractors, inspection of the areas surrounding sliding glass doors disclosed that the flashing had been installed in the wrong way. The below paragraphs demonstrate the significant number of recorded instances where contractors found rot and decay around sliding glass doors.

73.     In July 2019, extensive repairs were made to Unit N1 because the sliding glass door had moisture damage and termite problems.

74.     On September 25, 2020, Pinetree received a contractor's signed proposal to repair "Multiple Patio door Leaks." Eight units were affected, including two in building G.

75.     On March 1, 2021, a contractor hired by Pinetree to investigate water damage in the apartments found extensive and costly damage throughout the complex.

76.     On June 10, 2021, contractor Mueller Builders, LLC ("Mueller") invoiced Pinetree for the following: "removed siding, installed new flashing around patio doors, then reinstalled the siding on six (6) units." The cost of the work totaled $4,250.

77.     On September 15, 2021, a contractor recommended extensive repairs for water damage to Unit H5. The contractor recommended a comprehensive 11-item demolition and repair

plan for the roof, soffit, gutter, and porch/balcony, totaling $21,043. Photos show water damage and mold on the apartment's exterior.

78.    On December 22, 2021, THS National, LLC ("THS") submitted an Estimate for Unit E1 and E2 Patio Door Repairs. The proposal states: "Upon inspection, THS observed water damages to the interior drywall finishes above and around the patio door in the bedroom. It is likely the water is entering around the patio door in the unit above E2, as well as entering around the patio door at unit E 1. THS proposes the following scope of work to address the source of the leaks and repair the interior water damage…. Scope of work does not include repairs to rotten framing. If at the time of demolition rotten framing is discovered, a change order will be issued for the necessary rot repairs…. Total (A): $ 6,768.00."

79.    In or about March 2022, THS repaired the patio door in Unit E1 (and possibly Unit E2) for "rotten framing." The work cost $5,950.

80.    Contractor MBS Construction ("MBS") also performed a significant amount of carpentry repairs at Pinetree. In April 2022, MBS performed extensive repairs to the area above and around the sliding glass doors in Unit O10. The invoice for the work totaled $6,000. MBS "[r]emoved sheet rock from ceiling of bedroom and around patio door in bedroom, […] repaired sheet rock around second bedroom sliding patio door. … Repaired flashing on patio above patio doors to resolve leak issue. That will included (*sic*) removing vinyl siding and reinstalling. Replaced studs in the wall and header across patio door in first bedroom." "[S]tuds in the wall and across patio door in first bedroom" is exactly where decaying wood was found above the sliding glass door in Unit G8 following the fire.

81.    On May 23, 2022, MBS performed another demolition and repair above a sliding glass door, this time in Unit P1, at a cost of $4,000.  The invoice states, "[r]emoved sliding glass

patio door cut out sheet rock, removed rotten header above door, removed insulation from exterior wall removed rotten door jack removed backside of vinyl siding from the exterior. Replaced rotten two by fours in the wall. Reinstalled new insulation. Reinstalled vinyl siding and J channel, reinstall patio door, replaced sheet rock around patio door and mud and tape one coat. Repaired flashing on patio above door." Again, this is the same damage found above the Primary Bedroom sliding glass door in Ms. Ghee's apartment after the fire.

82.    A June 21, 2022 MBS invoice for $3,400 notes a repair to the siding above the patio door in Unit F8. The invoice reads, "cut out sheet rock above patio sliding door, [and] cut out rotten header above patio door…," then replaced and reinstalled materials. Again, this is the same damage found to the header above the Primary Bedroom sliding glass door in Ms. Ghee's apartment after the fire.

83.    An August 2, 2022 invoice for Unit C12 notes that MBS "cut out wet, damaged sheet rock from ceiling of bedroom and above patio door" and "[r]emoved exterior siding above patio sliding door." They then replaced the header and installed new Tyvek and flashing above the patio door, costing Pinetree $3,200 in total.

84.    Another MBS invoice for $4,375 from August 2, 2022, for Unit D3 states "cut out and removed wet damaged sheet rock from around both bedroom patio doors," and "also kilzed and bleached around bedroom number one patio door." An August 17, 2022 work invoice for Unit O10 details removing "vinyl siding from above sliding glass door, removed flashing from underneath patio band board, reflash above door and added new Tyvek to wall." Again, this is the same damage to the header found above the Primary Bedroom sliding glass door in Ms. Ghee's apartment after the fire.

25

85.    A February 6, 2023 MBS invoice for Unit K1 outlines removing the master bedroom sliding patio door, repairing the jamb leg and patio door roller, and repairing sheet rock around the interior of the patio door.

86.    Another February 6, 2023 MBS invoice, this one for Unit M3, details that they "sealed, flashing and patio and vinyl corner coming down side of upper balcony." This repair cost $3,200.

87.    A March 10, 2023 MBS invoice for Unit E8 describes the work done as including "cleaned moldy areas from patio, sliding glass doors in both rooms, repaired minor sheet rock repair. Sealed and painted areas."

88.    A May 11, 2023 MBS invoice for Unit O10 describes the work done as "repaired flashing and installed Tyvek… installed flashing under bottom layer of shingles from where first row of shingles and starter was installed wrong. … Repaired flashing under sliding glass door and sealed."

89.    A June 26, 2023 MBS invoice for Unit K8 describes the work done as "repaired flashing across both patios above sliding glass doors. Replaced Rottenwood (*sic*) above master bedroom, patio door and replaced. Celtics on area. Installed Tyvek on walls of both patio door areas." The invoice totaled $3,200.

90.    An October 31, 2023 MBS invoice for Unit D5 describes the work done as "repaired sheet rock above patio door. Repaired siding and flashing, above patio also had to repair gutter."

91.    A second MBS October 31, 2023 invoice, this one for Unit H1, describes the work done as "cut out and Removed damaged sheet rock from bedroom wall above patio door. removed

4 x 4 post under exterior deck that was not installed properly. … Replaced all rotted Celtics…" The invoice totaled $4,200.

92.  A December 4, 2023 MBS invoice for Unit J6 describes the work done as "repaired patio door header. Replaced flashing and installed tyvex (*sic*) on exterior wall. … Repaired sheetrock [drywall] on wall around patio door."

93.  A February 23, 2024 MBS invoice for Unit J3 describes the work done as including "removed two sections of glass panel from patio sliding door repaired roller guides on patio door and repaired roller wheels on patio door. Reinstall patio doors into the frame adjusted lock on the patio door."

94.  A May 30, 2024 MBS invoice for Unit H3 describes the work done as "cut out and removed interior sheet rock above patio door and section on ceiling. … Cut out and removed all rotten wall sheeting. Removed double 2 x 10 rotten header removed section of rotten wall plate on top…. Installed a drip edge on top under the patio decking boards." These repairs cost $5,275.

95.  A May 31, 2024 MBS invoice for Unit E1 describes the work done as "repaired wall and installed wall wrap also replaced flashing and drip edge. Replace one piece of vinyl siding that was nailed through the face."

96.  An August 2, 2024 MBS invoice for Unit O6 describes the work done as "removed flashing drip edge that was installed upside down underneath the band board of patio. Reinstalled flashing correctly…. Repaired sheet rock in both bedrooms around patio doors. Cleaned and painted one coat over discoloration on sheet rock." Pinetree knew it was not making repairs promptly and internally blamed one of its contractors in emails.

97.  On December 29, 2021 Pinetree Apartments Manager Dionne Mason sent an email to Yohannes about patio door repairs needed for Unit E1, complaining that "Mueller [a contractor]

has not been dependable for months. The delay can result in a fine for Pinetree and could cause a strain on the property manager and inspector working relationship, by any and everything going forward to be written up, with no lee way (sic), strict deadlines once the trust is broken between the property manager and inspectors."

98.     At a minimum, the contractor repairs discussed above required removing the vinyl siding around the door, repairing and/or replacing the flashing, and replacing the vinyl siding. Frequently, these repairs also required removing and replacing water-damaged drywall. Dozens of instances reveal even greater damage to the underlying wooden framing supporting a sliding glass door. This is the same type of damage that was hidden in the rear wall of Ms. Ghee's Primary Bedroom.

**H.     The Beachwold Defendants refused to authorize the repairs badly needed throughout the Pinetree Apartments complex.**

99.     The wooden framing rotting in the back wall of Ms. Ghee's Primary Bedroom without her knowledge was not an isolated event at Pinetree Apartments. Despite input from contractors and tenants, and despite their knowledge of the systemic structural issues at Pinetree Apartments, the Beachwold Defendants resisted significant repair expenditures. They hid costly structural issues from tenants (including Ms. Ghee and her family), slow-walked repairs, and ignored the clear need for complex-wide repairs to address improperly installed flashing, water infiltration, and termite problems. Pinetree Apartments' Maintenance Technician Norris testified that the Beachwold Defendants would only address single issues at a time, never doing the more costly but necessary larger-scale repairs.

100.     Since at least early 2019, Beachwold was trying to sell Pinetree Apartments. This desire to sell motivated the Beachwold Defendants to cut costs to maximize the profit to be realized

when the property was at last sold.[11] As such, the Beachwold Defendants ignored long-term maintenance needs and repairs that addressed recurring issues across the complex. They were highly involved and controlling in decision-making for maintenance expenditures. The Beachwold Defendants personally negotiated with contractors to minimize repairs and expenditures,[12] pressured middle-management employees to reduce costs,[13] and disregarded recommended repairs, as shown below.

101. On March 14, 2019 DeStefano emailed Gideon Friedman, Beachwold Residential's CEO. The subject line of the email read, "Termites N1-Pinetree." DeStefano exclaimed, "Gideon—we have bad termite infestation at Pinetree. Photos attached. We're moving forward with treatment of this building for $3,000. There is interior repair and the Exterminator notes framing damage. Ross's construction manager will assess. This is the second termite building in a month – they are not adjacent buildings or particularly close. I asked Ross to walk all unit interiors and think we need to have Exterminator survey the exteriors…" Another Beachwold Residential employee, Kate Kerrigan, remarked to DeStefano, "Those pics… wow." The photos sent by DeStefano are shown below.

---

[11] Consistent with this effort, on February 26, 2019, Dan DeStefano emailed Gideon Friedman, advising, "Gideon, termites reported at one building at Pinetree. Trying not to spend money at the property, but we don't have much of a choice."

[12] On April 12, 2022, a South Oxford manager at Pinetree informed Beachwold executive Rob Glass that a Pinetree unit "has severe water damage around both patio doors. It's similar to the issues we've had with the other units. Estimated cost is $6,800, material and labor included... Do you approve with moving forward[?]" Subsequently, Glass negotiated with a contractor to perform the repairs. Glass told MBS, "[w]e are pretty tight on budget here, if I give you both jobs to complete together and one project while you were out there, can you knock it down to $10,000 total?"

[13] Defendant Yohannes has testified that the Beachwold Defendants limited costly repairs at Pinetree Apartments.


PINETREE005421


PINETREE005423


PINETREE005422



PINETREE005424

102.    In response to this infestation, PestNow "recommended treating the full exterior of building N by trenching and rodding around the exterior of all 10 Townhomes in the cluster for Termites." PestNow also "recommend[ed] that the other additional 14 clusters of Townhomes be treated for termites as well." Despite the Beachwold Defendants' strong reaction to the infestation, a PestNow invoice indicates Beachwold opted only to pay for the exterior treatment of Building N, **disregarding PestNow's recommendation to treat the exteriors of 14 additional buildings**.

103.    Shortly after Building N was treated, a March 18, 2019 letter states that Pinetree/Beachwold had PestNow inspect buildings A-P "as requested for the purchase of the property." PestNow found "live termites on the exterior" of Buildings B, C, G, J, K, O, and P. They recommended treating the exteriors of these buildings, but also to treat Buildings A, D, F, H, I, L, and M "for preventative measures." There is no indication that the Beachwold Defendants had Buildings A, D, F, H, I, L, and M treated as PestNow recommended.

104.    In August 2020, Pinetree Apartments Manager Ebone Gamby identified eight units across multiple buildings with leaking patio doors. She observed that three "are having the worst problem, but the other five are headed down the same path." On August 26, 2020, Mueller documented water damage to patio sliding glass doors in eight units – D3, D8, F1, G1, K1, O3, O6, and O8. Mueller recommended removing and replacing entire doors. These structural repairs were estimated to cost $14,400. Pinetree rejected Mueller's recommendation and opted for cheaper repairs to only add new flashing around the doors, costing $6,800 total. Further, no repair was done at all on two of the units included in the original proposal.

105.    The Beachwold Defendants had the means to eradicate moisture and termite issues at the complex, but rejected the systemic repairs that the complex required. Instead, the Beachwold Defendants pursued a path of petty parsimony until August 2024 (six months after the fire), when, after five years of trying, they finally sold Pinetree Apartments. In short, the Beachwold Defendants chose not to make the systemic repairs around patio sliding glass doors that the circumstances demanded. As a direct and proximate result, Mark died and Ms. Ghee was severely burned.

## I.    The Defendants' failures sealed Ms. Ghee in a burning building.

106.    In the early morning on February 20, 2024, when Ms. Ghee first learned of the fire, she was asleep in her bed in the Primary Bedroom. Only Mark was in the living room when Ms. Ghee entered, the two older boys having escaped through Unit G8's front door.

107.    When Ms. Ghee entered the living room, she saw flames at  Unit G8's front door. As a result, she decided the safest course of action was to take Mark into her arms and exit through the sliding glass door in the Primary Bedroom.

108.    Once in the Primary Bedroom and still holding Mark in her arms, she pushed the thumb latch down to unlock the door and tried to move it to her left, but it would not slide. She

then placed Mark on her bed so she could use both hands to slide the door to the left.  But once again, she could not get the door to slide open.

109.    When Ms. Ghee turned to get Mark from her bed and exit Unit G8 through the front door, Mark had disappeared in the smoke. She searched and called for Mark but could not find him. Thinking that perhaps Mark had found his way through the smoke to the front door and safety, Ms. Ghee exited the apartment's flaming front door, hoping to see Mark outside.

110.    But Mark was nowhere to be seen.  As a result, desperate to rescue Mark, Ms. Ghee re-entered her apartment and resumed her search for him. Ms. Ghee suffered horrendous burns searching for Mark.

111.    Finally, the heat and smoke were too much for Ms. Ghee to tolerate and, distraught, she left through the front door of Unit G8 without Mark.

112.    Below is a photograph that fairly and accurately depicts the exterior of Unit G8 (the ground-floor apartment), showing the damage caused by the fire.



113.     Approximately three months after the fire, Plaintiff's expert Dano Holland examined Unit G8. In the back wall of the Primary Bedroom, he found water and termite damage to the jack stud (the vertical piece of the wooden framing that supports the ends of the header beam holding the sliding door in place inside the drywall) and to other parts of this wooden framing. *See* the diagram below. The water and termite damage caused the wooden framing to shift, resulting in compression and deformation of the sliding glass door frame. In his accompanying Affidavit, attached as Exhibit 12 (excluding supporting documentation), Mr. Holland opines that the foregoing caused the door to be out of square and unable to move.



114.     Ms. Ghee was unable to open the sliding glass door because the vertical and horizontal wooden framing around it had rotted due to termite infestation and water damage. The rotten wood sagged at one end, making the door out of square and preventing it from sliding on its track.

34

115. Water and termites infiltrated and infested the supporting wooden framing behind the drywall, causing the wooden framing to rot. This framing was intended to hold the sliding door's frame in place. Despite substantial evidence that the supporting wooden framing above and to the side of the sliding glass doors was eaten away by termites and soaked with water damage, damage evidenced over and over again throughout the apartment complex, the Beachwold Defendants never made the necessary repairs.

116. On the same day that Plaintiffs' experts inspected the remnants of the fire in Unit G8, they also examined Unit G6, the downstairs unit right next to Ms. Ghee's apartment. Like G8, Plaintiffs' experts found termite damage and rotten wood in the door jam next to the patio sliding glass door. The header above the sliding glass door in the unit was also destroyed. Photos showing the foregoing are below.







117.    Pinetree and South Oxford controlled the space between the interior and exterior back walls of the Primary Bedroom. Their failure to maintain this area prevented Ms. Ghee from opening the sliding glass door during the fire, resulting in her disfiguring injuries.

**J.      As a result of being unable to open the sliding glass door in the Primary Bedroom, Ms. Ghee suffered significant injuries.**

118.    From the scene of the fire, Ms. Ghee was transported by ambulance to Bon Secours-Southside Medical Center.  She was immediately intubated due to the soot and swelling in her vocal cords. After intubation, she had to be resuscitated following cardiac arrest due to her respiratory system failing from her inhalation of the smoke.

119.    Ms. Ghee was then transported to the VCU Burn Center. Within hours of arriving at the ER, she underwent her first surgical escharotomy, consisting of 22 incisions into her burned skin. This was the first of multiple surgeries that removed her burnt skin to replace it with skin grafts and artificial grafts. Further surgery required amputation on both hands – partial amputation of her fingers on her left hand and full amputation of every finger on her right hand.

120.    Ms. Ghee endured *eleven* total surgeries during her initial 69-day hospitalization. For much of this time, she was restrained to her bed because her pain agitated her to the point of her bucking, pulling on her lines and tubes. Her injuries prevented her from communicating except with head nods, unable to express the incomprehensible pain she suffered. She was unable to speak at all for 21 days after the fire, requiring her to work with a speech therapist to regain her voice eventually.

121.    During her initial hospitalization, she also underwent two bronchoscopies and two tracheostomies. She endured a collapsed left lung, prolonged intubation, and tube feeding.  She also suffered great psychological pain during her hospitalization. She could not sleep due to flashbacks and nightmares about the incident, and her condition further prevented her from

grappling with the loss of her son. She was not informed until the 25th day of her hospitalization that Mark died in the fire. She and her mother both struggled to let her surviving sons visit her in her disfigured condition.

**K.    Ms. Ghee's life going forward.**

122.    When the planned procedures and therapy are completed, 80 to 85 percent of Ms. Ghee's body will be covered in scars of different colors, textures, and shapes. Her body and life have been altered forever; she has and will always have horrifying permanent scarring, missing fingers, nightmares, flashbacks, and PTSD. She can no longer work, and her ability to provide childcare and to perform physical tasks has been significantly impaired.

**L.    Pinetree had no employees.  It was controlled by the "Beachwold Empire."**

123.    Pinetree, the LLC that owned and leased the Pinetree Apartments, **had no employees.** Like the multi-layered entity model used by many nursing home operators to provide maximum liability insulation, Pinetree was operated and managed by a group of entities with "Beachwold" in their names—Beachwold Partners, Beachwold Holdings, and Beachwold Residential. These same entities controlled South Oxford. These four entities owned and controlled Pinetree, the LLC that owned Pinetree Apartments, and Clearfield, the 33-member entity that owned Pinetree.

124.    A chart illustrating the Beachwold Empire is shown below.

37



**M.    A bottom-to-top description of Beachwold's Empire.**

125.    At all relevant times, Defendant Pinetree owned Pinetree Apartments, the 144-unit complex located at 3100 Pinetree Drive, Petersburg, Virginia, and leased Unit G8 to Ms. Ghee.

126.    Defendant Beachwold Holdings owned 100% of Pinetree prior to May 1, 2023.

127.    Thereafter, Pinetree was owned by Defendant Clearfield. *See* the federal court filing made by Pinetree, attached hereto as <u>Exhibit 13</u>.

128.    One of Clearfield's members was Defendant Beachwold Partners, whose six owners all shared the last name "Friedman," including Gideon Friedman. Along with Hazan, Friedman was also an individual owner of Defendant Clearfield.

129.    During the relevant period, South Oxford was the apartment manager of Pinetree Apartments.[14] South Oxford is listed as the sole "Manager" on both leases signed by Ms. Ghee.

---

[14]    In 2019, Beachwold terminated Pinetree Apartments' previous manager, Ross Companies, and installed its alter ego, South Oxford, as Manager of the apartment complex. To date, the Beachwold Defendants have refused to provide the Plaintiff with any agreements between

a.    The connections between Pinetree and South Oxford, along with their controlling entities, are partially revealed in the Pinetree leases, which provide "[a]lthough personal liability insurance coverage is not required, should you voluntarily choose to purchase a policy, your renter's insurance provider must add Pinetree Apartments ["Pinetree Apartments, LLC LLC" (*sic*) in the Lease Addendum] and South Oxford Management, LLC as additional interests on your policy."

b.    For payroll purposes, South Oxford employed Defendants Yohannes, McConnell, and Peebles.

c.    Additionally, during the relevant period, there was a single server for all file materials across entities, and the same IT department managed the server. All documents and communications for all corporate defendants (except PestNow) were kept on the same server.

d.    Although the leases Ms. Ghee signed were with "Pinetree Apartments," the insurance coverage known to the Plaintiff—including both primary and umbrella coverage—lists South Oxford as the first named insured. Beachwold Residential and Beachwold Holdings are also named insureds by endorsement. This, again, attests to the connections between Pinetree, Clearfield, Beachwold Holdings, Beachwold Partners, Beachwold Residential.

130.    Another Beachwold entity, Defendant Beachwold Residential, has owned 100% of South Oxford since May 1, 2023. According to a market observer, Beachwold Residential earns annual income of $51.2 million and has between "201-500 employees." According to Beachwold Residential's website, its "Team Members" include numerous South Oxford employees. Pinetree asserts that "some employees are assigned or designated to specific entities or companies—for

---

Pinetree and South Oxford. However, the Plaintiff has obtained the 2017 agreement between Pinetree and Ross. Gideon Friedman signed that agreement on behalf of Pinetree – again, an LLC with no employees. *See* Exhibit 14.

example, Rob Glass is a South Oxford employee by payroll, but he holds the title of Vice President of Asset Management for Beachwold Residential." (Rob Glass is referred to below as "Glass.")

131.    At all relevant times, Friedman was the Chief Executive Officer of Beachwold Residential.

a.    According to Beachwold Residential's website, in 2016, Friedman "founded South Oxford Management, a property management company headquartered in Dallas Texas, to manage Beachwold's portfolio." As noted above, Friedman was also a member of Defendant Clearfield, both individually and as a member of Beachwold Partners.

b.    In addition to Friedman, Ownership included Hazan and Rubenstein. Hazan serves as Chief Investment Officer, a position he has held since 2016. Rubenstein is listed as General Counsel on Beachwold's "Team Members" website page.

**N.    Pinetree Apartment's structural problems caused by water intrusion and termite infestations were well known by the Beachwold Defendants, including South Oxford.**

132.    Although the foregoing description starts with Pinetree (the owner and lessor of Pinetree Apartments) and then proceeds to identify Pinetree's single member, and so on, all the way up to Friedman, Hazan, and Rubenstein, it is important to understand that decisions and mandates relevant to the issues in this case were made and imposed from the top down. The Beachwold Defendants wanted to unload Pinetree Apartments for the highest possible profit.  As a result, for five years (beginning in 2019 and continuing until Pinetree Apartments was sold in August of 2024), the Beachwold Defendants allowed only piecemeal repairs at Pinetree Apartments,  despite the clear need for across-the-board, immediate repairs.

133.    Documents obtained in this case confirm top-to-bottom awareness of Pinetree Apartments' problems caused by water intrusion and termite infestation. Beachwold Residential's CEO Friedman, its Vice Presidents, its Asset Managers, South Oxford's Regional Manager, and

South Oxford's Maintenance Technicians and Leasing Professionals all knew of the problems, as well as Ownership's directive to wring maximum profits from the complex by shortchanging needed repairs. A summary of the foregoing individuals' top-to-bottom knowledge and involvement, as well as the seamless intra-entity nature of their communications, is shown in the table below.

| Employee | Title | Knowledge/Involvement |
|---|---|---|
| Gideon Friedman | CEO, Beachwold Residential | In February 2019, received an email from DeStefano exclaiming, "Gideon—we have a bad termite infestation at Pinetree. Photos attached."[15] In the same month DeStefano informed Friedman, "This is the second termite building in a month." Recognizing the breadth of the problem at the complex, DeStefano added, "they are not adjacent buildings or particularly close." |
| Dan DeStefano | Senior Vice President, Asset Management, Beachwold Residential | DeStefano was informed in February 2019 that "termites [were] eating through the wood" "into the drywall" and "behind the siding" at a building near the apartment that Ms. Ghee rented. |
| Rob Glass | Vice President, Asset Management, Beachwold Residential | In April 2022, Regional Manager Yohannes informed Glass that Pinetree's Unit O10 "has severe water damage around both patio doors." She further indicated the extent of the problems, saying, "It's similar to the issues we've had with the other units." The invoice noted that flashing "on patio above patio doors to resolve leak issue." The invoice also specified the replacement of supporting beams, including the header across the patio door in the first bedroom. The reference is precisely where decaying wood was found above the sliding glass door in G8 following the fire. |
| Tracy Arruda | Executive Vice President, South Oxford | Arruda emailed DeStefano, "We are looking at approximately $8K to complete this [repair] project. I just spoke to the rep for the company. He said the bandboard does need replacing and the sheething |

---

[15] The photos are referred to and shown above at Paragraph 101.

| | | needs replacing upstairs. There are holes in it due to water damage. He said it's a liability concern …." |
|---|---|---|
| Yohannes | South Oxford Regional Manager | Yohannes was informed of numerous resident complaints, including water damage around patio sliding glass doors, which she failed to address adequately. Indicative of her knowledge of the problems, in April 2022, Yohannes asked outside contractor MBS to inspect the patio door in Unit D3, stating, "we have water damage that needs repair." |
| McConnell, Peebles, and Norris | South Oxford Maintenance Technicians | McConnell, Peebles, and Norris were aware of water intruding into the walls around over a dozen patio sliding glass doors. All were directed to spend little annually on the apartment units, and to cut corners in preparing the units for new residents, including painting over moisture-laden areas and termite holes. Incident to a local housing authority's inspection of Unit G8 and days and/or hours before Ms. Ghee took her June 1, 2022 walkthrough of Unit G8, Defendants McConnell and/or Peebles painted over termite holes and moisture-laden wood to hide the water damage and termite infestation and allegedly greased the sliding glass doors to mask the out-of-square condition of the door. |

134.    Beachwold executives, including Ownership, closely monitored developments at Pinetree Apartments and tightly controlled expenditures on it. They did so because they were trying to unload the property and aimed to maximize their net profit by minimizing repairs and capital improvements. Demonstrating their detailed knowledge of the events at the Petersburg apartment complex, Beachwold executives received photos of live termites and the damage they caused, exterminator reports of infestation in the buildings, and numerous outside contractor invoices for repairs made necessary by termites and water infiltration. Repeatedly, the Beachwold Defendants declined to carry out repairs across the entire complex and minimized expenditures. As photos and videos attached as exhibits and included in this Third Amended Complaint demonstrate, Pinetree tenants, mostly lower-income families with little leverage to improve their situation, were left to

42

endure slumlord-imposed conditions in parts of their apartments.  Ms. Ghee was badly burned and her three-year-old son Mark died as a result of those conditions.

135.    The Defendants should be held liable for their own torts. Also, the foregoing indicates that there was unity of interest and ownership by Beachwold Partners, Beachwold Residential, and Beachwold Holdings of Pinetree, Clearfield, and South Oxford such that the separate personalities of the latter three LLCs no longer and/or never existed. Therefore, the corporate veil should be pierced.  Among other things discussed above, Pinetree's absence of any employees; the use of South Oxford employees to sign and act on behalf of Pinetree; direct insurance coverage only in the name South Oxford, not Pinetree; and all decision-making vested in entities one or two levels up from Pinetree, show the entity structure(s) employed by the Beachwold Defendants to be a sham. To adhere to that separateness would work an injustice in this matter.

## VI.    COUNTS

### Count I

### Common Law Fraud

**(Defendants Pinetree, Clearfield, Beachwold Partners, Beachwold Holdings, Beachwold Residential, South Oxford, Yohannes, McConnell, and Peebles)**

136.    The Plaintiff incorporates the foregoing paragraphs as if set forth in full in this Count.

137.    By painting over mold and moisture-laden wood around the sliding glass doors and the holes eaten by termites in the finished wood trim of Unit G8, McConnell and Peebles, agents and/or employees of the Beachwold Defendants, acting within the scope of their agency or employment, concealed a material fact from Ms. Ghee – namely, that there were termites, related water infiltration, and deteriorated wood inside the back wall of the Primary Bedroom which, in turn, interfered with the operation of the sliding glass door. (Defendants Pinetree, Clearfield,

Beachwold Partners, Beachwold Holdings, Beachwold Residential, South Oxford, Yohannes, McConnell, and Peebles, are referred to in this count as the "Count I Defendants.")

138.    McConnell and Peebles intentionally concealed these material facts to mislead Ms. Ghee. They knew that the flashing around patio sliding glass windows had been improperly installed, directing water to seep into the apartment walls and attracting wood-destroying termites. Indeed, wood-destroying termites had infested the buildings since at least 2019 and destroyed supporting beams and jack studs throughout the complex. They knew that apartment-wide repairs were necessary but only paid for repairs on a piecemeal basis. They knew that efforts to ready units for new tenants would conceal the foregoing issues. They knew that unless a unit had the siding removed and extensive repairs and replacements were undertaken, the apartment turnover preparations would simply conceal moisture and termite issues.  Even so McConnell and Peebles carried out the concealment efforts at Unit G8 mere hours before Ms. Ghee took occupancy on June 1, 2022.

139.    Ms. Ghee relied on the Count I Defendants to provide her and her sons with a safe apartment. She would not have moved into the apartment if she had known that behind the drywall there was wood damage and termites that interfered with the operation of the sliding glass door in the Primary Bedroom. However, by painting over the termite holes, McConnell and Peebles ensured that she would not know this information, and before the fire she never learned this information from any source.

140.    With full knowledge that for years water infiltration and termite infestation were interfering with operation of many sliding glass doors at Pinetree Apartments, thereby endangering the lives of their tenants, Defendants Pinetree, Clearfield, Beachwold Partners, Beachwold Holdings, Beachwold Residential, South Oxford, and Yohannes purposefully withheld the cash

required to eliminate the resulting damage and were complicit in causing the fraudulent conduct of McConnell and Peebles.

141.    The foregoing constitutes willful and wanton conduct, demonstrates a conscious disregard for the rights of others (including Ms. Ghee), and warrants the imposition of punitive damages.

142.    As a direct and proximate result of Pinetree's fraud, Ms. Ghee has ongoing and continuous permanent damages and injuries and, as such, is entitled to recover, and seeks recovery from the Count I Defendants for the following:

        a.        Compensation for severe bodily injuries;

        b.        Past and future medical bills and expenses;

        c.        Pain and suffering;

        d.        Punitive damages; and

        e.        Any and all other relief that this Court deems appropriate.

### Count II

### Concealment of a Latent Defect

**(Defendant Pinetree, Clearfield, Beachwold Partners, Beachwold Holdings, Beachwold Residential, South Oxford, and Yohannes)**

143.    The Plaintiff incorporates Paragraphs 1 through 135 as if set forth in full in this Count.

144.    When Pinetree transferred possession of Apartment G8 to Ms. Ghee on June 1, 2022, a latent defect existed in the drywall in the back wall of the Primary Bedroom—namely, water damage and termites that were causing the wooden framing behind the drywall to deteriorate and deflect, thereby interfering with the operation of the sliding glass door. (Defendants Pinetree, Clearfield, Beachwold Partners, Beachwold Holdings, Beachwold Residential, South Oxford, and Yohannes are referred to in this count as the "Count II Defendants.")

145.    When Pinetree transferred possession of Apartment G8 to Ms. Ghee on June 1, 2022, the Count II Defendants knew of this latent structural defect, but Ms. Ghee did not and could not have discovered it through reasonable inspection.

146.    The Count II Defendants owed Ms. Ghee a duty to disclose this latent defect, but instead they purposefully hid it.

147.    Although not required as an element of this cause of action, Plaintiff notes that she relied on the Count II Defendants to provide her and her sons with a safe apartment. She would not have moved into the apartment if she had known that behind the drywall there were termites, water infiltration, and deteriorated wood that interfered with the operation of the sliding glass door. But the Count II Defendants never disclosed this, and before the fire, she never learned of it from any source.

148.    The conduct of Pinetree described above constitutes willful and wanton conduct. It demonstrates a conscious disregard for the rights of others (including Ms. Ghee).

149.    As a direct and proximate result of Pinetree's failure to disclose this latent defect, Ms. Ghee has ongoing and continuous permanent damages and injuries and, as such, is entitled to recover, and seeks recovery from the Count II Defendants for the following:

    a.   Compensation for severe bodily injuries;

    b.   Past and future medical bills and expenses;

    c.   Pain and suffering;

    d.   Punitive damages; and

    e.   Any and all other relief that this Court deems appropriate.

46

## Count III

### Failure to Maintain the Inside of the Back Wall of the Primary Bedroom, An Area in the Beachwold Defendants' Control

**(Defendants Pinetree, Clearfield, Beachwold Partners, Beachwold Holdings, Beachwold Residential, South Oxford, and Yohannes)**

150.    The Plaintiff incorporates Paragraphs 1 through 135 as if set forth in full in this Count.

151.    Defendants Pinetree, Clearfield, Beachwold Partners, Beachwold Holdings, Beachwold Residential, South Oxford, and Yohannes (referred to in this count as the "Count III Defendants") owed Ms. Ghee numerous duties, including but not limited to the duty, after transferring possession of Apartment G8 to her, to exercise ordinary care and diligence to maintain the inside of the back wall of the Primary Bedroom in a reasonably safe condition.

152.    The Count III Defendants negligently breached the duty described above.

153.     The conduct of the Count III Defendants described above constitutes willful and wanton conduct. It demonstrates a conscious disregard for the rights of others (including Ms. Ghee).

154.    As a direct and proximate result of the negligence described above, Ms. Ghee has ongoing and continuous permanent damages and injuries and, as such, is entitled to recover and seeks recovery from the Count III Defendants for the following:

   a.   Compensation for severe bodily injuries;

   b.   Past and future medical bills and expenses;

   c.   Pain and suffering;

   d.   Punitive damages; and

   e.   Any and all other relief that this Court deems appropriate.

## Count IV

### Violations of the Virginia Consumer Protection Act

**(Defendants Pinetree, Clearfield, Beachwold Partners, Beachwold Holdings, Beachwold Residential, and South Oxford)**

155.     The Plaintiff incorporates Paragraphs 1 through 135 and Counts I and II as if set forth in full in this Count.

156.     Defendants Pinetree, Clearfield, Beachwold Partners, Beachwold Holdings, Beachwold Residential, and South Oxford (the foregoing Defendants are collectively referred to in this count as "the Count IV  Defendants") committed the frauds alleged in Counts I and II in violation of *Virginia Code* § 59.1-200(14), a subsection of the Virginia Consumer Protection Act, *Virginia Code* § 59.1-196 *et seq.*

157.     Ms. Ghee relied on the Count IV Defendants to provide her and her sons with a safe apartment. She would not have moved into the apartment if she had known that behind the drywall there was water damage and termites that interfered with the operation of the sliding glass door. By committing the frauds alleged in Count I and II, however, the Count IV Defendants ensured that she would not know this information. The Count IV Defendants concealed a material fact from Ms. Ghee – namely, that there were termites and related water infiltration and deteriorated wood inside the back wall of the Primary Bedroom, which, in turn, interfered with the operation of the sliding glass door.

158.     The Count IV Defendants' fraudulent acts were a direct and proximate cause of Ms. Ghee's injuries and her related medical bills.

159.     Because the Count IV Defendants' violations of the Virginia Consumer Protection Act were willful, Plaintiff is entitled to treble compensatory damages from the Count IV Defendants.

160.    In addition, Plaintiff is entitled to her reasonable attorneys' fees and court costs from the Count IV Defendants.

## Count V

## Negligence and Negligence *Per Se*

### (Defendant PestNow)

161.    The Plaintiff incorporates Paragraphs 1 through 135 as if set forth in full in this Count.

162.    Having undertaken to apply termiticides at Pinetree Apartments, including Building G,  PestNow owed Ms. Ghee numerous duties, including but not limited to the duty to apply the termiticides according to their label, the duty otherwise properly to apply the termiticides, and the duty to assign only personnel who were Certified Applicators to apply the termiticides.

163.    As noted above, PestNow was required under Virginia law to apply the termiticides as mandated on their label. *Virginia Code* § 3.2-3939(B).

164.    PestNow negligently breached the foregoing duties.

165.    Furthermore, Ms. Ghee belonged to the class of persons for whose benefit Virginia Code § 3.2-3939(B) was enacted and the harm that occurred (termite damage proximately causing Ms. Ghee' injuries) was the type of harm that this statute was designed to protect against. Therefore, PestNow was negligent *per se.*

166.    The foregoing breaches and statutory violations were a direct and proximate cause of Ms. Ghee's injuries.

167.    The conduct of PestNow described above constitutes willful and wanton conduct and demonstrates a conscious disregard for the rights of others, including Ms. Ghee.

168.    As a direct and proximate result of PestNow's breaches and statutory violations, Ms. Ghee has ongoing and continuous permanent damages and injuries and, as such, is entitled to recover and seeks recovery from PestNow for the following:

    a.   Compensation for severe bodily injuries;

    b.   Past and future medical bills and expenses;

    c.   Pain and suffering;

    d.   Punitive damages; and

    e.   Any and all other relief that this Court deems appropriate.

## Count VI

## Private Nuisance

**(Pinetree, Clearfield, Beachwold Partners, Beachwold Holdings, Beachwold Residential, South Oxford, and Yohannes)**

169.    The Plaintiff incorporates Paragraphs 1 through 135 as if set forth in full in this Count.

170.    At all relevant times, Pinetree Apartments was a private nuisance, created and perpetuated by the Defendants (Pinetree, Clearfield, Beachwold Partners, Beachwold Holdings, Beachwold Residential, South Oxford, and Yohannes ("the Count VI Defendants"). As noted herein, the flashing around the patio sliding glass door in Ms. Ghee's Primary Bedroom was incorrectly and/or improperly installed, causing water to be channeled into the wall around the door, resulting in water and moisture damage, mold, wood rot, and termite infestation. The Count VI Defendants were aware of the foregoing problems throughout the complex and in Ms. Ghee's apartment, but opted not to repair the damage or to see that PestNow inspected for and properly applied termiticide to kill the termites. Instead, the Count VI Defendants purposefully withheld or caused to be withheld the resources, especially money, necessary to maintain Pinetree Apartments and Ms. Ghee's apartment and opted instead to allow its agents and employees to cover up the cause of various deficiencies by painting over evidence of these deficiencies, thereby allowing the termites to spread throughout Pinetree Apartments, including but not limited to Unit G8.

171.    The foregoing endangered the life and health of Ms. Ghee. Not only were the foregoing conditions exceedingly unhealthy, but they also impeded the movement of the sliding glass door, the only direct escape from the Primary Bedroom.

172.    As a direct and proximate result of the foregoing private nuisance, Ms. Ghee was unable to escape from the fire, and she suffered pain, disfigurement, physical and mental injury, and extensive medical and hospital costs.

173.    As a direct and proximate result of the private nuisance described above, Ms. Ghee has ongoing and continuous permanent damages and injuries, and as such, is entitled to recover and seeks recovery from the Count VI Defendants for the following:

    a.    Compensation for severe bodily injuries;

    b.    Past and future medical bills and expenses;

    c.    Pain and suffering;

    d.    Punitive damages; and

    e.    Any and all other relief that this Court deems appropriate.

WHEREFORE, Plaintiff Nyeisha S. Ghee demands judgment against Defendants Pinetree Apartments, LLC, Clearfield/Pinetree Apartments, LLC, Beachwold Partners, LP, Beachwold Holdings, LLC, Beachwold Residential, LLC, South Oxford Management, LLC, Nadra Yohannes, Ricky McConnell, Alvin Peebles, and PestNow of Central Virginia, LLC in the amount of eighty million dollars ($80,000,000) in compensatory damages, plus three hundred and fifty thousand dollars ($350,000) in punitive damages, plus interest from February 20, 2024, costs, treble damages and attorney's fees as to the VCPA claim, and other relief that this Court deems appropriate.

Trial by jury is demanded.

Respectfully submitted,

NYEISHA S. GHEE


By: _____
                              Counsel

Charles H. Cuthbert, Jr. (VSB# 14519)
Richard M. Cuthbert (VSB# 82025)
CUTHBERT LAW OFFICES
A Professional Corporation
220 North Sycamore Street
Petersburg, Virginia 23803-3228
Phone: (804) 733-3100
Fax: (804) 732-4658
ccuthbert@cuthbertlaw.com
rcuthbert@cuthbertlaw.com

Mark J. Krudys (VSB# 30718)
Danny Zemel (VSB# 95073)
THE KRUDYS LAW FIRM, PLC
Truist Place, 919 East Main Street, Suite 2020
Richmond, VA, 23219
Phone: (804) 774-7950
Fax: (804) 381-4458
Email: mkrudys@krudys.com; dzemel@krudys.com

*Counsel for Plaintiff Nyeisha S. Ghee*

**Table of Contents of Exhibits (all are incorporated by reference)**

| Ex. # | Exhibit Description |
|---|---|
| 1 | Photos of Ms. Ghee and her sons. |
| 2 | Affidavit of Debra Smith |
| 3 | Affidavit of Vanessa Schane |
| 4 | Two videos capturing irate tenant complaining of Pinetree employee painting over mold around window |
| 5 | Audio voicemail message from tenant Diane Taylor |
| 6 | Photos sent by Alyssa Allen |
| 7 | Video by tenant Michael Artis of wet carpet and mold by sliding glass door and related emails |
| 8 | Video 1 - water leaking from above window during rain |
| 9 | Video 2 - water leaking from above window during rain |
| 10 | Condensed spreadsheet listing of relevant work orders in those years compiled by Plaintiff |
| 11 | Affidavit of Robert Kunst (excluding supporting documentation) |
| 12 | Affidavit of Dano Holland |
| 13 | Pinetree Apartments, LLC's Supplemental Financial Interest Disclosure Statement, ECF No. 12. filed in *Ghee v. Pinetree Apartments, LLC,* Case No. 3:25-cv-17-RCY, currently pending in the Eastern District of Virginia |
| 14 | 2017 agreement between Pinetree and Ross |